IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:18-CV-00515-CEM-GJK

ANGEL COLON, et al.,

      Plaintiffs,

v.

TWITTER, INC., GOOGLE, LLC and
FACEBOOK, INC.,

      Defendants.

_____/

## DEFENDANTS' JOINT MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Defendants Twitter, Inc., Google LLC, and Facebook, Inc. (collectively, "Defendants") hereby move to dismiss Plaintiffs' First Amended Complaint ("FAC") (ECF No. 50) with prejudice. The basis for this request, as set out more fully in the Memorandum below, is that the FAC fails to state a claim upon which relief may be granted and therefore is subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).

## MEMORANDUM OF LEGAL AUTHORITY

This is the second lawsuit filed by Plaintiffs' counsel seeking to hold Defendants liable for deaths and injuries resulting from the 2016 shooting by Omar Mateen at the Pulse nightclub in Orlando. The first action, asserting virtually identical factual and legal theories, was filed in another district court and was dismissed with prejudice in a comprehensive decision. *Crosby v. Twitter, Inc.*, No. 16-CV-14406, 2018 WL 1570282 (E.D. Mich. Mar. 30, 2018) (Lawson, J.) (Ex. A), *appeal docketed*, No. 18-1426 (6th Cir. Apr. 3, 2018). The

*Crosby* court held that the plaintiffs failed to establish multiple independent elements required for direct or secondary liability under the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq. ("ATA"), and that their state law claims failed for lack of proximate cause.  Central to the court's ruling was the plaintiffs' failure to allege facts establishing that any Defendants aided, abetted, or in any way contributed to Mateen's shooting.  Just days after the *Crosby* decision, Plaintiffs' counsel filed this lawsuit, asserting duplicate claims against the same defendants on behalf of a different set of Pulse victims.

*Crosby* is not an isolated decision, but is just the most recent in an unbroken string of rulings rejecting Plaintiffs' core legal theory that Defendants should be liable for attacks allegedly inspired or committed by ISIS because some content supporting ISIS's harmful messages allegedly appeared on Defendants' platforms, despite their policies prohibiting such content.  Courts around the country have held that this theory fails to state a cognizable claim under the ATA or state law and is precluded by Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230"), which bars the imposition of liability on Internet platforms based on third-party content posted on their sites.

The same result is warranted here.  There is no question that the Pulse nightclub shooting was a devastating tragedy.  But any claim that Facebook, Google, or Twitter are responsible for the attack fails as a matter of law.  Because no amendment can cure these defects, this Court should follow *Crosby* and dismiss Plaintiffs' action with prejudice.

### Factual Allegations And Legal Theories

The facts and legal theories alleged in this action are largely cut and pasted from the complaint in *Crosby*, which was dismissed with prejudice by Judge David M. Lawson of the

Eastern District of Michigan just five days before this action was filed. As in *Crosby*, Plaintiffs allege that they are victims of the June 2016 Pulse nightclub shooting, in which Omar Mateen, a U.S. citizen and Florida resident, killed 49 people and seriously injured 53 others. FAC ¶¶ 1, 388. Although ISIS later claimed responsibility, Plaintiffs do not allege that Mateen had ever "been directly in contact with ISIS" or that the attack was planned, or committed, or authorized by ISIS. *Id.* ¶¶ 445, 456. Instead, they describe Mateen as an independent actor who self-radicalized after viewing "jihadist" content on "the Internet" (*id.* ¶¶ 404–406, 447–450, 456).

Defendants Twitter, Google (through its YouTube service), and Facebook operate global Internet platforms for public self-expression and conversation that are free of charge and broadly available. FAC ¶¶ 1, 252, 275, 294. Every day, users of these platforms send and share hundreds of millions of Tweets, videos, and messages touching on myriad topics. *Id.* ¶ 626. As Plaintiffs admit, Defendants' operative rules prohibit threatening or promoting terrorism (*e.g., id.* ¶¶ 646, 648), and Defendants repeatedly shut down accounts opened by, and take down content posted by, "pro-ISIS" users (*e.g., id.* ¶ 630, 634, 637–638).[1]

The FAC contains hundreds of allegations about the origins, history, and activities of ISIS, but no facts specifically connecting the Pulse attack to any of Defendants' platforms or actions. Plaintiffs' theory seems to be that ISIS and its sympathizers "exploited" Defendants'

---

[1] Defendants' rules prohibit the use of their platforms for terrorist activities or content. *See* The Twitter Rules, https://support.twitter.com/articles/18311 (last visited 6/22/18); YouTube Violent or Graphic Content Policies, https://support.google.com/youtube/answer/2802008?hl=en (last visited 6/22/18); Facebook Community Standards, https://www.facebook.com/communitystandards/violence_criminal_behavior (last visited 6/22/18). These rules are incorporated into the FAC because (1) it repeatedly relies upon and quotes portions of them, confirming that they are "central to the plaintiff[s]' claim" and (2) they are "undisputed"; their "authenticity … is not challenged." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

platforms—which are used by billions of people—to transmit content promoting its activities and agenda.  They claim in broad terms that such content contributed to the rise of ISIS and played an undefined role in Mateen's decision to self-radicalize.  FAC ¶¶ 13, 448.[2]

Plaintiffs describe, for example, ISIS members or sympathizers using Twitter to send messages to recruit terrorists, raise funds, and spread propaganda (FAC ¶¶ 154–159, 165–167, 189–198); they refer to a handful of videos that allegedly appeared on YouTube—one of which they admit YouTube took down—and allege that ISIS used these videos to recruit terrorists and to disseminate propaganda (*id.* ¶¶ 170, 197–198, 271–275, 282, 284–293, 300–321, 323, 456); and they allege that "ISIS supporters" directed users to Facebook pages with ISIS propaganda, while admitting that Facebook was continuously "removing" these pages (*id.* ¶ 234, 233–237, 240).  Many of these postings are alleged to have been made years before the Pulse nightclub attack.

But other than these generalized allegations, Plaintiffs allege no facts suggesting that any of Defendants' platforms contributed to or caused the Pulse attack.  The FAC alleges that Mateen viewed unspecified ISIS videos on YouTube "to be recruited and radicalized" (FAC ¶ 448), but it does not link any such videos or online activity to Mateen's decision to commit the Pulse attack.  It also alleges that Mateen posted on Facebook "just before and during" the attack, and that after the attack, "ISIS supporters" adopted Mateen's photograph

---

[2] Defendants treat Plaintiffs' allegations as true for purposes of this motion, but object to the manner in which the FAC employs improper "group pleading"—frequently asserting broad claims against "Defendants" when the factual allegations allegedly supporting the point relate only to a single defendant.  "Under Rule 8(a), grouping multiple defendants together in a broad allegation is insufficient to provide the defendants with fair notice of the claims against them and the grounds for relief." *Yu v. Design Learned, Inc.*, No. 15-CV-05345, 2016 WL 1621704, at *4 (N.D. Cal. Apr. 22, 2016); *accord Riehle v. Bank of Am., N.A.*, CV-13-00251, 2013 WL 1694442, at *2 (D. Ariz. Apr. 18, 2013).

as their profile pictures (*id.* ¶¶ 437, 454), but does not allege that these postings in any way helped bring about the attack.  And, although the FAC asserts Mateen "utilized ISIS talking points made available from Twitter," the sole source cited for that assertion does not mention Twitter or say that Mateen used Twitter, but instead appears to refer to Tweets containing a transcript of Mateen's call to 911 that *a reporter* posted to Twitter after the attack.[3]

Not only do Plaintiffs fail to allege any link between the ISIS-related content that allegedly appeared on Defendants' sites and the Pulse attack, or that any of the Defendants had any advance knowledge of or involvement in any attack, but they also concede that all of the alleged content was created by, and posted solely at the direction of, third parties— alleged terrorists or their supporters.  *See, e.g.*, FAC ¶¶ 260–268.  Nonetheless, following in the tracks of more than a dozen other lawsuits in which other plaintiffs have sought to hold one or more of these Defendants liable for terrorist attacks, Plaintiffs seek to hold Defendants liable for injuries arising from the Pulse attack under two theories.

*First*, Plaintiffs assert that Defendants "knowingly and recklessly" allowed ISIS to share its content and failed to take "meaningful action to stop" ISIS such as "censor[ing] user content," "shut[ting] down ... ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up."  FAC ¶¶ 12, 260, 272, 627, 630; *see also id.* ¶¶ 572, 645. Although they admit that Defendants regularly took down terrorist content because it violates their terms of use (*see, e.g.*, *id.* ¶¶ 209, 286, 630; *supra* note 1), Plaintiffs assert that Defendants should have done more to enforce those rules.  Instead of reviewing and

---

[3]  FAC ¶ 453 (citing "Rukmini Callimachi, Orlando Sentinel, September 26, 2016"); *see* Jen Kirby, Orlando Gunman Omar Mateen Name-Drops Obscure ISIS Terrorist in 911 Transcripts, New York Magazine (Sept. 26, 2016), http://nymag.com/daily/intelligencer/2016/09/orlando-gunman-omar-mateens-911-transcripts-released.html.

removing content and blocking accounts when notified of a violation, they contend, Defendants should have "monitor[ed]" hundreds of millions of tweets, posts, videos, and other content transmitted daily via their platforms, and preemptively "delete[d]" accounts of ISIS or its sympathizers "as soon as they [were] created." *See id.* ¶¶ 573–575, 627, 632.

*Second*, Plaintiffs allege that Defendants earn revenue from advertisements placed on their platforms, including ads allegedly displayed on the same screen as "ISIS postings" (FAC ¶¶ 552–554), and that Defendants allegedly "create unique content by combining the ISIS postings with advertisements selected by Defendants" (*id.* ¶ 32). Plaintiffs further assert that Google allows revenue earned in connection with some YouTube videos to be shared with the users who upload them—an alleged practice that Plaintiffs speculate resulted in Google "shar[ing] ... revenue with ISIS" in connection with one video—although, again, not one that is alleged to have had any connection to the Pulse attack. *Id.* ¶¶ 596–598.

Based on these allegations, Plaintiffs seek treble damages under the ATA and recovery under state law. Counts I and II seek to hold Defendants secondarily liable under 18 U.S.C. § 2333(d) on the theory that they knowingly provided substantial assistance to, and conspired with, ISIS. FAC ¶¶ 660–673. Counts III, IV, VI, and VII all seek to hold Defendants directly liable under 18 U.S.C. § 2333(a)—based on theories that Defendants provided "material support" to ISIS in violation of 18 U.S.C. § 2339A (Count III, *id.* ¶¶ 674–680) and 18 U.S.C. § 2339B (Count IV, *id.* ¶¶ 681–687); knowingly concealed the provision of material support in violation of 18 U.S.C. § 2339C(c) (Count VI, *id.* ¶¶ 692–696); and violated terrorism sanctions regulations issued pursuant to the International Emergency Economic Powers Act (IEEPA), 31 C.F.R. Part 594, 50 U.S.C.

§ 1705(c) (Count VII, *id.* ¶¶ 697–700).[4]  Count V alleges negligent infliction of emotional

distress (*id.* ¶¶ 688–691), and Count VIII alleges wrongful death (*id.* ¶¶ 701–708).

Plaintiffs' effort to hold Defendants liable for Mateen's attack follows a string of

decisions in similar cases rejecting nearly every aspect of Plaintiffs' legal theories.  In

addition to *Crosby*, discussed above, both the Ninth Circuit in *Fields v. Twitter, Inc.*, 881

F.3d 739 (9th Cir. 2018), and the Northern District of California in *Pennie v. Twitter, Inc.*,

281 F. Supp. 3d 874 (N.D. Cal. 2017), held that similar claims based on other attacks failed

as a matter of law because the plaintiffs could not plausibly allege the proximate cause

required by the ATA—namely, a direct relationship between Defendants' actions and the

underlying terrorist attacks at issue.  The courts in *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d

1150 (N.D. Cal. 2017), *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140 (E.D.N.Y. 2017),

*Pennie*, 281 F. Supp. 3d 874, *Fields v. Twitter, Inc.* (*Fields I*), 200 F. Supp. 3d 964 (N.D.

Cal. 2016), and *Fields v. Twitter, Inc.* (*Fields II*), 217 F. Supp. 3d 1116 (N.D. Cal. 2016), all

held that Section 230 categorically bars precisely the sort of claims asserted here.

## Legal Standard

Under Fed. R. Civ. P. 12(b)(6), the court must dismiss a complaint that fails plausibly

to allege a valid legal claim. *Marshall Cty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992

F.2d 1171, 1174 (11th Cir. 1993); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

"[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading

---

[4]  IEEPA authorizes the President to declare a national emergency "to deal with any unusual and
extraordinary [foreign] threat," including by blocking or seizing property.  50 U.S.C. §§ 1701(a),
1702(a)(1)(B).  *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  Executive
Order 13224 was enacted under IEEPA to allow blocking or seizure of assets held by financial
institutions on behalf of designated terrorists.  50 U.S.C. § 1704; *see also* 31 C.F.R. § 594.204;
Exec. Order No. 13224, 66 Fed. Reg. 49,079, § 7 (Sept. 23, 2001); FAC ¶¶ 129, 204, 697–703.

as facts will not prevent dismissal," *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003), and if allegations are more conclusory than factual, the court need not assume their truth, *Chaparro v. Carnival Corp.*, 693 F. 3d 1333, 1337 (11th Cir. 2012).

## Argument

Plaintiffs' ATA claims fail at the threshold because the Pulse shooting—an act committed on U.S. soil by an American citizen against U.S. victims—was not an act of "international" terrorism.  Beyond that, Plaintiffs' direct liability claims under the ATA and state tort law should be dismissed because Plaintiffs cannot establish the critical element of proximate cause—a "direct relationship" between Defendants' alleged conduct and the attack.  The direct liability ATA claims independently fail because Plaintiffs have not plausibly alleged that Defendants themselves committed an "act of international terrorism" under the ATA's multipart definition.  Plaintiffs' secondary liability claims also fail because there are no plausible allegations that Defendants "knowingly" provided "substantial assistance" to—or conspired with—Mateen (or anyone else) in connection with the Pulse attack.  And all of Plaintiffs' claims are categorically barred by Section 230, which immunizes Defendants from liability for third-party content published on their platforms.

## I.    The Pulse Shooting Was Not An Act Of "International" Terrorism

The ATA allows recovery only for injuries caused by acts of "international" terrorism. 18 U.S.C. §§ 2333(a), 2333(d).  To qualify as international terrorism, an attack must (in addition to meeting the other elements discussed below) occur "primarily outside … the United States" or "transcend[] national boundaries."  § 2331(1).  That is in contrast to "domestic terrorism," defined as activities that "occur primarily within the

territorial jurisdiction of the United States." § 2331(5).  As the *Crosby* court held, the Pulse attack plainly was not "international" in this sense.  2018 WL 1570282, at *6.  It is "undisputed" that the attack "was carried out by a single shooter—Omar Mateen—and that both Mateen and his victims were, at the time of the attack, all located and resident in Orlando, Florida, within the United States."  *Id.*  The "only allegations … even hinting at some trans-national connection" are those that "suggest, at most," that "ISIS posts information on the Internet," which Mateen may have used, in part, to self-radicalize.  *Id.*; *see* FAC ¶¶ 400–410, 429–444.  Such allegations in no way suggest that "any element of Mateen's conduct in carrying out the attack … had any transnational component."  *Crosby*, 2018 WL 1570282, at *6.

Plaintiffs' identical allegations here similarly fail to establish "any 'means by which [the shooting] was accomplished' that involved acts crossing any national border"; to "point to any persons outside the United States" whom Mateen "intended to intimidate or coerce," or to show any international "locale in which [the] perpetrator[] operate[d]."  *Id.*  As a matter of law, Plaintiff cannot assert claims under the ATA—whether based on a direct or secondary liability theory—based on what was plainly a domestic act.

## II.    Plaintiffs' Fail To State A Claim For Direct Liability

### A.     The FAC Does Not Plausibly Allege Proximate Causation

A plaintiff asserting a claim for direct liability under the ATA must plead and prove injury "by reason of"—that is, proximately caused by—"an act of international terrorism" committed by the defendant.  18 U.S.C. § 2333(a); *see also Fields*, 881 F.3d at 744–749.  Proximate causation also is an essential element of Plaintiffs' state law claims.  *McCain v.*

*Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992) (negligent infliction of emotional distress); Fla. Stat. § 768.19 (wrongful death).  *Crosby* correctly dismissed claims based on the same theory asserted here for failure to establish a sufficient connection between Defendants' actions and the Pulse attack.  2018 WL 1570282, at *10–*12.  Plaintiffs' direct liability claims under the ATA and state law (Counts III-VII) fail for the same reason.

As *Crosby* held, the Ninth Circuit's recent decision in *Fields*, 881 F.3d 739, provides the proper test for proximate cause under the ATA.  *Crosby*, 2018 WL 1570282, at *11 (noting the "strikingly similar allegations" of causation in *Fields*).  The *Fields* plaintiffs sought to hold Twitter liable for the deaths of two individuals killed in a terrorist attack by an ISIS operative in Jordan based on allegations that Twitter had provided material support to ISIS in the form of "communication services and equipment."  881 F.3d at 741–743, 749–750.  The Ninth Circuit held that in order "to satisfy the ATA's 'by reason of' requirement, a plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts."  *Id*. at 744.  The court rejected the argument that proximate cause is established where the injury was only "reasonably foreseeable" as a "natural consequence" of the defendant's alleged conduct.  *Id*. at 744, 746–748.  "Congress intentionally used the 'by reason of' language to limit recovery" because "seemingly boundless litigation risks … would be posed by extending the ATA's bounds as far as foreseeability may reach."  *Id*. at 749.  Applying the "direct relationship" standard, the court upheld the dismissal of the ATA claims against Twitter.  *Id.* at 749–750.

Plaintiffs' causation allegations here fail for the same reason.  The FAC tries to connect Defendants' conduct to the Pulse shooting by focusing on Defendants' alleged

provision of support to ISIS (*e.g.,* FAC ¶¶ 12, 205–251, 260, 563, 593–598, 627, 630), but it establishes no link between ISIS and either Mateen or the Pulse attack.  As in *Crosby*, Plaintiffs have not alleged "sufficient facts either to suggest any probability that the Orlando attack was carried out by ISIS, or to demonstrate that the defendants' alleged inaction in permitting ISIS operatives to use their facilities had any proximate effect of facilitating the Orlando shooting."  2018 WL 1570282, at *11.  ISIS's after-the-fact claim of credit (*id.* ¶¶ 25, 445; *see also id.* ¶¶ 454–455) does not establish any causal link between ISIS and the attack.  Indeed, Plaintiffs adopt the FBI's statement that it found no evidence of prior contact with, or support for, Mateen by ISIS or other terrorist groups.  FAC ¶ 404 n.444; *see also Crosby*, 2018 WL 1570282, at *11 ("[N]othing in the amended complaint even alludes to any contacts or communications between anyone—let alone between ISIS and Mateen—that directly concerned the attack beforehand."); *id.* at *9 ("plaintiffs apparently concede that Mateen never had direct contact with any agent or entity directly connected to ISIS"); *see also* FAC ¶ 456.  Because Plaintiffs have not plausibly alleged that ISIS "use[d] its resources to carry out the attack in which [they] were injured," Defendants' alleged "support in augmenting those resources could not have been a substantial factor in causing that attack."  *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 330 (E.D.N.Y. 2015).

Even if Plaintiffs could allege that ISIS had something to do with the Pulse shooting, they cannot establish any cognizable link between *Defendants'* actions and the shooting.  Their attempt to manufacture such a link is exceptionally attenuated.  According to the FAC: (1) Defendants "knowingly permitted ISIS" and/or its sympathizers to create accounts, and then failed to take "meaningful action" to remove all ISIS-related content

from their platforms (FAC ¶¶ 563, 572); (2) ISIS "exploited" Defendants' platforms to promote its activities and agenda (*id.* ¶¶ 12, 13), to recruit terrorists (*id.* ¶¶ 327, 334, 341–345, 375) and to disseminate ISIS propaganda (*id.* ¶¶ 287–289); (3) some ISIS-related content—combined with other content Mateen viewed on the Internet—contributed in some undefined way to Mateen's becoming "self-radicalized"; (4) that self-radicalization, in turn, caused Mateen to commit the Pulse attack on his own, without support from ISIS; and (5) after the attack, ISIS claimed responsibility for Mateen's actions.  As Judge Lawson held in *Crosby*, these allegations establish, at most, that Defendants "merely were aware of a generalized risk that persons associated with or sympathetic to ISIS's cause could, at some point, derive some benefit from their services."  2018 WL 1570282, at *11.  That "tenuous connection[]" does not establish proximate cause, because the allegations "do not establish that there is any tangible connection, about which the defendants knew anything, between ISIS, Mateen, and Mateen's shooting spree."  *Id.* at *9, *11.

Finally*,* Plaintiffs cannot tie Defendants' conduct to their injuries by claiming that Defendants provided support to Mateen himself.  The FAC does not allege that Mateen ever used Twitter, or used Facebook or YouTube in any way causally connected to the Pulse shooting.  Plaintiffs allege that Mateen viewed unspecified "ISIS videos" on YouTube, pledged allegiance to ISIS during the Pulse attack using Facebook, and viewed ISIS talking points that allegedly had been posted on Twitter.  *Id.* ¶¶ 437, 448, 453, 454.  The court in *Crosby* found these exact same allegations insufficient to establish causation[5]: "allegations

---

[5]  The FAC adds a handful of allegations that were not in *Crosby*, but these relate solely to Defendants' alleged connection to ISIS.  *See* FAC ¶¶ 602–610, 640–641, 649–656.  In analyzing

that Mateen viewed some literature and videos produced by ISIS is not sufficient to sustain any inference that … defendants … had any discernible direct involvement in the Orlando attack." 2018 WL 1570282, at *11. As in *Crosby*, the FAC "fails to assert any facts plausibly suggesting that the substance of those videos and other messages, or the posting of them, had anything at all directly to do with the shooting." *Id.* at *6.[6]

In short, nothing in the FAC, even if taken as true, would plausibly establish that Defendants, by making their Internet platforms widely available (whether to Mateen or others), proximately caused the Pulse shooting. Every court to consider the issue on analogous facts has so held.[7] Accordingly, Claims III - VII should be dismissed.

**B.     The FAC Does Not Plausibly Allege That Defendants Committed An "Act Of International Terrorism" (Counts III-IV, VI-VII)**

Plaintiffs' direct liability claims under the ATA fail for the additional reason that the FAC does not and cannot plausibly allege that Defendants committed an "act of international terrorism" within the meaning of 18 U.S.C. § 2333(a). As shown above, the Pulse shooting was not "international" and thus cannot form the basis for any civil claim under the ATA. But even if Plaintiffs could avoid that defect, their direct liability theory still would fail because they cannot establish the other elements of the ATA's multipart definition of

---

proximate causation, the *Crosby* court *assumed* the existence of this connection, 2018 WL 1570282, at *10, so the new allegations do not affect the causation analysis.

[6] Although the proper test for proximate cause under the ATA requires a "direct relationship," *see supra* p. 10, allegations of the sort alleged here would fail even under the incorrect "substantial factor" test, as the district courts held on similar facts in *Fields I*, 200 F. Supp. 3d at 974 and in *Pennie*, 281 F. Supp. 3d at 886–888.

[7] *See Fields*, 881 F.3d at 749–750; *Pennie*, 281 F. Supp. 3d at 887–888; *Crosby*, 2018 WL 1570282, at *10–*12; *see also Ahmad v. Christian Friends of Israeli Cmtys.*, 13-CV-3376, 2014 WL 1796322, at *4 (S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (2d Cir. 2015) (no proximate causation for ATA claims based on provision of financial services to 500,000 people, some of whom committed terrorist attacks).

"international terrorism"—namely, (1) a violation of federal or state criminal law that (2) was violent or dangerous and appeared to be intended to intimidate civilian populations, influence government policy through intimidation or coercion, or affect government conduct by "mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1).

No Criminal Law Violation.  As noted above, Plaintiffs do not allege that Defendants committed the Pulse attack, FAC ¶¶ 429, 432–435, but assert that Defendants, by broadly providing online services allegedly used by some members or supporters of ISIS, violated four criminal statutes—two prohibiting the provision of "material support" (18 U.S.C. §§ 2339A & 2339B), one prohibiting the knowing "concealment" of "material support" (18 U.S.C. § 2339C(c)), and one prohibiting the provision of funds, goods, or services to a specially designated global terrorist (31 C.F.R. Pt. 594, 50 U.S.C. § 1705(c)).  The first two theories were alleged and correctly rejected in *Crosby*.  The other two are new, but do not change the analysis.

Section 2339A requires that the defendant have provided material support "knowing or intending that [it] be used in preparation for, or in carrying out [a violation of specific federal terrorism statutes]."  18 U.S.C. § 2339A(a).  As in *Crosby*, nothing in the FAC suggests that "the defendants knew that any 'services' they provided to ISIS were destined to aid the person responsible for the Orlando attack (Mateen)."  2018 WL 1570282, at *9.  Nor does anything in the FAC support an inference "that the defendants knew of any terrorist activities of ISIS that could be facilitated by the specific use of their services" by ISIS.  *Id.* Indeed, Plaintiffs' admission that Defendants prohibit and remove terrorist content from their platforms (FAC ¶¶ 209, 286, 630) negates any such inference.

Section 2339B requires that Defendants have "knowingly" provided material support to a designated foreign terrorist organization, 18 U.S.C. § 2339B(a)(1)—a theory that, again, was correctly rejected in *Crosby*. Plaintiffs "have not pointed to any individual or cognizable entity that the defendants plausibly knew to be facilitating or carrying out any acts of terrorism, and to whom the defendants nevertheless knowingly continued to provide services or support to in any form." 2018 WL 1570282, at *10. Instead, the FAC generally refers only to reports that ISIS members or supporters used Defendants' services to recruit and train ISIS operatives, and suggesting that Defendants could have done more to block such use. FAC ¶¶ 260–274, 283–293, 302–387, 624–650. As in *Crosby*, allegations that Defendants "provided 'routine' services knowing only generally that some (unidentified) users could be affiliated with terrorism" are insufficient. 2018 WL 1570282, at *9.

Section 2339C(c) applies where a defendant "knowingly" engaged in an affirmative act to "conceal[] or disguise[] the nature, location, source, ownership, or control of any material support or resources," while "knowing that the support or resources were provided" to a designated terrorist organization, "in violation of section 2339B." *See* 18 U.S.C. § 2339C(c)(2)(A). Because the FAC alleges no violation of Section 2339B—by Defendants or anyone else—it necessarily fails to meet the final element of this provision. The FAC also fails to establish actual concealment by Defendants, much less *knowing* concealment. As courts have held in construing Section 2339C(c) and analogous provisions, "concealment" means action by one party that "prevent[s] disclosure or recognition" or "obscure[s] the existence or true state or character of" something by another. *Force v. Facebook, Inc.*, No. 16-CV-5158, 2018 WL 472807, at *4, *12 (E.D.N.Y. Jan. 18, 2018) (citation omitted)

(§ 2339C(c)); *accord Strauss v. Credit Lyonnais, S.A.*, No. CV-06-0702, 2007 WL 2296832, at *5 (E.D.N.Y. Aug. 6, 2007) ("concealment" exception to ATA's limitations provision, 18 U.S.C. § 2335(b), requires "an act by one party which prevents another from discovering something, by affirmatively hiding information or by failing to disclose information which one had some obligation to reveal"). Plaintiffs do not and cannot allege such acts by Defendants. Providing an online service that is open to the public—and allegedly failing to remove publicly available content—conceals nothing. Indeed, the FAC asserts that ISIS members openly maintained and used accounts on Defendants' services, and that those uses were widely recognized by the public. *See, e.g.*, FAC ¶¶ 559-564, 572-583. As in *Force*, such allegations preclude any inference that Defendants "conceal[ed] or disguise[d]" terrorists' use of their services. 2018 WL 472807, at *12.

Finally, a criminal violation of IEEPA is "the same or similar" to claims under Section 2339B, in that "both prohibit support for designated terrorist organizations." *United States v. El-Mezain*, 664 F.3d 467, 548 (5th Cir. 2011). As discussed, Plaintiffs fail plausibly to allege that any Defendant provided support to any designated terrorist organization. A criminal violation of IEEPA also requires an especially high degree of culpability—namely, that defendant acted *willfully*. *See* 50 U.S.C. § 1705(c); *accord United States v. Zhi Yong Guo*, 634 F.3d 1119, 1123 (9th Cir. 2011) (a "willful" violation of 50 U.S.C. § 1705(a) requires that the defendant knew his conduct was unlawful and "intended to violate the law"). Other than reciting the elements of the statute (FAC ¶ 698), the FAC does not include a single allegation that Defendants "intended to violate the law," nor do any of Plaintiffs' factual allegations plausibly support such an inference. *Zhi Yong Guo*, 634 F.3d at 1123.

No Violent or Coercive or Intimidating Acts by Defendants.  Plaintiffs also fail to establish that Defendants engaged in any violent, coercive, or intimidating acts within the meaning of the "international terrorism" definition.  They appear to assume that it is enough to allege that a violation of the "material support" statutes or IEEPA is itself sufficient to establish civil liability under the ATA.  But that is wrong, as the Second Circuit recently explained in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018).  Establishing the elements of the underlying criminal violation is not "alone sufficient to prove … an act of international terrorism under section 2333(a)" because the ATA separately requires that the plaintiff meet the other elements of the "international terrorism" definition in Section 2331(A).  *Id.* at 325-26 (vacating judgment because jury was erroneously charged that a violation of § 2339B was itself sufficient to prove an "act of international terrorism").  "[T]o qualify as international terrorism, a defendant's act must also involve violence or endanger human life," and "[f]urther, [it] 'must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government.'"  *Id.* at 326 (quoting § 2331(1)(A) & (B)).

Plaintiffs make no attempt to satisfy these statutory elements, nor can they. Defendants' services are not violent or dangerous and do not become so just because a terrorist (among billions of users) might use those services improperly.  "[P]roviding routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to … compel a finding that as a matter of law, the services were violent or life-endangering acts."  *Crosby*, 2018 WL 1570282, at *9 (quoting *Linde*, 882 F.3d at 327).  So too, Plaintiffs' allegations "that the Defendants provided routine social media services to ISIS," without more, cannot satisfy this element.  *Id.* at *10.

Likewise, no objective observer could conclude that Defendants "intended to intimidate or coerce a civilian population or to influence or affect a government" merely because they offered general services to the public that may have been used by persons affiliated with ISIS.  *See Stansell v. BGP, Inc.*, No. 09-CV-2501, 2011 WL 1296881, at *9 (M.D. Fla. Mar. 31, 2011) (oil companies' direct payments to terrorist organization were insufficient to prove requisite intent); *Brill v. Chevron Corp.*, No. 15-CV-04916, 2017 WL 76894, at *4 (N.D. Cal. Jan. 9, 2017) (illegal payments made by oil company with a "blind eye" to whether they might be funneled to the Hussein regime did not establish "outward appearance" of intent to support terrorist acts); *see also In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 833 (S.D.N.Y. 2005) (rejecting claim that a bank is "liab[le] for injuries funded by money passing through it on routine banking business.").  Here, Plaintiffs "have not pointed to any individual or cognizable entity that the defendants plausibly knew to be facilitating or carrying out any acts of terrorism, and to whom the defendants nevertheless knowingly continued to provide services or support to in any form."  *Crosby*, 2018 WL 1570282, at *10.  Rather, the FAC confirms that Defendants intended to make their services widely available, enabling billions to exchange information.  *See* FAC ¶¶ 252–259, 275–282, 294–301.

### III.    <u>Plaintiffs' Secondary Liability Claims Fail</u>

Section 2333(d), added by the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222 (Sept. 28, 2016) ("JASTA"), supplements the "direct" cause of action set out in Section 2333(a) with specific, carefully limited provisions for secondary liability.  As in

*Crosby*, the FAC fails to allege multiple critical elements of this claim (even beyond failing to allege that the Pulse shooting was an act of *international* terrorism (*see supra* pp. 8–9)).

### A. The FAC Does Not And Cannot Plausibly Allege That ISIS Committed, Planned, Or Authorized The Pulse Attack

Section 2333(d) allows liability only where the relevant act of international terrorism was "committed, planned, or authorized" by a designated foreign terrorist organization (FTO). As in *Crosby*, that requirement is not met here. Although ISIS is an FTO, the Pulse attack was committed by Mateen (*see* FAC ¶¶ 429–444), not ISIS, and "[t]here are no pleaded facts to show that Mateen carried out [the attack] under ISIS's express direction." *Crosby*, 2018 WL 1570282, at *6. The FAC alleges only that Mateen was "self-radicalized" by ISIS propaganda (*see* FAC ¶ 404), that he pledged allegiance to ISIS during the attack (*id.* ¶¶ 452), and that ISIS later claimed credit for the attack (*id.* ¶¶ 454–457). Conspicuously absent is any suggestion that ISIS "knew anything about the attack before it occurred" or that Mateen ever "had direct contact with any agent or entity directly connected to ISIS." *Crosby*, 2018 WL 1570282, at *9. Indeed, "even ISIS never claimed that it had any contact with Mateen or instructed him" to commit the attack. *Id.* at *6. These allegations are "not sufficient to sustain any inference that … ISIS … had any discernible direct involvement in the Orlando attack." *Id.* at *11. Because there is no plausible allegation that ISIS committed, planned, or authorized the attack, there is no basis for secondary liability under § 2333(d).

### B. The FAC Does Not Plausibly Allege That Defendants Aided And Abetted, Or Conspired With, The "*Person Who Committed*" The Attack

Congress further limited ATA secondary liability by requiring that the defendant have aided and abetted or conspired with "the person who committed" the relevant act of

international terrorism.  18 U.S.C. § 2333(d).  The FAC cannot satisfy this provision, which makes clear that the defendant must have aided and abetted (or conspired with) the actual perpetrator.  The "person who committed" the terrorist act at issue here was Mateen (FAC ¶¶ 388–393, 429–444).  And, as in *Crosby*, "[t]here are no facts that suggest that defendants 'encouraged' Mateen to commit his crimes," or "that the defendants provided him with any assistance."  2018 WL 1570282, at *7.  Despite describing in detail both Mateen and his commission of the attack (FAC ¶¶ 400–410, 429–444), the FAC never suggests any Defendant knowingly provided any assistance to Mateen or conspired with him (*id*. ¶¶ 552–650, 660–668).  The FAC instead tries to allege a connection between Defendants' activities and ISIS.  *Id*. ¶¶ 667–668.  But those allegations do not establish that ISIS was the "person" who "committed" the Pulse shooting and so they cannot help Plaintiffs state a claim under § 2333(d).  *See Crosby*, 2018 WL 1570282, at *7.

> C.   **The FAC Does Not Plausibly Allege That Defendants Provided Substantial Assistance To The Pulse Attack Or Possessed The Requisite *Mens Rea* (Count I)**

An aiding and abetting claim under Section 2333(d) requires plausible allegations that the defendant "provid[ed] substantial assistance" to the primary violator in the commission of the attack, and did so with the requisite *mens rea*—i.e., "knowingly."  18 U.S.C. § 2333(d); *accord Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983) ("defendant must knowingly and substantially assist the principal violation"); *accord Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 570 (6th Cir. 2006).  As the *Crosby* court held on identical facts, Plaintiffs cannot meet these requirements.  2018 WL 1570282, at *6–*7.

*First*, Plaintiffs fail to plead facts establishing that any Defendant provided "substantial assistance" to anyone (let alone Mateen) in connection with the Pulse shooting. In *Halberstam*, the court looked to a series of factors to determine whether assistance to another's unlawful act is "substantial" enough to constitute aiding and abetting: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor,] and his state of mind," as well as "the duration of the assistance provided." 705 F.2d at 478 (quoting Restatement (Second) of Torts § 876 (1979), cmt. d); *id*. at 484.

The FAC asserts no facts that would establish "substantial assistance" under these factors. It does not allege that Defendants knew about the Pulse shooting in advance, much less took steps to assist in it or did so for a meaningful duration. "Certainly," there is no "suggest[ion] that any of the defendants' representatives were present at the scene, that they had any 'relationship' with Mateen, or that they were of a mind to see this horrible event take place." *Crosby*, 2018 WL 1570282, at *7. To the contrary, the FAC acknowledges that each Defendants' practice was to *remove* ISIS content and accounts from their platforms. *E.g.*, FAC ¶¶ 209, 564–565, 571, 630, 634, 646. That the *Halberstam* factors point decisively against liability is no surprise, as the first five "are the same as those used in determining the existence of legal causation," Restatement § 876, cmt. D, so that the same causal deficiencies that bar direct liability under § 2333(a) also preclude Plaintiffs' aiding and abetting claim. *See supra* pp. 9–13; *Fields*, 881 F.3d at 741, 743, 749–750.

*Second*, Plaintiffs have failed to plead facts satisfying the ATA's demanding *mens rea* requirement. Section 2333(d) permits secondary liability only where the defendant

"knowingly" assists the attacker in the primary wrong.   18 U.S.C. § 2333(d)(2); *accord Halberstam*, 705 F.2d at 478 (plaintiff must "prov[e] *knowing action* that substantially aids tortious conduct"); *JAWHBS, LLC v. Arevalo*, No. 15-CV-24176, 2017 WL 1345141, at *9 n.10 (S.D. Fla. Apr. 12, 2017) (aiding and abetting requires "knowledge of the violation and of one's own role in the violation").   Here, it is "undisputed that none of the defendants, or any of their employees or agents, knew anything at all about Mateen or his plans before he carried out the horrific attack in Florida." *Crosby*, 2018 WL 1570282, at *7.  And Plaintiffs nowhere suggest—nor could they—that Defendants "knew that any 'services' they provided to ISIS were destined to aid the person responsible for the Orlando attack (Mateen)." *Id.* at *9.  The FAC's only reference to Defendants' knowledge about the attack is a conclusory statement, devoid of factual support, that "Defendants knowingly provided substantial assistance and encouragement to ISIS … in committing, planning, or authorizing … the acts of international terrorism that injured Plaintiffs." FAC ¶ 667.  This boilerplate allegation is an implausible, threadbare recital that is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.  Plaintiffs' aiding and abetting claim must be dismissed.

### D. The FAC Does Not Plausibly Allege That Defendants Conspired With Anyone Involved In The Pulse Attack (Count II)

Plaintiffs' civil conspiracy claim is equally deficient, because it does not and cannot allege facts establishing the core element of "an agreement to do an unlawful act or a lawful act in an unlawful manner." *Halberstam*, 705 F.2d at 487; *see also Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1080 (11th Cir. 2016).  The FAC contains no facts "that plausibly suggest that any of the [D]efendants … made any agreement with Mateen (or, for that matter, with ISIS, or any identified person or entity associated with its cause of promoting

international terrorism)."  *Crosby*, 2018 WL 1570282, at *8.  It identifies no "discernible common plan or scheme that led to the Orlando attack, or any persons (other than Mateen) who may have agreed to carry out such a plan"—much less any such scheme involving Defendants.  *Id.*  Rather, the FAC alleges only conduct by Mateen "undert[aken] in isolation," including his *self*-radicalization from unidentified Internet postings, his unaccompanied surveillance of the nightclub and purchase of weapons in advance, and his solo commission of the attack.  *Id.*; *see also* FAC ¶¶ 404–410, 429–444.  Because such allegations cannot support an inference that Defendants formed an agreement with anyone regarding the Pulse attack, the conspiracy claim must be dismissed.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (complaint "needs some setting suggesting the agreement necessary to make out a [conspiracy] claim").

## IV.    Section 230 Independently Requires Dismissal Of All Of Plaintiffs' Claims

All of Plaintiffs' claims are independently barred by 47 U.S.C. § 230.  This broad federal immunity protects "interactive computer service" providers from claims deriving from third-party content available on their sites or from their performance or nonperformance of "editorial functions" regarding such content.  As multiple courts have held in dismissing lawsuits nearly identical to this one, Section 230 bars this entire action.

### A.    Section 230 Immunizes Interactive Service Providers Against Claims Based On Third-Party Content

Section 230 "establish[es] broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'"  *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quoting *Zeran Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)); *see also Dowbenko v. Google*

*Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014).   That includes any claim seeking to hold service providers liable based on whether or how they exercise "traditional editorial functions."   *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003); *accord Dowbenko*, 582 F. App'x at 805 (immunity covers allegations that a provider "manipulated its search results to prominently feature the [content] at issue").   The statute "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles."   *Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008); *accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254–255 (4th Cir. 2009) (Section 230 immunity attaches "at the earliest possible stage of the case," as it "is an *immunity from suit* rather than a mere defense to liability" (internal citation omitted)).

Although the *Crosby* court did not reach the issue, numerous other courts have held, in nearly identical cases, that Section 230 bars such claims.   In each of those cases, as here, the plaintiffs alleged that one or all of the Defendants provided "material support" to, or aided and abetted, a terrorist group by permitting the group's members or sympathizers to use its services, and that this "support" caused plaintiffs' injuries.   In each case where the court reached the issue, Section 230 barred the claims because the plaintiffs sought to hold Defendants liable for a quintessential publisher function—making third-party content available on their platforms.[8]   The same result is appropriate in this case.

---

[8] *See Force*, 2018 WL 472807, at *4, 9–10; *Pennie*, 281 F. Supp. 3d 874, 888–890; *Gonzalez*, 282 F. Supp. 3d 1150, 1164–1167; *Cohen*, 252 F. Supp. 3d at 157–158; *Fields I*, 200 F. Supp. 3d at 970–974; *Fields II*, 217 F. Supp. 3d at 1123–1129.

### B.  Plaintiffs' Claims Meet All The Requirements Of Section 230 Immunity

Section 230 mandates dismissal when (1) the defendant is a "provider … of an interactive computer service"; (2) the allegedly harmful content at issue was "provided by another information content provider," and not the defendant; and (3) the claim seeks to hold the defendant liable as a "publisher or speaker" of that content.  47 U.S.C. § 230(c)(1); *see also Almeida*, 456 F.3d at 1321.  Each element is met here.

### 1.  Defendants Provide "Interactive Computer Services"

An "interactive computer service" includes "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server."  47 U.S.C. § 230(f)(2).  It is undisputed that Defendants' online platforms meet this definition because users access Defendants' servers to share information with others.  FAC ¶ 12 (Defendants' platforms are "social networks"); *accord Fields I*, 200 F. Supp. 3d at 969 (Twitter); *Gonzalez*, 282 F. Supp. 3d at 1163–1164 (Google/YouTube); *Sikhs for Justice v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015) (Facebook).

### 2.  Third Parties Provided The Allegedly Harmful Content Underlying Plaintiffs' Claims

The second element—that "another information content provider" have provided the content at issue—also is met here.  An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  Plaintiffs concede that third parties, not Defendants, created *all* of the ISIS-related content that was allegedly posted on Defendants' services.  FAC ¶ 605.

This conclusion is unaffected by Plaintiffs' allegation that Defendants derived

revenue from displaying advertisements.  FAC ¶¶ 552–554, 584–586, 599–602.  Plaintiffs'

concession that Defendants did not create the content of any such ads (*id*. ¶ 605) forecloses

any such argument.  Revenue-generating "processes do not turn a service provider into an

information content provider."  *Roca Labs, Inc. v. Consumer Opinion Corp.*, 140 F. Supp. 3d

1311, 1323 (M.D. Fla. 2015) (defendants were not information content providers simply

because paid testimonials also appeared on their site).  There is no "for-profit exception to

§ 230's broad grant of immunity."  *M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*,

809 F. Supp. 2d 1041, 1050 (E.D. Mo. 2011); *accord Roommates*, 521 F.3d at 1161, 1174–

1175 (that site derived "revenue from advertisers and subscribers" did not affect immunity).

Equally without merit is Plaintiffs' assertion that, by allegedly displaying ads on the

same page as alleged terrorist content, or by "targeting advertisements based upon

knowledge of the viewer and the content" through the use of "proprietary algorithms,"

Defendants created new, composite content as to which Defendants themselves were

"information content providers."  FAC ¶¶ 53–554, 597–602, 603–612.  Every court to

consider this argument has rejected it (*see, e.g.*, *Pennie*, 281 F. Supp. 3d at 890–891;

*Gonzalez*, 282 F. Supp. 3d at 1168), and for good reason.  A service provider becomes an

information content provider only when it is "responsible for what makes the displayed

content allegedly unlawful."  *Roca Labs*, 140 F. Supp. 3d at 1322 (citing *Jones v. Dirty*

*World Entm't Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014)).  And under Section 230,

the use of neutral tools, including a defendant's "modification" or "manipulation" of

"underlying information [] submitted by third parties," does not equate with the "creation" or

"development" of information.  *Roca Labs*, 140 F. Supp. 3d at 1317–1318, 1322; *accord*

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003). Here, Plaintiffs do not (and cannot) allege that the ads on Defendants' sites, "themselves third-party content, … played any role in making [the alleged ISIS-related content] unlawful." *Pennie*, 281 F. Supp. 3d at 890 (quoting *Gonzalez*, 282 F. Supp. 3d at 1168).

### 3.      Plaintiffs' Claims Seek To Treat Defendants As Publishers

Finally, Plaintiffs' claims seek to hold Defendants liable as the "publisher or speaker" of third-party content within the meaning of Section 230.  Plaintiffs allege that Defendants are liable for the Pulse shooting because they "knowingly and recklessly" allowed ISIS or its sympathizers to "spread[] extremist propaganda, raise[] funds, and attract[] new recruits," and then allegedly failed to take "meaningful action to stop" such use by "censor[ing] user content" or "shut[ting] down … ISIS-linked account[s]."  FAC ¶¶ 260, 627, 630.

These alleged acts—allowing content to be published or failing to censor it—are "traditional editorial functions," *Jones*, 755 F.3d at 416, and therefore are "precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230." *Roommates*, 521 F.3d at 1171–1172 (provider not liable for "failing to detect and remove" unlawful content); *accord Klayman v. Zuckerberg*, 753 F.3d 1354, 1355, 1358, 1359 (D.C. Cir. 2014) (rejecting claims against Facebook for allegedly "refus[ing]" to take down inflammatory "Intifada" pages).  In *Whitney Information Network, Inc. v. Verio, Inc.*, No. 04-CV-00462, 2006 WL 66724, at *1–*2 (M.D. Fla. Jan. 11, 2006), Section 230 immunized the defendant web-hosting service—even though (unlike here) it was aware that a third party's content was infringing the plaintiff's rights—because the defendant was not "responsible for the contents" of the third party's page and "did not create any of the alleged statements on

that particular website." *Id*. at *3. Because the entire FAC arises from this same theory, it is barred by Section 230, regardless of what "labe[l]" is placed on particular claims. *See Barnes v. Yahoo, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009).

Nor can Plaintiffs avoid dismissal by recasting their claims as resting on Defendants' "provision of the infrastructure which provides material support to ISIS," rather than on the "content of ISIS's social media postings." FAC ¶ 30. The district courts in *Fields*, *Force*/*Cohen*, *Gonzalez*, and *Pennie* all rejected essentially identical arguments—that plaintiffs' claims turned on the provision of "infrastructure," "accounts," or "equipment" rather than the publication of terrorism-related content. *See Pennie*, 281 F. Supp. 3d at 877; *Gonzalez*, 282 F. Supp. 3d at 1165; *Force*, 2018 WL 472807, at *4; *Cohen*, 252 F. Supp. 3d at 157; *Fields II*, 217 F. Supp. 3d at 1123–1126. And outside the terrorism context, federal appellate courts have rejected similar attempts to evade Section 230 by casting claims as concerning the provision of accounts. *See Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 416, 420, 422 (1st Cir. 2007) (platform's decision not to prevent users from "registering under multiple screen names"—a policy that allegedly "ma[de] it possible for individuals to spread misinformation more credibly"—was "as much an editorial decision with respect to that misinformation as a decision not to delete a particular posting"); *Doe v. MySpace, Inc.*, 528 F.3d 413, 419–420 (5th Cir. 2008) (allegations premised on failure to screen users when opening an account was "merely another way of claiming that MySpace was liable for publishing [users'] communications").

The principal problem, as the district court held in *Fields*, is that a theory of liability for providing infrastructure is just another way of penalizing a protected publishing decision:

either way, "the alleged wrongdoing is the decision to permit third parties to post content." *Fields I*, 200 F. Supp. 3d at 972. A decision about *who* may use an online communications platform is just as much about *what* third-party content may appear on that site as a decision to withdraw or alter specific content directly. *See id.*; *see also Gonzalez*, 282 F. Supp. 3d at 1166 (adopting reasoning of *Fields I*); *Cohen*, 252 F. Supp. 3d at 157 ("Facebook's choices as to who may use its platform are inherently bound up in its decisions as to what may be said on its platform."). The only difference between an infrastructure-provision theory and a failure-to-remove theory is that the former would hold Defendants "liable for granting permission to post … instead of for allowing postings that have already occurred." *Fields I*, 200 F. Supp. 3d at 972. Both target publisher activity and are barred by Section 230. *Id.*

Not only does Plaintiffs' infrastructure theory fail to avoid Section 230 immunity, but it also mischaracterizes the core of their claims. The FAC is "riddled with detailed descriptions" of ISIS-related "messages, images, and videos." *Fields I*, 200 F. Supp. 3d at 971; *see* FAC. ¶¶ 205–251, 339–342, 353–374. Its premise—and sole basis for attempting to connect Defendants to the underlying events—is that ISIS and its supporters allegedly used Defendants' sites to spread hateful messages, and Defendants should have done more to remove such material. *See, e.g.*, FAC ¶ 12; *see also Gonzalez*, 282 F.3d at 1165 ("Plaintiffs' parsing of means and content is utterly inconsistent with their allegations," which claim not "that they have been harmed by the mere provision of the YouTube platform to ISIS," but rather by ISIS's *use* of YouTube to "communicate[] its terror message."); *Cohen*, 252 F. Supp. 3d at 157 ("The essence of the Force Complaint is not that Plaintiffs were harmed by Hamas's ability to obtain Facebook accounts but rather by its use of Facebook."). That is a

content-based theory.  Indeed, Plaintiffs allege *no other basis* than the content of specific

postings for asserting that Defendants' platforms supported ISIS and thereby somehow

caused the Pulse shooting.  This theory necessarily seeks to hold Defendants liable for the

alleged consequences of content published on their services, and is barred by Section 230.

### Conclusion

For the reasons set forth above, Defendants respectfully request that the Court dismiss

the FAC in its entirety and with prejudice.


Dated: June 26, 2018                                    Respectfully submitted,


*/s/ with the consent of Mary Ruth Houston*            */s/ David S. Wood*
MARY RUTH HOUSTON                                       DAVID S. WOOD
Florida Bar No.: 834440                                 Florida Bar No. 289515
Email: mhouston@shutts.com                              Email: david.wood@akerman.com
JACLYN S. CLARK                                         ALLISON P. GALLAGHER
Florida Bar No. 117652                                  Florida Bar No. 808911
E-mail: jclark@shutts.com                               Email: allison.gallagher@akerman.com
SHUTTS & BOWEN LLP                                      AKERMAN LLP
300 South Orange Avenue, Suite 1600                     420 S. Orange Avenue, Suite 1200
Orlando, Florida 32801                                  Post Office Box 231
Telephone: (407) 423-3200                               Orlando, Florida 32802-0231
Facsimile: (407) 425-8316                               Telephone: (407) 423-4000
                                                        Facsimile: (407) 843-6610

PATRICK J. CAROME (*pro hac vice*)                      KRISTIN A. LINSLEY (*pro hac vice*)
Email: patrick.carome@wilmerhale.com                    Email: klinsley@gibsondunn.com
ARI HOLTZBLATT (*pro hac vice*)                         JOSEPH A. GORMAN (*pro hac vice*)
Email: ari.holtzblatt@wilmerhale.com                    Email: jgorman@gibsondunn.com
WILMER CUTLER PICKERING                                 GIBSON, DUNN & CRUTCHER LLP
  HALE AND DORR LLP                                     555 Mission Street, Suite 3000
1875 Pennsylvania Avenue                                San Francisco, CA 94105
Washington, D.C. 20006                                  Telephone: (415) 393-8306
Telephone: (202) 663-6000                               Facsimile: (415) 393-8306
Facsimile: (202) 663-6363

*Attorneys for Defendant*                               *Attorney for Defendant*
**TWITTER, INC.**                                       **FACEBOOK, INC.**

*/s/ with the consent of Nathan M. Berman*
NATHAN M. BERMAN
Florida Bar No.: 0329230
Email: nberman@zuckerman.com
ZUCKERMAN SPAEDER LLP
101 E. Kennedy Blvd., Suite 1200
Tampa, Florida 33602
Telephone: (813) 221-1010
Facsimile: (813) 223-7961


BRIAN M. WILLEN (*pro hac vice*)
Email: bwillen@wsgr.com
WILSON SONSINI
   GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

KELLY MARIE KNOLL (*pro hac vice*)
Email: kknoll@wsgr.com
WILSON SONSINI
   GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

**Attorneys for Defendant**
**GOOGLE LLC**


## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on June 26, 2018, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


*/s/ David S. Wood*
David S. Wood