**Excolo Law, PLLC**
Keith Altman (*pro hac vice*)
Solomon Radner (*pro hac vice to be applied for*)
26700 Lahser Road, Suite 401
Southfield, MI 48033
516-456-5885
Email: kaltman@excololaw.com
sradner@excololaw.com

**1-800-LAWFIRM**
Ari Kresch (*pro hac vice to be applied for*)
26700 Lahser Road, Suite 401
Southfield, MI 48033
516-456-5885
800-LawFirm
Email: akresch@1800lawfirm.com

**MICHAEL T. GIBSON**
2420 Lakemont Ave, #150
Orlando, FL 32814
407-422-4529
Email: michael@gibsonjustice.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

----------------------------------------------------------------

Angel Colon, Norman E. Casiano-Mojica, Franchesska Mercado, Jeanette McCoy, Cesar Rodriguez, Corey Rivera, Rosamaria Febo, David Jourdenais, Emily Ann Portalatin, Rodney Sumter, Adrian Lopez, Javier Nava, Leonel Melendez, Joaquin Rojas, Kaliesha Andino, Carlos Muniz, Carmen N. Capo-Quinones, individually and on behalf of the estate of Luis Omar Ocasio-Capo, Olga Maria Disla, individually and on behalf of the estate of Anthony Luis Laureano Disla, Ismail Medina Morales, individually and on behalf of the estate of Angel Candelario Padro, Ivan Dominguez,

Case No: 6:18-cv-515-CEM-GJK
Hon: Carlos E. Mendoza
Mag: Karla R. Spaulding

**SECOND AMENDED COMPLAINT FOR DAMAGES**

**JURY TRIAL DEMANDED**

individually and on behalf of the estate of Eric Ivan Ortiz Rivera, Jammy Valentin Fernandez, individually and on behalf of the estate of Leroy Valentin Ferndandez, Bernice DeJesus Valazquez, individually and on behalf of the estate of Franky Jimmy DeJesus Valazques, Keinon Carter, Edwin Rivera Alvarez, Geoffrey Rodriguez, Sandy Roberts, Kadim Ramos, Sonia N. Cedeno, Javier Antonetti, Juan Antonetti, Francisco G. Pabon Garcia, Michael Gonzalez, Marissa Delgado, Christopher Hansen, Yvens Carrenard, Mohammed S. Islam, Mercedes A. McQuery, Jonathan L. Garcia, Miguel Vega, Christian Oriz-Cardona, Carlos J. Perez Anglero, Jose Diaz, Juan J. Cufino-Rodriguez, Chriss Michael West, Nathan Orozco, Cassandra Marquez, Demetrius Polanco, Rolando J. Rodriguez, Jose Pacheco, Lizmaryee Finol Viloria, Maritza Gomez, Mercedes Garcia, Roberto Texidor-Carrasquillo, Yorvis Jose Camargo-Romero, Jacobi Ceballo, Bettie Lindsey, Joseph Negron, Cory Richards, Nelson Rodriguez, Mavelyn Merced, Neredia Ribot, and Donald Brown individually and on behalf of the estate of Antonio Brown,

*Plaintiffs*,

-against-

TWITTER, INC., GOOGLE, LLC., and FACEBOOK, INC.

*Defendants*.

-----------------------------------------------------------------

# COMPLAINT

NOW COME Plaintiffs, by and through their attorneys, and allege the following against

Defendants Twitter, Inc., Google, LLC., and Facebook, Inc. ("Defendants"):

## <u>NATURE OF ACTION</u>

1.      This is an action for damages against Twitter, Google, and Facebook pursuant to the Antiterrorism Act, 18 U.S.C. § 2333 ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222 (2016), for aiding, abetting, and knowingly providing support and resources to ISIS, the notorious designated foreign terrorist organization that carried out the June 12, 2016 terrorist attack in Orlando, Florida, that killed 49 innocent civilians and wounded some 53 others, including Plaintiffs.

2.      The ATA's civil remedies have served as an important means for enforcing the federal criminal anti-terrorism provisions since the early 1990s.

3.      Congress enacted the ATA in October 1992 as a legal complement to criminal penalties against terrorists that kill or injure Americans abroad, specifically intending that the civil provisions would not only provide a mechanism for compensating victims of terror but also serve as an important means of depriving terrorists of financial resources to carry out attacks.

4.      Following the bombing of the World Trade Center in New York by *al-Qaeda* in 1993, Congress targeted terrorist resources again by enacting 18 U.S.C. § 2339A in September 1994, making it a crime to provide material support or resources knowing or intending that they will be used in preparing or carrying out terrorist acts.

5.      In April 1996, Congress further expanded the effort to cut off resources to terrorists by enacting 18 U.S.C. § 2339B, making it a crime to knowingly provide material support or resources to a designated foreign terrorist organization.

6.      In the wake of the terror attacks on the United States by *al-Qaeda* of September 11, 2001 killing nearly 3,000 Americans, Congress amended the "material support" statutes, 18 U.S.C. §§ 2339A-B, via the PATRIOT Act in October 2001 and the Intelligence Reform and

Terrorism Prevention Act of 2004, to impose greater criminal penalties for violating these statutes and to expand the definition of "material support or resources" prohibited thereby.

7.    In September 2016, Congress amended the ATA's civil provisions to recognize causes of action for aiding and abetting and conspiring with foreign terrorist organizations who plan, prepare, or carry out acts of international terrorism.  The Justice Against Sponsors of Terrorism Act ("JASTA"), Public Law No: 114-222 (09/28/2016) states in relevant part:

> Purpose.--The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.
> (JASTA 2(b))

8.    The terror attacks in this case were carried out by ISIS, a terrorist organization for years closely affiliated with *al-Qaeda*, but from which *al-Qaeda* separated as being too brutal and extreme.

9.    Known at various times as "The al-Zarqawi Network," "*al-Qaida* in Iraq," "The Islamic State in Iraq," "ISIL," and other official and unofficial names, ISIS has been a designated Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189 ("INI"), since October 2004.

10.    By the time of the terror attacks in this case, ISIS had become one of the largest and most widely-recognized and feared terrorist organizations in the world.

11.    The expansion and success of ISIS is in large part due to its use of the Defendants' social media platforms to promote and carry out its terrorist activities.

12.    For years, Defendants have knowingly and recklessly provided the terrorist group ISIS with accounts to use its social networks as a tool for spreading extremist propaganda,

raising funds, and attracting new recruits. This material support has been instrumental to the rise of ISIS and has enabled it to carry out or cause to be carried out, numerous terrorist attacks, including the June 12, 2016 terrorist attacks in Orlando, Florida, where 49 people were killed and 53 were severely injured, including Plaintiffs.

13.     Without Defendants Twitter, Facebook, and Google (YouTube), the explosive growth of ISIS over the last few years into the most feared terrorist group in the world would not have been possible. According to the Brookings Institution, ISIS "has exploited social media, most notoriously Twitter, to send its propaganda   and messaging out to the world and to draw in people vulnerable to radicalization."[1]  Using Defendants' sites, "ISIS has been able to exert an outsized impact on how the world perceives it, by disseminating images of graphic violence (including the beheading of Western journalists and aid workers) . . . while using social media to attract new recruits and inspire lone actor attacks."   According to former FBI Director James Comey, ISIS has perfected its use of Defendants' sites to inspire small-scale individual attacks, "to crowdsource terrorism" and "to sell murder."

14.     Since first appearing on Twitter in 2010, ISIS accounts on Twitter have grown at an astonishing rate and, until recently, ISIS maintained official accounts on Twitter unfettered. These official accounts included media outlets, regional hubs and well-known ISIS members, some with tens of thousands of followers. For example, Al-Furqan, ISIS's official media wing responsible for producing ISIS's multimedia propaganda, maintained a dedicated Twitter page where it posted messages from ISIS leadership as well as videos and images of beheadings and other brutal forms of executions to 19,000 followers.

---

[1] https://www.brookings.edu/blog/markaz/2015/11/09/how-terrorists-recruit-online-and-how-to-stop-it/

15. Likewise, Al-Hayat Media Center, ISIS's official public relations group, maintained at least a half dozen accounts, emphasizing the recruitment of Westerners. As of June 2014, Al-Hayat had nearly 20,000 followers.



*Figure 1 Tweet by Al-Hayat Media Center Account @alhayaten Promoting an ISIS Recruitment Video*

16. Another Twitter account, @ISIS_Media_Hub, had 8,954 followers as of September 2014.



*Figure 2 ISIS Propaganda Posted on @ISIS_Media_Hub*

17. As of December 2014, ISIS had an estimated 70,000 Twitter accounts, at least 79 of which were "official," and it posted at least 90 tweets every minute.

18. As with Twitter, ISIS has used Google (YouTube) and Facebook in a similar manner.

19. ISIS, in particular, embraced and used Google's YouTube platform and services as a powerful tool for terrorism.

20. Google's YouTube media platform and services provide tremendous utility and value to ISIS as a tool to connect its members and to facilitate the terrorist group's ability to communicate, recruit members, plan and carry out attacks, and strike fear in its enemies.

21. Google's services have played a uniquely essential role in the development of ISIS's image, its success in recruiting members from around the world, and its ability to carry out attacks and intimidate its enemies.

22. For example, ISIS uses Google's YouTube platform and services to distribute high-production-quality videos, images, and recordings that make it appear more sophisticated, established, and invincible.

23. ISIS has used YouTube to cultivate and maintain an image of brutality, to instill greater fear and intimidation, and to appear unstoppable, by disseminating videos and images of numerous beheadings and other brutal killings, including setting captives on fire, blowing them up with explosives, slowly lowering them in a cage underwater to drown, and more.

24. In this case, ISIS used Defendants' platforms to specifically threaten the United States that it would be attacked for participating in a coalition of nations against ISIS, to celebrate smaller attacks leading up to these major attacks, and to transform the operational leader of the Orlando attack into "celebrity" among jihadi terrorists in the year leading up to the Orlando attack via videos featuring ISIS exploits in Spain, Syria, France and Belgium.

25.     ISIS also used Defendants' platforms to celebrate the Orlando attack, to intensify the intimidation of the attacks, and to claim credit for the attacks.

26.     For years, ISIS and its affiliated media production and distribution networks openly maintained and used official Twitter, Facebook, and YouTube accounts with little or no interference. Despite extensive media coverage, complaints, legal warnings, petitions, congressional hearings, and other attention for providing its online social media platforms and communications services to ISIS, prior to the Orlando Attack Defendants continued to provide these resources and services to ISIS and its affiliates, refusing to actively identify ISIS Twitter, Facebook, and YouTube accounts, and only reviewing accounts reported by other social media users.

27.     Defendants knowingly provided material support and resources to ISIS in the form of Twitter, Facebook, and Google's YouTube platforms and other services, as well as by making personnel available to ISIS.

28.     ISIS used and relied on Twitter, Facebook, and YouTube as among its most important tools to facilitate and carry out its terrorist activity, including the terrorist attack in which ISIS murdered and injured Plaintiffs.

29.     By providing its social media platforms and other online services and personnel to ISIS, Defendants: violated the federal prohibitions on providing material support or resources for acts of international terrorism (18 U.S.C. § 2339A) and providing material support or resources to designated foreign terrorist organizations (18 U.S.C. § 2339B); aided and abetted and conspired with a designated FTO in the commission of acts of international terrorism as defined by 18 U.S.C. § 2331; and committed acts of international terrorism as defined by 18 U.S.C. §

2331. Accordingly, Defendants are liable pursuant to 18 U.S.C. § 2333 to the Plaintiffs, who were injured by reason of acts of international terrorism.

30.     Plaintiffs' claims are based not upon the content of ISIS's social media postings, but upon Defendants provision of the infrastructure which provides material support to ISIS.

31.     Furthermore, Defendants profit from ISIS by placing ads on ISIS's postings.  For at least one of the Defendants, Google, revenue earned from advertising is shared with ISIS.

32.     Lastly, Defendants incorporate ISIS's postings to create unique content by combining the ISIS postings with advertisements selected by Defendants based upon ISIS's postings and the viewer looking at the postings and the advertisements.

## THE PARTIES

### A.     The Plaintiffs

33.     Plaintiff Angel C. Colon is a United States citizen and a citizen of Florida. He was domiciled in Florida before sustaining his injuring during the Orlando Attack.

34.     Plaintiff Norman E. Casiano-Mojica is a United States citizen and a citizen of Florida. He was domiciled in Florida before sustaining his injuring during the Orlando Attack.

35.     Plaintiff Rosamaria Febo is a United States citizen, citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

36.     Plaintiff Franchesska Mercado is a United States citizen, a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

37.     Plaintiff Jeanette McCoy is a United States citizen, a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

38.     Plaintiff Cesar Rodriguez is a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack. Cesar Rodriguez is a national of the United States.

39.     Plaintiff Corey Rivera is a United States citizen, citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

40.     Plaintiff David Jourdenais is a United States citizen, citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

41.     Plaintiff Emily Ann Portalatin is a United States citizen, citizen of Florida, and domiciled in Florida, and before sustaining her injuries during the Orlando Attack.

42.     Plaintiff Rodney Sumter is a United States citizen, citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

43.     Plaintiff Adrian Lopez is a United States citizen and a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

44.     Plaintiff Javier Nava is a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack. Javier Nava is a national of the United States.

45.     Plaintiff Leonel Melendez is a United States citizen and a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

46.     Plaintiff Joaquin Rojas is a United States citizen and citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

47.     Plaintiff Kaliesha Andino is a United States citizen and citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

48.     Plaintiff Carlos Muniz is a United States citizen and citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

49.     Decedent Luis Omar Ocasio-Capo was a United States citizen and a citizen of Florida, and domiciled in Florida, before his death during the Orlando Attack.

50.     Plaintiff Carmen N. Capo-Quinones is the administrator of Decedent Luis Omar Ocasio-Capo's estate. Carmen N. Capo-Quinones is domiciled in Florida and is a national of the United States.

51.     Decedent Anthony Luis Laureano Disla was a United States citizen and citizen of Florida, and domiciled in Florida, before his death during the Orlando Attack.

52.     Plaintiff Olga Maria Disla is the administrator of Decedent Anthony Luis Laureano Disla's estate. Olga Maria Disla is domiciled in Puerto Rico and a national of the United States.

53.     Decedent Angel Candelario Padro was a United States citizen and citizen of Florida, and domiciled in Florida, before his death during the Orlando Attack.

54.     Plaintiff Ismail Medina Morales is the administrator of Decedent Angel Candelario Padro's estate. Ismail Medina Morales is domiciled in Puerto Rico and a national of the United States.

55.     Decedent Eric Ivan Ortiz-Rivera was a United States citizen and citizen of Florida, and domiciled in Florida, before his death during the Orlando Attack.

56.     Plaintiff Ivan Dominguez is the administrator of Decedent Eric Ivan Ortiz-Rivera's estate. Ivan Dominguez is domiciled in California and a citizen of the United States.

57.     Decedent Leroy Valentin Fernandez was a United States citizen and citizen of Florida, and domiciled in Florida, before his death during the Orlando Attack.

58.     Plaintiff Jammy Valentin Fernandez is the administrator of Decedent Leroy Valentin Fernandez's estate. Jammy Valentin Fernandez is domiciled in Puerto Rico and a citizen of the United States.

59.     Decedent Franky Jimmy DeJesus Valazques was a United States citizen and citizen of Florida, and domiciled in Florida, before his death during the Orlando Attack.

60.     Bernice DeJesus Valazques is the administrator of Decedent Franky Jimmy DeJesus Valazques' estate. Bernice DeJesus Valazques is domiciled in Puerto Rico and a national of the United States.

61.     Plaintiff Keinon Carter is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

62.     Plaintiff Edwin Rivera Alvarez is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

63.     Plaintiff Geoffrey Rodriguez is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

64.     Plaintiff Sandy Roberts is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

65.     Plaintiff Kadim Ramos is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

66.     Plaintiff Sonia N. Cedeno is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

67.     Plaintiff Javier Antonetti is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

68.     Plaintiff Juan Antonetti is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

69.     Plaintiff Francisco G. Pabon Garcia is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

70.     Plaintiff Michael Gonzalez is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

71.     Plaintiff Marissa Delgado is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

72.     Plaintiff Christopher Hansen is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

73.     Plaintiff Yvens Carrenard is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

74.     Plaintiff Mohammed S. Islam is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

75.     Plaintiff Mercedes A. McQuery is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

76.     Plaintiff Jonathan L. Garcia is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

77.     Plaintiff Miguel Vega is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

78.     Plaintiff Christian Ortiz-Cardona is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

79.     Plaintiff Carlos J. Perez Anglero is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

80.     Plaintiff Jose Diaz is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

81.     Plaintiff Juan J. Cufino-Rodriguez is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

82.     Plaintiff Chriss Michael West is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

83.     Plaintiff Nathan Orozco is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

84.     Plaintiff Cassandra Marquez is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

85.     Plaintiff Demetrius Polanco is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

86.     Plaintiff Rolando J. Rodriguez is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

87.     Plaintiff Jose Pacheco is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

88.     Plaintiff Lizmaryee Finol Viloria is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

89.     Plaintiff Maritza Gomez is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

90.     Plaintiff Mercedes Garcia is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

91.     Plaintiff Roberto Texidor-Carrasquillo is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

92.     Plaintiff Yorvis Jose Camargo-Romero is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

93.     Plaintiff Jacobi Ceballo is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

94.     Plaintiff Bettie Lindsey is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

95.     Plaintiff Joseph Negron is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

96.     Plaintiff Cory Richards is a United States citizen and was a citizen of New York, and domiciled in New York, before sustaining his injuries during the Orlando Attack.

97.     Plaintiff Nelson Rodriguez is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining his injuries during the Orlando Attack.

98.     Plaintiff Mavelyn Merced is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

99.     Plaintiff Nereida Ribot is a United States citizen and was a citizen of Florida, and domiciled in Florida, before sustaining her injuries during the Orlando Attack.

100.    Plaintiff Donald Brown is the administrator of Decedent Antonio Brown's estate. Donald Brown is domiciled in Florida and a national of the United States.

**B.      The Defendants**

101.     Defendant Twitter, Inc. ("Twitter") is a publicly traded U.S. company incorporated in Delaware, with its principal place of business at 1355 Market Street, Suite 900, San Francisco, California 94103.

102.     Defendant Facebook, Inc. ("Facebook") is a publicly traded U.S company incorporated in Delaware, with its principal place of business at 1601 Willow Road, Menlo Park, California, 94025.

103.     Defendant Google, LLC. ("Google") is a limited liability corporation organized under the laws of Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California, 94043. Google owns and operates YouTube. For the purposes of this complaint, Google and YouTube are used interchangeably.

## JURISDICTION AND VENUE

104.     Defendants are subject to the jurisdiction of this Court. Defendants are at home in the United States because they are Delaware corporations with principal places of business in California. Defendants may be found in this District and have an agent in this District.

105.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2334, as this is a civil action brought by nationals of the United States who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs.

106.     Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) as more than one of the Plaintiffs are residents of this district and the attack took place in this district.

## FACTUAL ALLEGATIONS

## I.  BACKGROUND: U.S. ANTITERRORISM ENFORCEMENT LEGISLATION

### A.      Criminal Punishment of International Terrorism

107.    In the 1980's, terrorist groups carried out a number of major terror attacks around the world, killing and injuring many Americans abroad.

108.    Among these terror attacks were:

A.  The April 1983 suicide bombing of the U.S. Embassy in Beirut, Lebanon, killing 63 people, including 17 Americans;

B.  The October 1983 suicide bombing of U.S. Marine barracks in Beirut, Lebanon, killing 241 U.S. Marines and injuring more than 100;

C.  The December 1983 terrorist bombings of the U.S. Embassy and the residential quarters of American company Raytheon in Kuwait;

D.  The September 1984 terrorist bombing of a U.S. Embassy annex northeast of Beirut, Lebanon;

E.  The June 1985 hijacking of TWA flight 847;

F.  The October 1985 hijacking of the Achille Lauro cruise ship and murder of wheelchair-bound American Leon Klinghoffer; and

G.  The December 1985 terrorist bombings of the Rome and Vienna airports.

109.    In response to these attacks, Congress in 1986 amended the U.S. Criminal Code, Title 18, Part I, to add a new chapter titled, "Extraterritorial Jurisdiction Over Terrorist Acts Abroad Against United States Nationals."

110.    This new chapter contained a new section titled, "Terrorist acts abroad against United States nationals," providing criminal penalties for killing, conspiring, or attempting to kill a national of the United States, or engaging in physical violence with the intent to cause serious bodily injury to a national of the United States or that results in serious bodily injury to a national of the United States.

**B.  Private Enforcement: The Antiterrorism Act of 1992 ("ATA")**

111.    As acts of terror unfortunately continued, the United States continued to seek new methods of combating international terrorism.

112.    In October 1992, Congress enacted the Antiterrorism Act of 1992 ("ATA"),[2] which amended the chapter of the Criminal Code dealing with terrorism to include a private right of action for U.S. nationals injured by acts of international terrorism as a legal complement to the criminal penalties against terrorists that kill or injure Americans abroad. *See* 18 U.S.C. § 2333.

113.    ATA claims necessarily involve criminal law, because the ATA's definition of "international terrorism" is limited to activities that, *inter alia*, "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." *See* 18 U.S.C. § 2331.

114.    Thus, in enacting the ATA, Congress sought not only to provide victims of terror with a remedy to seek compensation, but also specifically intended that the private cause of action would serve as an important tool for enforcing the federal criminal antiterrorism statutes by creating a method of depriving terrorists of financial resources to carry out attacks.

---

[2] The ATA was enacted as part of the "Federal Courts Administration Act of 1992." *See* Pub. L. 102-572, title X, § 1003 (October 29, 1992); 106 Stat. 4521.

115.   Indeed, as the ATA was being considered in Congress, the U.S. State Department's Deputy Legal Advisor, Alan J. Kreczko, testified before the Senate Judiciary Committee's Subcommittee on Courts and Administrative Practice that this proposed bill "will add to the arsenal of legal tools that can be used against those who commit acts of terrorism against United States citizens abroad."[3]

116.   The Deputy Legal Advisor also testified:

"[T]his bill will provide general jurisdiction to our federal courts and a cause of action for cases in which an American has been injured by an act of terrorism overseas.

We view this bill as a welcome addition to the growing web of law we are weaving against terrorists. . . . The existence of such a cause of action . . . may deter terrorist groups from maintaining assets in the United States, from benefiting from investments in the U.S. and from soliciting funds within the U.S. In addition, other countries may follow our lead and implement complimentary national measures, thereby increasing obstacles to terrorist operations.

Moreover, the bill may be useful in situations in which the rules of evidence or standards of proof preclude the U.S. government from effectively prosecuting a criminal case in U.S. Courts. Because a different evidentiary standard is involved in a civil suit, the bill may provide another vehicle for ensuring that terrorists do not escape justice."[4]

117.   Likewise, Senator Grassley, one of the sponsors of the bill, explained a purpose of the ATA's civil cause of action as follows:

"The United States must take a strong stand against terrorism. The Department of State testified that this bill would add to the arsenal

---

[3] "Statement of Alan J. Kreczko, Deputy Legal Adviser, On S. 2465: A bill to provide a new civil cause of action in federal court for terrorist acts abroad against United States nationals," *Before the Subcommittee on Courts and Administrative Practice of the Senate Judiciary Committee* (July 25, 1990) (emphasis added), https://www.state.gov/documents/organization/28458.pdf.

[4] *Id.* (emphasis added).

of legal tools that can be used against those who commit acts of terrorism against U.S. citizens abroad.

. . .

Now is the time for action. Now is the time to strengthen our ability to both deter and punish acts of terrorism.

We must make it clear that terrorists' assets are not welcome in our country. And if they are found, terrorists will be held accountable where it hurts them most: at their lifeline, their funds."[5]

118.    In July 1992, a Senate committee report further explained: "By its provisions for compensatory damages, treble damages, and the imposition of liability at any point along the causal chain of terrorism, [the civil provisions of the ATA] would interrupt, or at least imperil, the flow of money [to terrorist organizations.]"[6]

119.    The committee report also stated that 18 U.S.C. § 2333 "extends the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines."[7]

**C.  Enactment of the "Material Support" Criminal Statutes**

120.    On February 26, 1993, a group of *al-Qaeda* terrorists detonated a truck bomb under the North Tower of the World Trade Center in New York City, attempting to cause the collapse of both towers and the death of thousands of Americans.

121.    Although the damage from the 1993 World Trade Center bombing was limited, it nevertheless killed 6 people and injured more than 1,000 others.

---

[5] 136 Cong. Rec. 26716-26717 (Oct. 1, 1990) (emphasis added), https://www.gpo.gov/fdsys/pkg/GPO-CRECB-1990-pt19/pdf/GPO-CRECB-1990-pt19-1.pdf.

[6] S. Rep. No. 102-342, 22 (1992).

[7] *Id.* at 45.

122.    In response to the 1993 World Trade Center bombing among other things, Congress enacted new legislation again aimed at depriving terrorists of the resources needed to carry out attacks.

123.    Thus, in September 1994, Congress enacted the "Violent Crime Control and Law Enforcement Act of 1994,"[8] which included a new criminal statute, 18 U.S.C. § 2339A ("Providing material support to terrorists"), making it a crime to provide material support or resources, or to conceal or disguise the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out illegal terrorist acts.

124.    As originally enacted, 18 U.S.C. § 2339A(a) defined "material support or resources" to mean: "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, but does not include humanitarian assistance to persons not directly involved in such violations."

125.    In April 1996, Congress enacted the "Antiterrorism and Effective Death Penalty Act of 1996" ("AEDPA").[9]

126.    Among other things, the AEDPA amended 18 U.S.C. § 2339A to move the definition of "material support or resources" from subsection (a) to subsection (b) of § 2339A, to delete the phrase "but does not include humanitarian assistance to persons not directly involved in such violations" from that definition, and to insert the phrase "except medicine or religious materials" in its place.

---

[8] Pub. L. 103-322 (Sept. 13, 1994), 108 Stat. 1796-2151.
[9] Pub. L. 104-132 (Apr. 24, 1996), 110 Stat. 1214-1319.

127.     In addition, the AEDPA enacted 18 U.S.C. § 2339B ("Providing material support or resources to designated foreign terrorist organizations"), making it a crime to knowingly provide material support or resources to a designated foreign terrorist organization ("FTO"), without regard to how such support or resources will be used.

128.     Title 18 U.S.C. § 2339B incorporates and adopts by reference the definition for "material support or resources" set out in § 2339A.

129.     Regarding the new § 2333B, the House Judiciary Committee report explained:

> "This section recognizes the fungibility of financial resources and other types of material support. Allowing an individual to supply funds, goods, or services to an organization, or to any of its subgroups that draw significant funding from the main organization's treasury, helps defray the cost to the terrorist organization of running the ostensibly legitimate activities. This in turn frees an equal sum that can then be spent on terrorist activities."[10]

130.     In section 301 of the AEDPA, Congress enacted specific findings and a purpose of the AEDPA's Title III ("International Terrorism Prohibitions"), Subtitle A ("Prohibition on International Terrorism Fundraising"), including the following:

> "(a) FINDINGS.—The Congress finds that—
> International terrorism is a serious and deadly problem that threatens the vital interests of the United States;
> the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress may by law impose penalties relating to the provision of material support to foreign terrorist organizations engaged in terrorist activity;
> …
> (4) international terrorism affects the interstate and foreign commerce of the United States by harming international trade and

---

[10] H. Rept. 104-383, 81 (1995).

market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States;
…
(7) some foreign terrorist organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.
(b) Purpose.—The purpose of this subtitle is to provide the Federal Government <u>the fullest possible basis, consistent with the Constitution</u>, to prevent persons within the United States, or subject to the jurisdiction of the United States, from providing material support or resources to foreign organizations that engage in terrorist activities."[11]

### D.  Executive Order No. 13224: Global Terrorism Sanctions

131.    On the morning of September 11, 2001, several teams of *al-Qaeda* operatives carried out terrorist hijackings of civilian passenger aircraft in the United States with the purpose of crashing them into various targets, causing enormous damage and mass murder (the "9/11 Attacks").

132.    In the course of the 9/11 Attacks, *al-Qaeda* terrorists crashed two aircraft into the World Trade Center towers in New York, causing the fiery collapse of both towers, a third aircraft was crashed into the U.S. military headquarters (the "Pentagon") in Washington, D.C., and a fourth aircraft was crashed into a field in Pennsylvania.

133.    The 9/11 Attacks killed nearly 3,000 people and injured more than 6,000 others, and caused more than $10 billion in damage to property.

134.    On September 23, 2001, in response to the 9/11 Attacks, President George W. Bush issued Executive Order No. 13224 ("EO 13224") pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* ("IEEPA"), and other authorities.

---

[11] Pub. L. 104-132, § 301, 110 Stat. 1247 (emphasis added).

135.    In EO 13224, President Bush found that "grave acts of terrorism and threats of terrorism committed by foreign terrorists . . . and the continuing and immediate threat of further attacks on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and he declared a national emergency to deal with such threats.

136.    EO 13224 legally blocked all property and interests in property of "Specially Designated Global Terrorists" ("SDGTs"), prohibited the provision of funds, goods, or services for the benefit of SDGTs, and authorized the U.S. Treasury to block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, SDGTs, as well as their subsidiaries, front organizations, agents, and associates.

137.    The prohibitions of EO 13224 remain in effect.

138.    Pursuant to EO 13224, subsequent Presidential Executive Orders, the IEEPA, and other statutory authorities, the U.S. Department of the Treasury has enacted federal regulations setting out legal sanctions imposed against SDGTs. *See* 31 C.F.R. Part 594 ("Global Terrorism Sanctions Regulations").

139.    Title 31 C.F.R. § 594.204 prohibits "engag[ing] in any transaction or dealing in property or interests in property of [SDGTs], including but not limited to the following transactions: (a) The making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any [SDGT]; and (b) The receipt of any contribution of provision of funds, goods, or services from any [SDGT]."

140.    Title 31 C.F.R. § 594.205 prohibits "any transaction … that evades, avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in [31

C.F.R. Part 594]," as well as "any conspiracy formed for the purpose of engaging in a transaction prohibited by [31 C.F.R. Part 594]."

141.    Title 31 C.F.R. § 594.309 provides the following expansive definition of property and property interest:

> "The terms *property* and *property interest* include, but are not limited to, money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes, guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens or other rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any other evidences of title, ownership or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder, powers of attorney, goods, wares, merchandise, chattels, stocks on hand, ships, goods on ships, real estate mortgages, deeds of trust, vendors' sales agreements, land contracts, leaseholds, ground rents, real estate and any other interest therein, options, negotiable instruments, trade acceptances, royalties, book accounts, accounts payable, judgments, patents, trademarks or copyrights, insurance policies, safe deposit boxes and their contents, annuities, pooling agreements, <u>services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent</u>." (italics in original; underline added).

142.    In addition, 31 C.F.R. § 594.306 provides: "Except as otherwise provided in this part, the term *interest* when used with respect to property (e.g., "an interest in property") means an interest of any nature whatsoever, direct or indirect." (italics in original).

143.    Willful violations of Executive Order No. 13224 and 31 C.F.R. Part 594 are subject to federal criminal penalties pursuant to the IEEPA. *See* 50 U.S.C. § 1705.

### E.  Post-9/11 Amendments to 18 U.S.C. §§ 2339A-B

144. In the wake of the 9/11 Attacks, Congress passed the "USA PATRIOT Act" in October 2001.[12]

145. Among other things, the USA PATRIOT Act increased the penalties for violation of 18 U.S.C. §§ 2339A-B.

146. The USA PATRIOT Act also added "expert advice or assistance" to the definition of "material support or resources" applicable to §§ 2339A-B.

147. In December 2004, as part of the "Intelligence Reform and Terrorism Prevention Act of 2004,"[13] Congress enacted the "Material Support to Terrorism Prohibition Enhancement Act of 2004,"[14] designed to further extend the reach of U.S. antiterrorism statutes.

148. The 2004 amendments to the U.S. antiterrorism statutes included an expansion and clarification of the definition of "material support or resources" applicable to 18 U.S.C. §§ 2339A-B, by substituting the following language in 18 U.S.C. § 2339A(b):

> "(b) DEFINITIONS.—As used in this section—
>    (1) the term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;
>    (2) the term 'training' means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

---

[12] Pub. L. 107-56 (Oct. 26, 2001), 115 Stat. 272-402.

[13] Pub. L. 108-458 (Dec. 17, 2004), 118 Stat. 3638-3872.

[14] *Id.* at Title VI ("Terrorism Prevention"), Subtitle G ("Providing Material Support to Terrorism"), 118 Stat. 3761-3764.

> (3) the term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge."

149.    In addition, the 2004 amendments to 18 U.S.C. § 2339B, among other things, clarified the "knowledge" required to violate § 2339B, by adding the following sentence to the end of § 2339B(a)(1):

> "...To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)."

150.    On April 20, 2005, the U.S. Department of Justice presented testimony to the U.S. Senate Judiciary Committee's Subcommittee on Terrorism, Technology and Homeland Security concerning the effectiveness of the material support statutes as amended in 2004.[15]

151.    The Department of Justice testimony included the following:

> "The material support statutes, as enhanced and clarified by the USA PATRIOT Act in 2001, and the Intelligence Reform and Terrorism Prevention Act just a few months ago, are critical features of the law enforcement approach to counterterrorism. Rather than criminalizing the violent acts used by terrorists, these statutes recognize that there are important components of the terrorist infrastructure that stop short of actual attacks. We know from experience that terrorists need funding and logistical support to operate. They need to raise funds, open and use bank accounts to transfer money, and to communicate by phone and the Internet. They need travel documents. They need to train and recruit new

---

[15] "Statement of Daniel Meron, Principal Deputy Assistant Attorney General, Civil Division, and Barry Sabin, Chief, Counterterrorism Section, Criminal Division, Before the Subcommittee on Terrorism, Technology and Home Security, Committee on the Judiciary, United States Senate, Concerning the Federal Material Support Statutes," *U.S. Department of Justice* (Apr. 20, 2005).

operatives, and procure equipment for their attacks. People who occupy this position in the terrorism division of responsibility might not themselves be bomb-throwers. The front-line terrorists cannot operate without specialists. The material support statutes are designed to reach the non-violent specialists and the logistical support networks.

...

The operation of the material support statutes is also illustrated by a number of pending prosecutions...

...

[One] § 2339A case involves Babar Ahmad and Azzam Publications, charged in Connecticut in October of 2004. Ahmad, a resident of the United Kingdom, allegedly operated and directed Azzam Publications and its family of Internet websites to recruit and assist the Chechen mujahideen and the Taliban and to raise funds for violent jihad in Afghanistan, Chechnya and other locations. These websites existed and operated throughout the world, including in the United States. Along with other Internet media allegedly created and operated by Ahrnad, these sites gave instructions for travel to Pakistan and Afghanistan to fight with these groups and for surreptitious transfer of funds to the Taliban; they also solicited military items for these groups, including gas masks and night vision goggles. The websites also advertised videotapes – allegedly produced by Ahmad and others – depicting violent jihad in Chechnya, Bosnia, and Afghanistan, and the torture and killing of captured Russian troops.

Ahmad has been charged with crimes that include providing material support to terrorists under 18 U.S.C. 2339A. We describe this indictment to you – in part – to highlight the use of the Internet by those who support their violent goals through communications, recruiting and propaganda. This is criminal conduct, not rights protected by the First Amendment. The government must meet the challenges posed by the technology of the twenty-first century through the use of all our tools, including criminal investigation and prosecution.

...

Significantly, the definition of 'material support or resources' was expanded to encompass <u>all</u> property – whether tangible or intangible – and <u>all</u> services, except for medicine and religious materials. The definition formerly was limited to specified types of material support and 'other physical assets.' Congress's action to clarify this definition assures that no form of terrorist assistance or activity will escape the reach of the statute."[16]

---

[16] *Id.* (emphasis in original).

**F.  The Justice Against Sponsors of Terrorism Act ("JASTA")**

152.    In September 2016, Congress enacted JASTA,[17] which amended the ATA's civil provisions to recognize causes of action for aiding and abetting and conspiring with foreign terrorist organizations who plan, prepare, or carry out acts of international terrorism.

153.    In enacting JASTA, Congress made a number of specific findings, including the following:

> "(a) FINDINGS.—Congress finds the following:
>
> (4) International terrorism is a serious and deadly problem that threatens the vital interests of the United States.
>
> (5) International terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States.
>
> (6) Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States.
>
> (7) It is necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under chapter 113B of title 18, United States Code.
>
> (8) The decision of the United States Court of Appeals for the District of Columbia in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), which has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court of the United States, provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code.
>
> (9) Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States

---

[17] Pub. L. 114-222 (Sept. 28, 2016); 130 Stat. 852.

or the national security, foreign policy, or economy of the United States, <u>necessarily direct their conduct at the United States</u>, and should reasonably anticipate being brought to court in the United States to answer for such activities.

(10) The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries."[18]

154.   Congress also specifically stated that the purpose of JASTA was as follows:

"(b) PURPOSE.—The purpose of this Act is to <u>provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States</u>, to seek relief against <u>persons, entities</u>, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."[19]

## II.   ISIS: A DESIGNATED FOREIGN TERRORIST ORGANIZATION

### A.   Al-Zarqawi and the Internet as a New Weapon in the Global Terrorist's Arsenal

155.   In the late 1980's, Abu Musab al-Zarqawi ("al-Zarqawi") left his native Jordan and traveled briefly to Afghanistan to join radical Islamists fighting against Soviet forces at that time.

156.   When he returned to Jordan, al-Zarqawi adopted a goal of overthrowing the Jordanian monarchy and establishing an Islamic state in Jordan and formed a local radical Islamist group called *Jund al-Sham*.

---

[18] JASTA § 2(a) (emphasis added).

[19] JASTA § 2(b) (emphasis added).

157.    In 1992, when a cache of guns and explosives were discovered in his home, al-Zarqawi was arrested and imprisoned in Jordan.

158.    After his release from prison in 1999, al-Zarqawi returned to Afghanistan, where he met with *al-Qaeda* leader Osama Bin-Laden ("Bin-Laden") and reportedly received $200,000 in "seed money" from Bin-Laden to establish a *jihadi* training camp near the border of Iran.

159.    Al-Zarqawi soon formed a new radical Islamist terrorist group called "*Jam'at al Tawhid wa'al-Jihad*" ("The Monotheism and Jihad Group"), popularly known as "*al-Tawhid*" or "The Zarqawi Network."

160.    The following is a picture of al-Zarqawi and the *al-Tawhid* flag:



*Figure 3 al-Zarqawi*

*Figure 4 al-Tawhid flag*

161.    On September 23, 2003, the U.S. Treasury designated al-Zarqawi as a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order No. 13224.

162.    Al-Zarqawi's *al-Tawhid* was based upon a vision of Sunni Islamist eschatology in which violent attacks on non-believers, heretics, and apostates are not only justified but religiously mandated.

163.    Al-Zarqawi taught that these attacks would lead to the establishment of an Islamic state and accelerate a global apocalyptic battle in which Islam would ultimately triumph and govern the world.

164.    Al-Zarqawi's successors, including the "Islamic State" today, maintain al-Zarqawi's vision of Islam, teaching that true Muslims have an obligation to engage in *jihad* ("holy war"), using intimidation, violence, and killing to establish Sunni Islamic dominance.

165.    At the beginning of 2004, Osama bin Ladin's terrorist organization *al-Qaeda*—having carried out the 9/11 Attacks on the United States—was still the dominant symbol of global terrorism.

166.    In January 2004, al-Zarqawi reportedly sought to be officially recognized by bin-Laden as part of *al-Qaeda's* global *jihadi* movement, but without success.

167.    Over the course of 2004, al-Zarqawi began to use the Internet to promote his particularly savage form of *jihad* and gain widespread notoriety.

168.    While al-Zarqawi was not the first to use the Internet to promote and engage in *jihad*, he is known as a figure who embraced internet technology and communication to promote terrorism, taking terror on the internet to a new level.

169.    Al-Zarqawi combined shocking images of graphic violence and cruelty with the Internet to fashion a new psychological weapon in the service of terrorism.

170.    Terrorism analyst Rita Katz, director of the SITE Intelligence Group, explained: "While Osama bin Laden traditionally relied on Al Jazeera [satellite television] and the media to

disseminate his propaganda, Zarqawi went straight to the internet, which enabled him to produce graphic videos that would never have been shown on the mainstream media."[20]

171.    For example, on May 11, 2004, al-Zarqawi's group posted a link on the *jihadi* internet website forum "*Muntada al-Ansar al-Islami*" ("Forum of the Islamic Supporters") ("*al-Ansar*") to a grainy five-and-a-half-minute video titled, "Sheikh Abu Musab Al-Zarqawi slaughters an American infidel with his own hands" (the "Berg Video").

172.    The Berg Video showed five hooded terrorists dressed in black standing behind abducted Jewish-American businessman Nicholas Berg, who was sitting and dressed in an orange jumpsuit (reminiscent of the orange prison uniforms worn by captured terrorists held by the U.S. at Guantanamo Bay).

173.    The following is a screen clip from the Berg Video:



*Figure 5 Clip From Video of Murder of Nicholas Berg*

174.    The Berg Video next showed one of the hooded men (presumed to be al-Zarqawi) read a statement condemning reported abuse of security prisoners at the Iraqi Abu Ghraib prison, after which he pulled a knife from his shirt, stepped forward, and sawed off Berg's head.

175.    The *al-Ansar* internet forum quickly crashed due to the volume of traffic and attempted downloads of the Berg Video from the site.

---

[20] Scott Shane, "Web Used As Tool of Terror," *Sun Sentinel* (June 9, 2006), http://articles.sun-sentinel.com/2006-06-09/news/0606081728_1_al-zarqawi-al-jazeera-rita-katz.

176.     Nevertheless, before the website crashed, forum members copied the Berg Video from the *al-Ansar* forum to other sites and it was thus downloaded thousands of times and still circulates on the internet today.

177.     Despite the relatively low quality of the Berg Video and the technical difficulties involved in its distribution, The Atlantic magazine later reported: "With the slash of a knife, al-Zarqawi had pulled off the most successful online terrorist PR campaign ever . . . Al-Zarqawi's success was possible because he had anticipated the importance of the Internet—an increasingly important weapon in the global terrorist arsenal."[21]

178.     Following the Berg Video, in June 2004 al-Zarqawi released the first part of a full hour-long propaganda video titled, "The Winds of Victory."

179.     The "Winds of Victory" video opened with the nighttime bombing of the city of Baghdad by U.S. forces while mocking captions flashed the words "Democracy" and "Freedom" in Arabic across the screen.

180.     The nighttime bombing was then contrasted with graphic scenes in full daylight of mutilated Iraqi children ostensibly injured by the attacks, and pictures showing abuse of Iraqi captives held by American soldiers at Abu Ghraib prison.

181.     The "Winds of Victory" also featured foreign *jihadi* members from Kuwait, Saudi Arabia, Libya, and other places, reading their wills in preparation for suicide missions, followed by footage of their bombing attacks, often from multiple angles.

182.     As the release of "The Winds of Victory" preceded the development of YouTube, al-Zarqawi's group did not have the internet capability to mass-distribute a single 90-megabyte

---

[21] Nadya Labi, "Jihad 2.0," *The Atlantic* (July/August 2006), http://www.theatlantic.com/magazine/archive/2006/07/jihad-20/304980/.

video file, so the hour-long video had to be broken into chapters and released on internet *jihadi* forums piecemeal over the course of several weeks.

183.    In the months to come, al-Zarqawi and his followers continued to carry out and record more beheadings of foreign captives and post videos of these murderous atrocities on *jihadi* internet forums.

184.    Among the videos posted on *jihadi* internet forums of al-Zarqawi and his followers beheading foreign captives in 2004 were the following:

      A.  Kim Sun-il, a South Korean interpreter and Christian missionary, beheaded in June 2004;

      B.  Georgi Lazov, a Bulgarian truck driver, beheaded in July 2004;

      C.  Mohammed Mutawalli, an Egyptian citizen, beheaded in August 2004;

      D.  Twelve Nepali citizens murdered on video, one was beheaded and the others were shot, in August 2004;

      E.  Eugene Armstrong, a U.S. construction contractor, beheaded in September 2004;

      F.  Jack Hensley, a U.S. construction contractor, beheaded in September 2004;

      G.  Kenneth Bigly, a British civil engineer, beheaded in October 2004; and

      H.  Shosei Koda, a Japanese tourist, beheaded in October 2004.

185.    On October 15, 2004, the U.S. Government designated al-Zarqawi's terrorist group *al-Tawid* as a "specially designated global terrorist" ("SDGT") pursuant to Executive Order 13224, and as a designated "foreign terrorist organization" ("FTO") pursuant to § 219 of the INA, 8 U.S.C. § 1189.

186.    These SDGT and FTO designations have been updated from time to time to include ISIS's various names and aliases including, among others, "*al-Qaeda* in Iraq," "The

Islamic State of Iraq," "The Islamic State of Iraq and Syria," and "The Islamic State," and remain in effect today.

187.    Al-Zarqawi's innovative—yet relatively low-tech—use of the internet to broadcast his *jihadi* message together with graphic videos of beheadings and suicide bombings catapulted him to a new prominence.

188.    According to BBC Security Correspondent Gordon Corera, "[o]ver the summer of 2004 with Osama bin Laden yet to appear and Zarqawi carrying out increasingly bloody and high profile attacks, some began to question whether Zarqawi was beginning to rival or even succeed bin Laden."[22]

189.    Corera explained that, even though al-Zarqawi's terrorist group was estimated to have only between 50 to 500 members at this time, "they exercise[d] an exaggerated degree of influence due to their coupling of extreme violence with an acute understanding of the power of the media."[23]

190.    Al-Zarqawi becomes a figure *al-Qaeda* could not ignore: according to terrorism analyst Aaron Y. Zelin, founder of Jihadology.net, not only did bin-Laden not want to be "outdone" by al-Zarqawi, "bin-Laden himself wanted to 'own' the Iraq jihad as well as remain relevant while hiding from the United States."[24]

---

[22] Gordon Corera, "Unraveling Zarqawi's al-Qaeda Connection," *Terrorism Monitor*, Vol. 2, Issue 24 (The Jamestown Foundation, Dec. 15, 2004), http://www.jamestown.org/programs/tm/single/?tx_ttnews%5Btt_news%5D=27306&tx_ttnews%5BbackPid%5D=179&no_cache=1#.V49QsjXdlrZ.

[23] *Id.*

[24] Aaron Y. Zelin, "The War between ISIS and al-Qaeda for Supremacy of the Global Jihadist Movement," *The Washington Institute for Near East Policy* (June 2014), http://www.washingtoninstitute.org/uploads/Documents/pubs/ResearchNote_20_Zelin.pdf.

191.    In late 2004, al-Zarqawi finally received the official recognition he sought: on October 17, 2004, al-Zarqawi declared allegiance to bin-Laden in an official online statement, and *al-Qaeda* accepted and publicized al-Zarqawi's oath to bin-Laden in its online magazine *Mu'askar al-Battar* on October 25, 2004.

192.    On December 27, 2004, Al Jazeera television broadcast an audiotape of bin-Laden calling al-Zarqawi "the prince of al Qaeda in Iraq" and asking "all our organization brethren to listen to him and obey him in his good deeds."[25]

193.    Al-Zarqawi changed his group's name to "*Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn*" ("Organization of Jihad's Base in the Land of Two Rivers [Iraq]"), and it became commonly known as "*al-Qaeda* in Iraq" ("AQI").

194.    The following is a picture of the AQI flag:



*Figure 6 AQI Flag*

195.    The official connection with *al-Qaeda* not only provided al-Zarqawi with greater legitimacy among *jihadi* terrorists, it also gave him essential tangible resources, including access to *al-Qaeda's* important private donors and recruitment, logistics, and facilitation networks.

---

[25] "Purported bin Laden tape endorses al-Zarqawi," *CNN* (Dec. 27, 2004), http://edition.cnn.com/2004/WORLD/meast/12/27/binladen.tape/.

196.    By mid-2005, Lt. General David Petraeus assessed that al-Zarqawi had indeed attained "an international name 'of enormous symbolic importance' . . . on a par with bin-Laden, largely because of his group's proficiency at publicizing him on the Internet."[26]

197.    However, al-Zarqawi's notoriety was not without cost: on June 7, 2006, Al-Zarqawi was targeted and killed by a U.S. airstrike.

**B.      AQI Rebrands Itself as the Islamic State of Iraq**

198.    Prior to Al-Zarqawi's death, AQI and allied groups in Iraq joined together to create a "Mujahideen Shura Council."

199.    In October 2006, after al-Zarqawi's death, the Mujahideen Shura Council released a video declaring the establishment of what it called "The Islamic State of Iraq" (*"ad-Dawlah al-'Iraq al-Islamiyah"*) ("ISI").

200.    Although the video of the announcement of ISI was originally posted on *jihadi* website forums, in December 2006 ISI supporters posted the video on YouTube.

201.    The following are screen clips from the video posted on YouTube with English subtitles:



*Figure 7 Scene from ISIS Video*

---

[26] Susan B. Glasser and Steve Coll, "The Web as Weapon," *The Washington Post* (Aug. 9, 2005),  http://www.washingtonpost.com/wp-dyn/content/article/2005/08/08/AR2005080801018.html.



*Figure 8 Scene from ISIS Video*

202.    The United States and its allies, nevertheless, generally continued to call the group "*al-Qaeda* in Iraq" or AQI.

203.    Although ISI's reach was still limited, its goal was to take control of the western and central areas of Iraq and turn it into a Sunni Islamic religious state.

204.    The following is a picture of the ISI flag (which also remains the flag of ISIS):



*Figure 9 ISIS Flag*

## C.    ISI Expands into Syria to Become ISIS

205.    On May 16, 2010, ISI announced Abu Bakr al-Baghdadi ("Abu Bakr") as its new leader.

206.    On April 8, 2013, Abu Bakr announced that ISI had been responsible for secretly establishing and supporting an Islamist militant group known as "*al-Nusra*" in neighboring Syria since August 2011.

207.    In his announcement, Abu Bakr declared that ISI and *al-Nusra* were now officially merged under the name "*ad-Dawlah al-Islamiyah fil-'Iraq wash-Sham*" ("The Islamic State of Iraq and Syria" or "ISIS"[27]).

208.    The Syrian leader of *al-Nusra* rejected Abu Bakr's merger announcement, but many *al-Nusra* members, particularly those who were foreign-born, shifted their allegiance to ISIS.

209.    ISIS took advantage of this shift to establish a substantial official presence in Syria almost overnight, and to take control of additional Syrian areas in the following months, including the northeastern Syrian city of Raqqa, which ISIS declared as its capital.

210.    ISIS imposed its own strict *sharia* (Islamic law) on Raqqa's 220,000 inhabitants and declared members of other Muslim sects in the city to be infidels.

211.    ISIS jailed, maimed, or killed its opponents in the city of Raqqa, or those whom ISIS accused of engaging in activities ISIS considered anti-Islamic.

212.    ISIS subjugated the city of Raqqa through terror and fear, with its members patrolling the city wearing explosive suicide vests, killing, beheading, and crucifying some of its victims and leaving their remains in the public square.

213.    Ultimately, ISIS's extreme brutality and ruthlessness even led *al-Qaeda's* leader Ayman al-Zawahiri (who succeeded Osama bin-Laden) to disavow ISIS.

214.    On February 3, 2014, al-Zawahiri declared that *al-Qaeda* had cut all ties with ISIS.

_____

[27] The Arabic "*al-Sham*" can be understood as either Syria or the Levant, the latter being an historically broader term. The English acronyms "ISIS" and "ISIL" have thus both been used to identify the same terrorist organization depending upon translation. ISIS is also known (primarily by its detractors) as "DAESH," an acronym based upon its Arabic name.

### D. ISIS Proclaims an Islamic Caliphate on YouTube and Expands its Reach of Terror

215. On June 29, 2014, ISIS used YouTube to post a video titled "The End of Sykes-Picot," in which ISIS announced that it would annul the Sykes-Picot Agreement that had served as the basis for the nation-states of the Middle East, and shatter all the borders to form a single Islamic state.

216. The following is a screen clip from the ISIS video "The End of Sykes-Picot":



*Figure 10 Scene from ISIS Video "The End of Sykes-Picot"*

217. Also on June 29, 2014, ISIS used YouTube to post an audio message titled "This is the Promise of Allah," in which ISIS spokesman Abu Muhammad al-Adnani declared the establishment of ISIS as a worldwide "Islamic Caliphate"[28]—an Islamic religious state to which all Muslims must submit and pledge fealty—with Abu Bakr as its "Caliph" (ruler).

218. The following is an ISIS graphic promoting the video "This is the Promise of Allah":



*Figure 11 ISIS Graphic "This is the Promise of Allah"*

---

[28] At this time, ISIS shortened its named to *ad-Dawlah al-Islamiyah* ("The Islamic State" or "IS"). For the sake of simplicity, the more commonly used name ISIS is used in this Complaint.

219.    ISIS has claimed that it is destined to establish its rule worldwide.

220.    Several smaller Islamist terrorist groups have taken control of territory within other countries and areas, including Libya, Yemen, and the Sinai Peninsula, and have claimed such territories to be "provinces" of the ISIS Caliphate.

**E.      Official Terrorist Designations of ISIS**

221.    Not only have ISIS's claims of statehood and sovereignty been rejected by countries worldwide, ISIS has been officially designated as a terrorist organization by the United Nations, the European Union, and numerous governments around the world, including the United States, Britain, Australia, Canada, Turkey, Saudi Arabia, Indonesia, the United Arab Emirates, Malaysia, Egypt, India, Russia, Kyrgyzstan, Syria, Jordan, and Pakistan.

222.    Since October 15, 2004 and still today, ISIS is a designated foreign terrorist organization ("FTO") pursuant to § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

223.    Knowingly providing material support or resources to ISIS, a designated FTO, is a federal criminal offense under 18 U.S.C. § 2339B.

224.    Since October 15, 2004, and still today, ISIS is a specially designated global terrorist ("SDGT") under Executive Order No. 13224.

225.    Federal law prohibits "making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any [SDGT]," including ISIS, and a violation of these prohibitions is a federal criminal offense. 31 C.F.R. § 594.204; 50 U.S.C. § 1705.

**III.    ISIS'S EXTENSIVE USE OF DEFENDANTS' SERVICES**

**A. ISIS is Dependent on Twitter, Facebook, and YouTube to Terrorize: ISIS Uses Defendants to Recruit New Terrorists.**

226.    One of ISIS's primary uses of Defendants' sites is a recruitment platform, particularly to draw fighters from Western countries.

227.    ISIS reaches potential recruits by maintaining accounts on Twitter, Facebook, and YouTube so that individuals across the globe may reach out to them directly. After the first contact, potential recruits and ISIS recruiters often communicate via Defendants' Direct Messaging capabilities. According to former FBI Director James Comey, "[o]ne of the challenges in facing this hydra-headed monster is that if (ISIS) finds someone online, someone who might be willing to travel or kill in place they will begin a Twitter direct messaging contact." Indeed, according to the Brookings Institution, some ISIS members "use Twitter purely for private messaging or covert signaling."

228.    In addition to individual recruitment, ISIS members use Defendants to post instructional guidelines and promotional videos referred to as "mujatweets."

229.    For example, in June 2014, ISIS fighters tweeted guidelines in English targeting Westerners and instructing them on how to travel to the Middle East to join its fight.

230.    That same month, ISIS posted a recruitment video on various social media sites, including Defendants. Although YouTube removed the video from its site, the link remained available for download from Twitter. The video was further promoted through retweets by accounts associated with ISIS.

231.    ISIS also posted its notorious promotional training video, "Flames of War," narrated in English, in September 2014. The video was widely distributed on Twitter through ISIS sympathizers. After joining ISIS, new recruits become propaganda tools themselves, using Defendants to advertise their membership and terrorist activities.

232.    For example, in May 2013, a British citizen who publicly identified himself as an ISIS supporter tweeted about his touchdown in Turkey before crossing the border into Syria to join ISIS in the fight against the Syrian regime.  And in December 2013, the first Saudi Arabian female suicide bomber to join ISIS in Syria tweeted her intent to become a martyr for the ISIS cause, as she embarked for Syria.

233.    As another example, two Tunisian girls, ages 19 and 21, were lured by ISIS's use of Facebook to travel to Syria believing they would be providing humanitarian aid[29].  Instead, they were taken to an ISIS compound where there were forced to serve as prostitutes and were repeatedly raped.  The girls escaped during a bombing of the compound and returned home.

234.    Recently, it was reported that the leader of ISIS in the United Kingdom, Omar Hussain, was using Facebook to recruit terrorists to launch attacks in the U.K.[30]

235.    After kidnapping and murdering Ruqia Hassan Mohammad, a female journalist and activist, ISIS used her account to lure others into supporting ISIS[31].

236.    Through its use of Defendants' sites, ISIS has recruited more than 30,000 foreign recruits since 2013, including some 4,500 Westerners and 250 Americans.

**B. ISIS Uses Defendants to Fund Terrorism**

237.    ISIS also uses Defendants to raise funds for its terrorist activities.

238.    According to David Cohen, the U.S. Treasury Department's Under Secretary for Terrorism and Financial Intelligence, "[y]ou see these appeals on Twitter in particular

---

[29] http://www.teenvogue.com/story/isis-recruits-american-teens

[30] http://www.mirror.co.uk/news/uk-news/british-isis-leader-using-facebook-7545645?

[31]      http://www.independent.co.uk/news/world/middle-east/ruqia-hassan-mohammed-the-activist-and-citizen-journalist-that-isis-murdered-and-then-posed-as-for-a6798111.html

from, you know, well-know[n] terrorist financiers . . . and they're quite explicit that these are to be made to ISIL for their military campaign."

239.    The Financial Action Task Force confirms that "individuals associated with ISIL have called for donations via Twitter and have asked the donors to contact them." These tweets even promote "donation tiers." One ISIS-linked cleric with the Twitter account @Jahd_bmalk, for instance, sought donations for weapons with the slogan "Participate in Jihad with your Money." The account tweeted that "if 50 dinars is donated, equivalent to 50 sniper rounds, one will receive a 'silver status.' Likewise, if 100 dinars is donated, which buys eight mortar rounds, the contributor will earn the title of 'gold status' donor." According to various tweets from the account, over 26,000 Saudi Riyals (almost $7,000) were donated.



*Figure 12 Fundraising Images from ISIS Twitter Accounts*

240.    A similar Twitter campaign in the spring of 2014 asked followers to "support the Mujahideen with financial contributions via the following reliable accounts" and provided contact information for how to make the requested donations.

241.    In its other Twitter fundraising campaigns, ISIS has posted photographs of cash gold bars and luxury cars that it received from donors, as well as weapons purchased with the proceeds.



*Figure 13 Donations to ISIS Publicized on Twitter*

242.    As discussed more fully below, YouTube approves of ISIS videos allowing for ads to be placed with ISIS videos.  YouTube earns revenue from these advertisements and shares a portion of the proceeds with ISIS.

243.    Below is an example of a video posted by ISIS on YouTube with a member speaking in French looking for Muslims to support ISIS's cause online.



*Figure 14 Screenshot from ISIS Video Posted on June 17, 2015*

## C. ISIS Uses Defendants' Sites to Spread Its Terror Propaganda

244.    Defendants' platforms have played an essential role in the rise of ISIS to become the most feared terrorist organization in the world.

245.    ISIS's use of violence and threats of violence is calculated and intended to have an impact far beyond the harm inflicted upon the individual victims of an attack.

246.    ISIS's use of violence and threats of violence is part of its program of terrorism, designed inter alia to gain attention, instill fear and "terror" in others, send a message, and obtain results.

247.    In other words, the physical attack itself and the harm to the individual victims of the attack are not the only goal or "end" of ISIS's terror attacks; rather, ISIS uses terror attacks as a "means" to communicate and accomplish its broader objectives.

248.    ISIS uses terrorism as a psychological weapon.

249.    Thus, the messages communicated before, during, and after an ISIS terror attack, as well as the attack itself, are essential components of generating the physical, emotional, and psychological impact ISIS desire to achieve via the terrorist attack.

250.    The impact and effectiveness of ISIS terrorism, and its motivation to carry out more terrorist attacks, are dependent upon ISIS's ability to communicate its messages and reach its intended audiences, without intermediaries and without interference.

251.    Defendants provide ISIS with a unique and powerful tool of communication that enables ISIS to achieve these goals, and it has become an essential and integral part of ISIS's program of terrorism.

252.    Defendants' platforms enable ISIS to communicate its messages directly to intended audiences without having to go through the filter of commercial media, and it enables ISIS to have greater access to the commercial media to further its goals as well.

253. ISIS not only uses Defendants' platforms for recruiting, planning, inciting, and giving instructions for terror attacks, ISIS also uses Defendants' platforms to issue terroristic threats, attract attention to its terror attacks and atrocities, instill and intensify fear from terror attacks, intimidate and coerce civilian populations, take credit for terror attacks, communicate its desired messages about the terror attacks, reach its desired audiences, demand and attempt to obtain results from the terror attacks, and influence and affect government policies and conduct.

254. ISIS thus uses Defendants' platforms to actually carry out essential communication components of ISIS's terror attacks.

255. Simply put, ISIS uses Facebook, Twitter, and YouTube as tools and weapons of terrorism.

256. Moreover, by allowing ISIS and its affiliates to register for Facebook, Twitter, and YouTube accounts and use Defendants' Services, Defendants lend a sense of authenticity and legitimacy to ISIS as an organization that can operate openly and with impunity, notwithstanding the murderous crimes it commits and its status as an illegal terrorist organization.

257. In defiance of federal criminal laws that prohibit providing services to designated terrorists, Defendants enable ISIS terrorists to come out of hiding and present a public face under their own brand and logo, and under the brands and logos of American companies: Facebook, Twitter, and Google.

258. Defendants' provision of support to ISIS is not simply a matter of whether ISIS abuses its use of Defendants' Services, or whether Defendants abuse their editorial judgment regarding the content of ISIS's postings; under federal law, Defendants have no discretion about whether to provide its Services to ISIS—it is prohibited by law from doing so.

259.    ISIS also uses Defendants' sites to spread propaganda and incite fear by posting  graphic photos and videos of its terrorist feats.

260.    Through Defendants' sites, ISIS disseminates its official media publications as well as posts about real-time atrocities and threats to its perceived enemies.

261.    In October 2013, ISIS posted a video of a prison break at the Abu Ghraib prison in Iraq, and its subsequent execution of Iraqi army officers.

262.    In November 2013, an ISIS-affiliated user reported on Twitter that ISIS had killed a man it mistakenly believed to be Shiite.  Another post by an ISIS account purported to depict Abu Dahr, identified as the "suicide bomber that attacked the Iranian embassy."

263.    In December 2013, an ISIS-affiliated user tweeted pictures of what it described as the killing of an Iraqi cameraman.

264.    In June 2014, ISIS tweeted a picture of an Iraqi police chief, sitting with his severed head perched on his legs. The accompanying tweet read: "This is our ball . . . it has skin on it." ISIS then hashtagged the tweet with the handle #WorldCup so that the image popped up on the feeds of millions following the soccer challenge in Brazil.

265.    On July 25, 2014, ISIS members tweeted photos of the beheading of around  75 Syrian soldiers who had been captured during the Syrian conflict.

266.    In August 2014, an Australian member of ISIS tweeted a photo of his seven-year- old son holding the decapitated head of a Syrian soldier.

267.    Also in August 2014, ISIS member Abu Musaab Hafid al-Baghdadi posted photos on his Twitter account showing an ISIS militant beheading a blindfolded captured Lebanese Army Sergeant Ali al-Sayyed.

268.   That same month, ISIS supporters tweeted over 14,000 tweets threatening Americans under the hashtags #WaronWhites and #AMessagefromISIStoUS, including posting gruesome photos of dead and seriously injured Allied soldiers. Some of the photos depicted U.S. marines hung from bridges in Fallujah, human heads on spikes and the twin towers in flames following the 9/11 attacks. Other messages included direct threats to attack U.S. embassies around the world, and to kill all Americans "wherever you are."

269.   Various ISIS accounts have also tweeted pictures and videos of the beheadings of Americans James Foley, Steven Sotloff, and Peter Kassig.

270.   To keep its membership informed, in April 2014, ISIS created an Arabic-language Twitter App called "The Dawn of Glad Tidings," or "The Dawn," which posts tweets to thousands of users' accounts, the content of which is controlled by ISIS's social media operation. The tweets include hashtags, links, and images related to ISIS's activities. By June 2014, the app reached a high of 40,000 tweets in one day as ISIS captured Mosul, Iraq.

271.   ISIS has also used Twitter to coordinate hashtag campaigns, whereby it enlists thousands of members to repetitively tweet hashtags at certain times of the day so that they trend on Twitter, meaning a wider number of users are exposed to the tweets. One such campaign dubbed a "Twitter storm," took place on June 8, 2014, and led to a surge in followers.

272.   In 2014, propaganda operatives from ISIS posted videos of photojournalist John Cantile and other captors on both Twitter and YouTube.[32] These operatives used various techniques to ensure that ISIS's posting was spread using Defendants' sites. In her New York Times article, (Not "Lone Wolves" After All: How ISIS Guides World's Terror Plots From Afar-

---

[32]   http://www.theguardian.com/world/2014/sep/24/isis-Twitter-youtube-message-social-media-jihadi

2/5/17), Rakmini Callimachi acknowledges that because of Twitter and other social media, "In the most basic enabled attacks Islamic State handlers acted as confidants and coaches, coaxing recruits to embrace violence. … Because the recruits are instructed to use encrypted messaging applications, the guiding role played by the terrorist group often remains obscured. As a result, remotely guided plots in Europe, Asia, and the United States … were initially labeled the work of "lone wolves", … and only later discovered to have direct communications with the group discovered."

## D. Twitter's Services

273.    Twitter is an online news and social networking service that provides sophisticated yet easy-to-use online products and services (collectively, "Services"). Twitter's network allows users to publicly connect with its more than 100 million users through "following" other accounts, as well as through "tweets," or 140 character posts.

274.    Twitter's Services include the use of Twitter's computer infrastructure, network, applications, tools and features, communications services, and more.

275.    Certain uses or features of Twitter's Services are only available to its registered users, who register and establish an account with Twitter by inputting identifying information and clicking on a "sign up" button.

276.    For example, only registered users may establish a Twitter "account," "follow" and "Direct Message" other Twitter accounts, post tweets and videos on Twitter's platform, or post comments on a Twitter user's posted tweets.

277.    Is it not necessary to view the "Terms of Service" or other policies or conditions of Twitter's Services to proceed with registration.

278.    Twitter's platform can be used to post and distribute content or videos publicly, or privacy settings are available to enable users to communicate, share, or distribute videos or messages privately.

279.    Twitter enables registered users to "follow" other Twitter accounts and receive notifications of new content, videos, or messages posted by those accounts.

280.    Twitter generally provides its platform and services to registered users free of charge.

**E.     ISIS and Twitter**

281.    For years, the media has reported on the ISIS's use of Defendants' social media sites and their refusal to take any meaningful action to stop it.

282.    In December 2011, the New York Times reported that the terrorist group al-Shabaab, "best known for chopping off hands and starving their own people, just opened a Twitter account and have been writing up a storm, bragging about recent attacks and taunting their enemies."

283.    That same month, terrorism experts cautioned that "Twitter terrorism" was part of "an emerging trend" and that several branches of *al-Qaeda* were using Twitter to recruit individuals, fundraise and distribute propaganda more efficiently.  New York Times correspondent, Rukmini Callimachi, probably the most significant reporter covering terrorism, acknowledges that social media and specifically Twitter, allows her to "get inside the minds of ISIS". Moreover, Callimachi acknowledges, "Twitter is the main engine" in ISIS communication, messaging and recruiting.  "Al Qaeda (and now ISIS) have created a structure that was meant to regenerate itself and no longer be dependent on just one person (bin Laden). The Ideology is now a living, breathing thing, because of Twitter. You no longer have to go to

some closed dark-web forum to see their stuff." Using Twitter, you don't need to even know the exact address to gain access to messages.  "With Twitter, you can guess; you look for certain words and you end up finding these accounts. And then it's kind of organic; You go to one account, then you go to their followers and you follow all those people, and suddenly you're in the know." (Rukmini Callimachi, Wired.com, 8/3/16.)

284.    On November 20, 2015, Business Insider reported that ISIS members have been providing a 34-page guide to operational security and communications available through multiple social media platforms which delivers instructions to users about communications methods including specifics in the use of Twitter, for purposes of recruiting and radicalizing in the United States.

285.    On October 14, 2013, the BBC issued a report on "The Sympatic," "one of the most important spokesmen of the Islamic State of Iraq and the Levant on the social contact website Twitter" who famously tweeted: "I swear by God that with us there are mujahideen who are not more than 15 years old!! Where are the men of the [Arabian] Peninsula? By God, shame on  you."

286.    On October 31, 2013, Agence France-Presse reported on an ISIS video depicting a prison break at Abu Ghraib and the execution of Iraqi army officers that was "posted  on  jihadi forums and Twitter."

287.    On June 19, 2014, CNN reported on ISIS's use of Twitter to raise money for weapons, food, and operations. The next day, Seth Jones, Associate Director of International Security and Defense Policy Center, stated in an interview on CNN that Twitter was widely used by terrorist groups like ISIS to collect information, fundraise and recruit. "Social media is where it's at for these groups," he added.

288.    On August 21, 2014, after ISIS tweeted out  the  graphic  video  showing  the

beheading of American James Foley, the Wall Street Journal warned that Twitter could no longer afford to be the "Wild West" of social media.

289.    In September 2014, Time Magazine quoted terrorism expert Rita Katz, who observed that "[f]or several years, ISIS followers have been hijacking Twitter to freely promote their jihad with very little to no interference at all. . . . Twitter's lack of action has resulted in a strong, and massive pro-ISIS presence on their social media platform, consisting of campaigns to mobilize, recruit and terrorize."

290.    Throughout this period, both the U.S. government and the public at large have urged Defendants to stop providing its services to terrorists.

291.    In December 2011, an Israeli law group threatened to file suit against Twitter for allowing terrorist groups like Hezbollah to use its social network in violation of U.S. anti-terrorism laws.

292.    In December 2012, several members of Congress wrote to FBI Director Robert Mueller asking the Bureau to demand that the Twitter block the accounts of various  terrorist groups.

293.    In a committee hearing held on August 2, 2012, Rep. Ted Poe, chair of the House Foreign Affairs Subcommittee on Terrorism, lamented that "when it comes to a terrorist using Twitter, Twitter has not shut down or suspended a single account." "Terrorists are using Twitter," Rep. Poe added, and "[i]t seems like it's a violation of the law." In 2015, Rep. Poe again reported that Twitter had consistently failed to respond sufficiently to pleas to shut down clear incitements to violence by terrorists.

294.    Recently, former Secretary of State Hillary Clinton has urged Defendants to become more aggressive in preventing ISIS from using its network. "Resolve means depriving jihadists of virtual territory, just as we work to deprive them of actual territory," she told one

audience. Later, Secretary Clinton stated that Twitter and other companies "cannot permit the recruitment and the actual direction of attacks or the celebration of violence by this sophisticated Internet user. They're going to have to help us take down these announcements and these appeals."

295.    On January 7, 2016, White House officials announced that they would hold high-level discussions with Defendants to encourage them "to do more to block terrorists" from using their services. "The primary purpose is for government officials to press the biggest Internet firms to take a more proactive approach to countering terrorist messages and recruitment online. . . . That issue has long vexed U.S. counterterrorism officials, as terror groups use Twitter . . . to spread terrorist propaganda, cultivate followers and steer them toward committing violence. But the companies have resisted some requests by law-enforcement leaders to take action . . ."

## F.    Facebook's Services

296.    Facebook is an online social media and social networking service that provides sophisticated yet easy-to-use online products and services (collectively, "Services"). Facebook allows users to connect with "friends," a connection that allows for the exchange of messages, posting of status updates and digital photos, sharing of digital videos and links to online content, as well as the use of various software applications.

297.    Facebook's Services include the use of Facebook's computer infrastructure, network, applications, tools and features, communications services, and more.

298.    Certain uses or features of Facebook's Services are only available to its registered users, who register and establish an account with Facebook by inputting identifying information and clicking on a "sign up" button.

299.    For example, only registered users may establish a Facebook "account," add or communicate with "friends" on Facebook's platform, privately message friends or businesses through Facebook's "Messenger" application, or post status and video updates or comments on the page of a Facebook account or video.

300.    Is it not necessary to view the "Terms of Service" or other policies or conditions of Facebook's Services to proceed with registration.

301.    Facebook's platform can be used to post and distribute content and videos publicly, or privacy settings are available to enable users to communicate, share, or distribute videos or messages privately.

302.    Facebook enables registered users to "friend request," "like," or "follow," other Facebook accounts in order to receive notifications of new content, videos or messages posted by those accounts.

303.    Facebook generally provides its platform and services to registered users free of charge.

**G.     ISIS and Facebook**

304.    On January 10, 2012, CBC News Released an article stating that Facebook is being used by terrorist organizations for recruitment and to gather military and political intelligence. "Many users don't even bother finding out who they are confirming as 'friend' and to whom they are providing access to a large amount of information on their personal life. The terrorists themselves, in parallel, are able to create false profiles that enable them to get into highly visible groups," he said.[33]

---

[33]     http://www.cbc.ca/news/technology/terrorist-groups-recruiting-through-social-media-1.1131053

305.    On January 10, 2014, the Washington Post released an article titled *Why aren't YouTube, Facebook, and Twitter doing more to stop terrorists from inciting violence?*[34]

306.    In June 2014, the Washington Times reported that Facebook is refusing to take down a known ISIS terror group fan page that "has nearly 6,000 members and adoringly quotes Abu Musab al-Zarqawi, founder of al-Qaeda in Iraq who was killed by U.S. forces in 2006."[35]

307.    On August 21, 2014, the anti-defamation league explained that ISIS supporters on Twitter have "not only promoted ISIS propaganda (primarily in English) but has also directed supporters to his English-language Facebook pages (continuously replacing pages as they are removed by Facebook for content violation) that do the same.[36]"

308.    On October 28, 2015, at the Radicalization: Social Media And The Rise Of Terrorism hearing, it was reported that Zale Thompson, who attacked four New York City Police Officers with an axe, posted on Facebook "Which is better, to sit around and do nothing or to wage jihad.[37]"

309.    At this same hearing, it was also reported that in September 2014 "Alton Nolen, a convert to Islam and ex-convict who had just been fired from his job at a food processing plant, entered his former workplace and beheaded an employee with a knife. This attack combines elements of workplace violence and terrorism. Nolen had been a voracious consumer

---

[34]      https://www.washingtonpost.com/posteverything/wp/2014/07/10/farrow-why-arent-youtube-facebook-and-Twitter-doing-more-to-stop-terrorists-from-inciting-violence/

[35]   http://www.washingtontimes.com/news/2014/jun/16/husain-facebook-refuses-take-down-isis-terror-grou/

[36]   http://www.adl.org/combating-hate/international-extremism-terrorism/c/isis-islamic-state-social-media.html?referrer=https://www.google.com/#.Vzs0xfkrIdU

[37]      https://oversight.house.gov/wp-content/uploads/2015/10/10-28-2015-Natl-Security-Subcommittee-Hearing-on-Radicalization-Purdy-TRC-Testimony.pdf

of IS propaganda, a fact reflected on his Facebook page."[38]

310.    On November 11, 2015, it was reported that one of the attackers from a terrorist bus attack two weeks prior "was a regular on Facebook, where he had already posted a "will for any martyr." Very likely, they made use of one of the thousands of posts, manuals and instructional videos circulating in Palestinian society these last few weeks, like the image, shared by thousands on Facebook, showing an anatomical chart of the human body with advice on where to stab for maximal damage."[39]

311.    On December 4, 2015, The Counter Extremism Project released a statement that "Today's news that one of the shooters in the San Bernardino attack that killed 14 innocent people pledged allegiance to ISIS in a Facebook posting demonstrates once again that the threat of ISIS and violent Islamist extremist ideology knows no borders."[40]

312.    On April 8, 2016, the Mirror reported that "Jihadi fighters in the Middle East are using Facebook to buy and sell heavy duty weaponry" and that "Fighters in ISIS-linked regions in Libya are creating secret arms bazaars and hosting them on the massive social network. Because of Facebook's ability to create groups and to send secure payments through its Messenger application, it works as the perfect platform for illegal deals."[41]

313.    On March 30, 2018 a memorandum written by a senior Facebook executive was

---

[38]    https://oversight.house.gov/wp-content/uploads/2015/10/10-28-2015-Natl-Security-Subcommittee-Hearing-on-Radicalization-Gartenstein-Ross-FDD-Testimony.pdf

[39]  http://www.nytimes.com/2015/11/03/opinion/the-facebook-intifada.html?_r=1

[40]    http://www.counterextremism.com/press/counter-extremism-project-releases-statement-news-san-bernardino-shooter-pledged-allegiance?utm_content=buffer38967&utm_medium=social&utm_source=facebook.com&utm_campaign=buffer#sthash.iJjhU3bF.dpuf

[41]  http://www.mirror.co.uk/tech/isis-terrorists-use-facebook-buy-7713893

widely publicized through the news[42].  Part of the memorandum states:

> We connect people.
>
> That can be good if they make it positive. Maybe someone finds love. Maybe it even saves the life of someone on the brink of suicide. So we connect more people.
>
> That can be bad if they make it negative. Maybe it costs a life by exposing someone to bullies. Maybe someone dies in a terrorist attack coordinated on our tools.
>
> And still we connect people.
>
> The ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is *de facto* good.

314.   This memorandum was dated June 18. 2016 which was six days after the Pulse nightclub attack, four days after a lawsuit against Facebook was filed concerning the November 13, 2015 terror attack in Paris, and a few days after it became widely reported that Omar Mateen had used Facebook before and during the Pulse attack.  Clearly, the timing of this memo indicates that Facebook was well aware that its site was being used by ISIS for terrorist activities and Facebook was putting growth over people being harmed in terrorist attacks.

315.   In April, 2018, Facebook CEO Mark Zuckerberg testified before Congress. During the testimony, Facebook admitted that it was responsible for content:

> SULLIVAN: But you said you're responsible for your content, which makes ...
>
> ZUCKERBERG: Exactly.
>
> SULLIVAN: ... you kind of a publisher, right?

---

[42]       https://www.theverge.com/2018/3/30/17179100/facebook-memo-leaks-boz-andrew-bosworth

ZUCKERBERG: Well, I agree that we're responsible for the content, but we don't produce the content. I — I think that when people ask us if we're a media company or a publisher, my understanding of what — the heart of what they're really getting at, is do we feel responsibility for the content on our platform.

The answer to that, I think, is clearly "yes." And — but I don't think that that's incompatible with fundamentally, at our core, being a technology company where the main thing that we do is have engineers and build products.

## H.      Google's Services

316.    Google provides sophisticated yet easy-to-use online products and services (collectively, "Services"), including the online video platform known as "YouTube."

317.    Google's Services include the use of Google's computer infrastructure, network, applications, tools and features, communications services, and more.

318.    Certain uses or features of Google's Services are only available to its registered users, who register and establish an account with Google by inputting identifying information and clicking on a "sign up" button.

319.    For example, only registered users may establish a YouTube "channel," post videos on Google's YouTube platform, or post comments on the page of a YouTube channel or video.

320.    Is it not necessary to view the "Terms of Service" or other policies or conditions of Google's Services to proceed with registration.

321.    Google's YouTube platform can be used to post and distribute videos publicly, or privacy settings are available to enable users to communicate, share, or distribute videos or messages privately.

322.    Google enables registered users to "subscribe" to YouTube "channels" in order to receive notifications of new videos or messages posted on those channels.

323.    Google generally provides its YouTube platform and services to registered users free of charge.

## I.    ISIS and YouTube

324.    ISIS has used YouTube as an extremely effective means of announcing and releasing its propaganda materials, which include music, speeches, graphic acts of violence, full-length videos and more, presenting an image of technical sophistication and advanced media capabilities.

325.    In November 2006, following the development of YouTube, ISIS (then known as AQI/ISI) announced the establishment of its "*al-Furqan* Institute for Media Production" ("*al-Furqan* Media"), which was to produce more professional and stylized video and other materials to be disseminated through online platforms.

326.    *Al-Furqan* Media's logo appears as follows:



*Figure 15 Al-Furqam Logo*

327.    In a press release announcing *Al-Furqan* Media, ISIS stated: "This Institute is a milestone on the path of Jihad; a distinguished media that takes the great care in the management

of the conflict with the Crusaders [Western nations] and their tails [sic] and to expose the lies in the Crusaders' media."[43]

328.   Following a raid on one of ISIS's *al-Furqan* Media offices in Samarra, Iraq in June 2007, Brigadier General Kevin Bergner, a spokesman for the Multinational Forces Iraq, described the extensive scope of the office's operations as follows:

> "[The Samarra office] produced CDs, DVDs, posters, pamphlets, and web-related propaganda products and contained documents clearly identifying al Qaeda in Iraq[/ISI]'s intent to use media as a weapon.
> . . .
> The building contained 65 hard drives, 18 thumb drives, over 500 CDs and 12 stand-alone computers . . . In all, this media center had the capacity of reproducing 156 CDs in an eight-hour period and had a fully functioning film studio.
> . . .
> [U.S. forces also found] a sampling of other propaganda documents: a letter that gives instructions on how to use the media to get out the al Qaeda [in Iraq/ISI] message most effectively; an al Qaeda [in Iraq/ISI] activity report highlighting car bomb, suicide, missile, mortar, sniping and IED [improvised explosive device] attacks; a propaganda poster that encourages filming and distributing videos, showing al Qaeda [in Iraq/ISI] attacks on coalition forces; and a pamphlet and a CD cover of their sniper school."[44]

329.   ISIS's *al-Furqan* Media has used YouTube extensively to distribute its video propaganda online.

330.   In 2013, ISIS began a dramatic new expansion of its media production capabilities and exploitation of YouTube and other social media.

---

[43] *See* Bill Roggio, "US targets al Qaeda's al Furqan media wing in Iraq," *The Long War Journal* (Oct. 28, 2007), http://www.longwarjournal.org/archives/2007/10/us_targets_al_qaedas.php.

[44] *Id.*

331.    In March 2013, ISI announced the formation of a second ISI media production arm known as "*al-I'tisam* Media Foundation" ("*al-I'tisam* Media"), in addition to its already well-established *al-Furqan* Media.

332.    *Al-I'tisam* Media's logo appears as follows:



*Figure 16 Al-I'tisam Media's logo*

333.    In August 2013, ISIS announced the formation of a third media production arm, the "*Ajnad* Foundation for Media Production" (the "*Ajnad* Foundation"), specializing in audio content that would also be distributed via YouTube as music videos, Islamic inspirational songs ("*nashids*") that accompany ISIS videos, as well as sermons, Quran readings, and other indoctrination to be posted on YouTube.

334.    The ISIS *nashids* are emotionally powerful musical chants, and ISIS terrorists have reportedly used recordings of these *nashids* that are posted on YouTube to pump up their emotions and excitement prior to carrying out an attack.

335.    The *Ajnad* Foundation's logo appears as follows:



*Figure 17 Ajnad Foundation's Logo*

336.    In May 2014, ISIS launched a fourth media production department named "*al-Hayat* Media Center" ("*al-Hayat* Media") specifically to target Western and non-Arabic-speaking audiences, producing and distributing material in many languages, including English, French, Dutch, German, Turkish, Russian, and more, to be distributed via YouTube in conjunction with other internet platforms.

337.    *Al-Hayat* Media's logo appears as follows:



*Figure 18 Al-Hayat Media's Logo*

338.    With its highly developed media production departments and various branded media outlets, ISIS has been able to create and distribute via YouTube video propaganda, recruitment, and operational campaigns that are exceptionally professional, sophisticated, and effective.

339.    Amb. Alberto Fernandez, Vice-President of the Middle East Media Research Institute ("MEMRI") and former Coordinator for Strategic Counter-Terrorism Communications at the U.S. Department of State, has called ISIS's media materials, "the gold standard for propaganda in terms of its quality and quantity."[45]

340.    Essential to the success of its media and terror campaigns—and to the success of ISIS—has been ISIS's use of YouTube to disseminate its videos and messages and execute its

---

[45] Dr. Erin Marie Saltman & Charlie Winter, "Islamic State: The Changing Face of Modern Jihadism," Quilliam (Nov. 2014), https://www.quilliamfoundation.org/wp/wp-content/uploads/publications/free/islamic-state-the-changing-face-of-modern-jihadism.pdf.

propaganda, recruitment, and operational campaigns; indeed, all of ISIS's media production departments described above have used YouTube for this purpose.

341.    ISIS has used YouTube to disseminate videos of its brutality and conquests as a psychological weapon to strike fear in its enemies.

342.    For example, in October 2013, ISIS used YouTube to post a video of a prison break at the Abu Ghraib prison in Iraq, and its subsequent execution of Iraqi army officers, which served to intimidate soldiers in the Iraqi army.

343.    The following is an ISIS graphic promoting ISIS's October 2013 Abu Ghraib video:



*Figure 19 ISIS Graphic Promoting Abu Gharib Video*

344.    In contrast to the days before the development of YouTube, when al-Zarqawi was limited to releasing short, low-quality videos, on websites that could only handle limited traffic, Google's YouTube platform and services provide ISIS with the ability to produce and disseminate professional-quality feature films of any length to an unlimited audience.

345.    For example, on March 17, 2014, ISIS's *al-I'tisam* Media used YouTube to release an hour-long highly-graphic video titled, "The Clanging of the Swords 4," produced by ISIS's *al-Furqan* Media.

346.    The terrorism analysis website Jihadica.com reported that within 24 hours of the video's publication on YouTube, "The Clanging of the Swords 4" had been viewed 56,998 times.[46]

347.    ISIS has used YouTube to raise its profile among terror groups and even overtake older jihadist competitors like *al-Qaeda*.

348.    ISIS uses YouTube to disseminate its propaganda in video to both Muslims and non-Muslims, with the effect of instilling fear and terror in the "non-believers" while encouraging others to join in ISIS's cause.

349.    ISIS also uses YouTube to communicate with ISIS "sympathizers" and to provide them with directions as well.

350.    ISIS has engaged and continues to engage, in horrific terrorist atrocities against civilians/non-combatants in every area it has operated, and has posted videos of such activity on YouTube to spread even more fear.

351.    ISIS has kidnapped innocent civilians and made various demands for their release, and it has carried out numerous beheadings, crucifixions, public executions, and mass-murders of its enemies and people it considers "apostates" or "infidels," all in front of the cameras for the purpose of posting videos of these atrocities on YouTube.

352.    ISIS has directed and overseen the systematic rape and enslavement of captive women and girls and has conducted a program of genocide against religious and ethnic groups, even promoting the sale of women as slaves on YouTube.

---

[46] Nica Prucha, "*Is this the most successful release of a jihadist video ever?*" Jihadica.com (May 19, 2014), http://www.jihadica.com/is-this-the-most-successful-release-of-a-jihadist-video-ever/.

353.   ISIS has enforced its own strict interpretations of Islamic law in the areas it has captured, meting out punishments including whipping, amputation, and death to those who fail or refuse to comply, again using YouTube to post videos praising these punishments.

354.   ISIS has paraded captives before cameras and forced them to give statements for ISIS propaganda, and it has become infamous for its use of YouTube to broadcast worldwide its cruel and ever-unusual executions of captives for their shocking and terror-inducing effect.

355.   Using YouTube and other social media, ISIS has recruited, and continues to recruit, individuals from all over the world to travel to Syria and Iraq for the purpose of joining its ranks and participating in its terrorist activities and atrocities.

356.   Tens of thousands of people from around the world have viewed ISIS's propaganda on YouTube and have been persuaded to travel to Syria and Iraq to join ISIS and engage in its jihad.

357.   ISIS's use of YouTube has enabled the terrorist organization to produce and distribute high-quality videos by dedicated professional ISIS media personnel.

358.   For example, in June 2014, ISIS's *al-Hayat* Media used YouTube to launch and propagate a series of videos called the "MujaTweets," claiming to show "snippets of day-to-day life in the 'Islamic State'" to portray life under ISIS as peaceful and normal.

359.   The Huffington Post described the quality of ISIS's propaganda videos as follows:[47]

> When it comes to producing recruitment and propaganda videos…unaffiliated supporters leave room to a much smaller group of

---

[47] Alessandro Bonzio, "ISIS' Use of Social Media Is Not Surprising; Its Sophisticated Digital Strategy Is," The Huffington Post (Nov. 14, 2014), http://www.huffingtonpost.co.uk/alessandro bonzio/isisuseofsocialmedia_b_5818720.html.

official ISIS members. This mainly consists of professional filmmakers working directly for the Islamic State. Their use of high definition video cameras, slick graphics and refined editing techniques has elevated the quality of the videos produced to Hollywood standards. One series of video clips called Mujatweets, released by ISIS' media arm on YouTube, portrays a number of ISIS militants as they engage in noble activities such as visiting an injured fighter at the hospital or distributing candies to some children. Episodes are filmed in HD, contain sophisticated graphics and logos, and include English subtitles—a sign of how the message is explicitly intended for second generation immigrants, especially the young.

360.    In September 2014, ISIS used YouTube to release an animated recruitment video set to the entrancing sounds of ISIS's militant Islamist *nasheed* chant and titled "Grand Theft Auto: *Salil al-Sawarem* ['Clanging of the Swords'],* ostensibly announcing the release of an ISIS video game modeled after a famous PlayStation interactive video game titled "Grand Theft Auto" that sold 27.5 million copies.

361.    The following are screen clips from the ISIS YouTube video "Grand Theft Auto: *Salil al-Sawarem*:



*Figure 20 ISIS YouTube video "Grand Theft Auto: Salil al-Sawarem*



*Figure 21 ISIS YouTube video "Grand Theft Auto: Salil al-Sawarem*

362.     In releasing its video-version of "Grand Theft Auto" on YouTube, which depicted an ISIS terrorist shooting a policeman and attacking a convoy of army trucks and jeeps, ISIS announced that its purpose was to "raise the morale of the mujahedin ["holy warriors"] and to train children and youth how to battle the West and to strike terror into the hearts of those who oppose the Islamic State."[48]

363.     Through its use of YouTube and other social media, ISIS has recruited more than 30,000 foreign recruits since 2014, including some 4,500 Westerners and 250 Americans.

364.     ISIS has used YouTube to indoctrinate and radicalize potential recruits and followers, providing a constant stream of religious teachings, mantras, and images showing the "truth" of ISIS's doctrines and the "heresy" of other groups, particularly Christians, Jews, and non-Sunni Muslims

365.     ISIS has used YouTube to indoctrinate and provided training to these recruits, and has sent many of them to return to their home countries to carry out terrorist attacks there.

366.     ISIS has also used and continues to use, YouTube to solicit and recruit individuals to remain in their home countries to carry out terrorist attacks there.

367.     These efforts have been particularly directed at citizens of countries participating in efforts to suppress and defeat ISIS in Syria and Iraq, including the United States, England, France, Belgium, Turkey, and Russia, and ISIS has also used YouTube to provide indoctrination, training, and inspiration to these recruits to carry out terrorist attacks.

---

[48] Paul Crompton, "Grand Theft Auto: ISIS? Militants reveal video game," Al Arabiya News (Sept. 20, 2014), http://english.alarabiya.net/en/variety/2014/09/20/Grand-Theft-Auto-ISIS-Militants-reveal-video-game.html.

368.    ISIS's use of violence against civilians is politically motivated and intended to intimidate and coerce the civilian populations where it carries out such violence, to influence the policies of governments, and to affect the policy of governments through kidnapping, assassination, and mass destruction.

369.    ISIS has used YouTube to indoctrinate and radicalize potential recruits and followers, providing a constant stream of religious teachings, mantras, music videos, and other images showing the "truth" of ISIS's doctrines and the "heresy" of other groups, particularly Christians, Jews, and non-Sunni Muslims.

370.    ISIS has used YouTube to exaggerate its expansion territorially by disseminating videos with maps showing areas ISIS claims to control as well as other regions where other groups have allegedly pledged allegiance to ISIS.

371.    ISIS has used YouTube to generate sympathy by showing images of women and children allegedly injured or killed by the enemies of ISIS.

372.    ISIS uses YouTube as a psychological weapon to project strength, brutality, superiority, and invincibility, and to instill fear, awe, and terror.

373.    ISIS regularly records the executions of large groups of local prisoners in order to intimidate and demoralize its opposition, and then uses YouTube to make these videos, mixed and produced with drama and set to music, "go viral" on the internet and into the mainstream media.

374.    ISIS also used YouTube to post a series of videos of beheadings together with political messages and warnings to the West.

375. On August 19, 2014, ISIS used YouTube to post a video in English titled "A Message to America," showing the beheading of American journalist James Foley by a hooded man with a British accent, later known as "Jihadi John."

376. The following are screen clips from the August 19, 2014 video:



*Figure 22 Clip from "A Message to America"*



*Figure 23 Clip from "A Message to America"*

377. In the YouTube video of Foley's murder, ISIS also showed another captive American, Steven Sotloff, and threatened that his fate would be the same if the U.S. did not cease all attacks against ISIS.

378. On September 2, 2014, ISIS used YouTube to post a video titled "A Second Message to America," showing the beheading of Steven Sotloff, and threatening to murder Britain David Hanes.

379. The following are screen clips from the September 2, 2014 video:



*Figure 24 Clip from "A Second Message to America"*



*Figure 25 Clip from "A Second Message to America"*

380.   On September 13, 2014, ISIS used YouTube to post a video titled "A Message to the Allies of America," showing the beheading of David Haines, a British aid worker, and threatening to murder Britain Alan Henning.

381.   The following is a screen clip from the September 13, 2014 video:



*Figure 26 Clip from "A Message to the Allies of America"*

382.   On October 3, 2014, ISIS used YouTube to post a video titled "Another Message to America and its Allies," showing the beheading of Alan Henning, a British aid worker, and threatening to murder American Peter Kassig.

383.   The following is a screen clip from the October 3, 2014 video:



*Figure 27 Clip from "Another Message to America and its Allies"*

384.   On November 16, 2014, ISIS used YouTube to post a video titled "Although the Disbelievers Will Not Like It," which opened with an ISIS propaganda map showing areas that had been declared "provinces" of the ISIS "Caliphate" and a speech by ISIS leader Abu Bakr (who took the name Khalifah Ibrahim al-Badri) accepting oaths of loyalty purportedly made from various terrorist leaders of these "provinces."

385.   The following are screen clips from the November 16, 2014 video:



*Figure 28 Clip from "Although the Disbelievers Will Not Like It"*



*Figure 29 Clip from "Although the Disbelievers Will Not Like It"*

386.    The video shows action scenes of Christians, Shiite Muslims, and Americans being killed by ISIS *jihadis*, contrasted with bloody images of children depicted as victims of enemy attacks.

387.    The video continues with a procession of about 18 bound captives said to be Syrian pilots, who are forced to kneel and are beheaded before the camera by ISIS terrorists, all set to the sound of the militant ISIS *nashid* musical chant familiar to many ISIS videos.

388.    The following are additional screen clips from the November 16, 2014 video:



*Figure 30 Clips from "Although the Disbelievers Will Not Like It"*

389.    Just before the beheading is shown in the video, ISIS executioner "Jihadi John" makes the following statement:

> "To Obama, the dog of Rome, today we are slaughtering the soldiers of [Syrian President] Bashar [al Assad] and tomorrow we'll be slaughtering your soldiers. And with Allah's permission we will break this final and last crusade. And the Islamic State will soon, like your puppet David Cameron said, will begin to slaughter your people in your streets."

390.    After the beheadings, the video shows the bodies of the captives on the ground with their severed heads placed on their backs and pools of blood on the ground.

391.    In the final minute of the video, the scene changes to "Jihadi John" standing alone by another severed head on the ground, which he says is that of American Peter Kassig, as the terrorist announces another threat to America and its allies.

392.    On February 3, 2015, ISIS's *al-Furqan* Institute used YouTube to post a video titled "Healing a Believer's Chest," which showed Jordanian pilot Mu'adh Al-Kasasbeh (who had been captured by ISIS) being burned alive in a cage.

393.    The following are scenes from the "Healing a Believer's Chest" video that ISIS posted on YouTube:



*Figure 31 Clips from "Healing a Believer's Chest"*

394.    On February 15, 2015, ISIS used YouTube to post a video titled "A Message Signed With Blood To The Nation Of The Cross," showing the beheading of 21 Coptic Christian men ISIS had captured in Libya.

395.    The following is a screen clip from the February 15, 2015 video:



*Figure 32 Clip from "A Message Signed With Blood To The Nation Of The Cross"*

396.   ISIS has also used YouTube to post videos of other cruel executions, including numerous beheadings and crucifixions, discharging explosives attached to captives, slowly lowering caged captives into water to drown, and more.

397.   ISIS's ability to use YouTube to disseminate around the world its message, evidence of its atrocities, and an image of invincibility, not only intensifies the intimidation it creates but also motivates and emboldens its members and followers to carry out even more terrorist attacks.

398.   ISIS has also used YouTube to raise funds for its terrorist activities.

399.   ISIS has used YouTube to inflame Muslim emotions and incite violence against non-Muslims and to glorify terrorist "martyrs" and *jihad*.

400.   ISIS has used YouTube to direct viewers to other online sites, postings, media, and other social network media.

401.   Thus, ISIS has used YouTube as a platform from which followers can access not only YouTube videos and comments, but also other websites, Facebook pages, Twitter accounts, and other online social network media.

402.   ISIS has used YouTube as a means to communicate its messages to the broader news media.

403.   ISIS has used YouTube accounts, channels, subscriptions, and messages to build and maintain networks.

404.   In June 2015, it was reported that ISIS had released at least 830 videos just since 2013, an average of 21 videos each month.

405.   YouTube is especially useful to ISIS because, among other things, it is provided free of charge, allows unlimited usage, offers the ability to reach an enormous number of users

instantaneously, provides the ability to distribute videos without disclosing location, enables like-minded users to connect and communicate, affords both public and private communications, and integrates other social media platforms and services.

406.    YouTube is also readily available, easy-to-use, and enables registered users to share videos, large and small, using Google's computer servers via the Internet.

407.    Moreover, the money ISIS saves by using YouTube frees up funds for ISIS to devote to even more terrorist attacks.

408.    In all of these ways and more, Google's Services have played an essential role in enabling ISIS to grow, develop, and project itself as the most feared terrorist organization in the world.

409.    The sophisticated technological capabilities that Google's Services give to ISIS have had an enormous impact on ISIS's methods and success in recruiting, indoctrination, training, conducting terrorist operations, and engaging in psychological warfare.

## IV.    ISIS'S JUNE 12, 2016 ORLANDO ATTACK

### A.    Introduction

410.    On June 12, 2016, ISIS carried out a horrific terrorist attack at the Pulse nightclub in Orlando, Florida, murdering 49 people, and injuring 53 more, including Plaintiffs (the "Orlando Attack").

411.    The Orlando Attack was intended: a) to intimidate and coerce the civilian populations of the United States and other countries engaged in activities against ISIS; b) to influence the policies of these governments by intimidation and coercion; and c) to affect the conduct of these governments by mass destruction, assassination, and kidnapping.

412.     Indeed, a major component of the Orlando Attack was the messaging disseminated by ISIS prior to, during, and after the events, in which ISIS stated its reasons for committing the terrorist attack against these countries' civilians.

413.     The Orlando Attack involved extensive planning, recruiting, organization, training, preparation, coordination, and funding.

414.     It also involved the use of Defendants' platforms, before and after the attack, to intensify the fear and intimidation that ISIS intended to inflict by this mass casualty attack.

415.     ISIS used Defendants' platforms and services to facilitate and accomplish all of these things.

**B.      Recruiting and Planning**

416.     The stated goal of ISIS is to use social media, including Defendants' platforms, services, computers, and communications equipment, to assist in carrying out their terrorist attacks throughout the world.

417.     The United States has become a central target of ISIS's campaign of terror attacks.

418.     ISIS's terror attacks are primarily organized through online social media platforms and communication services, like Defendants' websites. Defendants' services allow ISIS to carry out its terrorist activities, including recruiting, radicalizing, and instructing terrorists, raising funds, and creating fear.

419.    Since 2014, the Islamic State's spokesman, Abu Muhammad al-Adnani, has called for ISIS followers to attack Westerners in retaliation for strikes by the United States-led coalition fighting ISIS in Iraq and Syria.[49]

420.    al-Adnani has repeatedly singled out the United States, which is part of the coalition, as a main target.[50]

421.    In September 2014, Abu Muhammad al-Adnani issued a landmark call for attacks in the West:

> "If you can kill a disbelieving American or European – especially the spiteful and filthy French – or an Australian, or a Canadian, or any other disbeliever from the disbelievers waging war, including the citizens of the countries that entered into a coalition against the Islamic State, then rely upon Allah, and kill him in any manner or way however it may be. Do not ask for anyone's advice and do not seek anyone's verdict. Kill the disbeliever whether he is civilian or military, for they have the same ruling."[51]

422.    Omar Mateen was a private security guard living in Fort Pierce, Florida, about 117 miles from the Pulse nightclub.[52]

423.    In May 2013, the FBI began investigating Mateen for reported links to terrorism, but after ten months, the investigation was closed and Mateen's name was removed from the terrorist watch-list.[53]

---

[49] https://www.nytimes.com/2016/07/17/world/europe/isis-nice-france-attack.html

[50] http://www.terrorismanalysts.com/pt/index.php/pot/article/view/440/html

[51] *Id.*

[52]    http://archive.tcpalm.com/news/crime/st-lucie-county/who-is-omar-mateen-35140633-45ca-1fbf-e053-0100007fbd3e-382613281.html

[53] http://www.latimes.com/nation/la-na-fbi-investigation-mateen-20160712-snap-story.html

424.     The investigation revealed that co-workers had warned that Mateen had claimed connections to the terrorist groups Al Qaeda and Hezbollah, and that he wanted to die as a martyr.[54]

425.     ISIS has long publicized its hatred of homosexuals, including releasing, through Defendants' platforms, propaganda images and videos of fighters killing people suspected of being gay by throwing them off tall buildings.[55]

426.     FBI analysts concluded Mateen was self-radicalized on the Internet over a period of several years and decided recently before the attack to embrace the Islamic State.[56]

427.     FBI analysts found that Mateen watched online jihadist sermons since at least 2012 and more recently had downloaded jihadist material to his laptop computer, including grisly videos of beheadings of captives by militants.[57]

428.     Committee staff also uncovered that Mateen used Facebook in May 2016 to search for information on the married couple who shot and killed 14 people at a holiday party on Dec. 2 in San Bernardino.  Additionally, on June 4, 2016, Mateen apparently entered a search with the words: "Baghdadi Speech," referring to the Islamic State leader in Iraq and Syria.[58]

---

[54] *Id.*

[55] https://www.nytimes.com/2016/06/13/us/orlando-omar-mateen-isis.html

[56] *Id.*

[57] http://www.latimes.com/nation/la-na-orlando-cellphone-20160615-snap-story.html

[58] *Id.*

429.  In April or May 2016, Mateen tries to buy body armor and 1000 rounds of ammunition. A store employee tells Mateen the shop doesn't sell the body armor or bulk ammo that Mateen was looking for.[59]

430.  From June 1 to June 6, Mateen visited Pulse and the Disney Springs shopping complex in what investigators believe was a surveillance trip. These visits coincide with "Gay Days 2016." After clearing a background check, he legally purchases a Sig Sauer MCX assault-style rifle and a Glock 9mm semiautomatic pistol.[60]

431.  After years of reports of suppressed "rage" and a man who hid his "darker side," reports suggest that one day Mateen "snapped," as his father suggested that Mateen was incensed by the sight of two men kissing in front of his young son.[61]

432.  On June 12, 2016, Mateen leaves his house angry, carrying a bag of guns. His wife later told investigators she begged her husband not to leave, grabbing him by the arm. Mateen leaves and drives to the Pulse nightclub.[62]

## C.  ISIS vs. the United States, France, Spain, and their Allies

433.  In September 2014, ISIS used YouTube to post an audio message from ISIS spokesman Abu Muhammad al-Adnani titled "Verily Your Lord is Ever Watchful," in which he urged ISIS supporters worldwide to perform terrorist attacks against countries

---

[59] http://www.cnn.com/2016/06/22/us/omar-mateen-timeline/index.html

[60] *Id.*

[61]  https://www.nytimes.com/2016/06/19/us/omar-mateen-gunman-orlando-shooting.html?rref=collection%2Fnewseventcollection%2F2016-orlando-shooting&action=click&contentCollection=us&region=rank&module=package&version=highlights&contentPlacement=1&pgtype=collection

[62] http://www.cnn.com/2016/06/22/us/omar-mateen-timeline/index.html

that participated in fighting against ISIS, and in particular, against the United States, France, Spain, and other European nations.

434.     The following are translated excerpts from al-Adnani's September 2014 message:

> "[To the U.S. and its allies:] We promise you that this campaign will be your last and it will collapse and fail, just as all your other campaigns collapsed. But this time, when the war ends we will be the ones to invade your countries, whereas you will no longer invade [ours]. We will invade your Rome, break your Cross and enslave your women, with Allah's help. This is His promise and he will not break it until it is realized. And if we do not achieve this, our sons or grandsons will, and they will sell your sons and grandsons as slaves.
>
> . . .
>
> [To American and Europeans:] The Islamic State did not launch a war against you, as your lying governments and your media claim. You are the ones who initiated hostilities against us, and the [side] that initiates hostilities is the evil one. You will pay [for it] dearly when your economies collapse. You will pay dearly when your sons are sent to fight us and return crippled and damaged, in coffins or as lunatics. You will pay when each of you feels afraid to travel abroad. You will pay when you walk the streets in trepidation, for fear of Muslims. You will not be safe in your own beds. You will pay the price when your Crusader war fails, and then we invade the very heart of your countries.
>
> . . .
>
> [To Muslims:] O monotheist, don't sit out this war, wherever you may be. [Attack] the tyrants' soldiers, their police and security forces, their intelligence [forces] and collaborators. Cause them to lose sleep, make their lives miserable, and cause them to be preoccupied with their own [problems]. If you are able to kill an American or European infidel – particularly any of the hostile, impure Frenchmen – or an Australian or a Canadian, or any [other] infidel enemy from the countries that have banded against the Islamic State, then put your trust in Allah and kill him, by any way or means. Do not consult anyone and do not seek a *fatwa* [religious ruling] from anyone. It is immaterial if the infidel is a combatant or a civilian. Their sentence is one; they are both infidels, both enemies. The blood of both is permitted . . . The best thing to do would be to kill any French or American infidel or any of their allies . . . If you cannot [detonate] a bomb or [fire] a bullet, arrange to meet alone

with a French or an American infidel and bash his skull in with a rock, slaughter him with a knife, run him over with your car, throw him off a cliff, strangle him, or inject him with poison. Don't stand by, helpless and abject . . . If you are incapable even of this – then spit in his face. And if you refuse [to do] this while your brothers are being bombed and killed and their lives and property are under attack everywhere, then examine your faith. This is a serious matter you face, for the Islamic faith is predicated upon the principle of loyalty to Muslims and hostility toward infidels."[63]

435.    On October 14, 2014, ISIS used YouTube to release a video message directed to the people of France, titled "Message of the Mujahid 3."

436.    The "Message of the Mujahid 3" YouTube video featured a French-speaking member of ISIS, sitting in the driver's seat of a car with a rifle, threatening France with terrorist attacks and calling upon Muslims to carry out attacks.

437.    The following are screen clips from ISIS's "Message of the Mujahid 3" video:

 

*Figure 36 Clips from "Message of the Mujahid 3"*

438.    The following is a translation of excerpts from the French-speaker's statement in the Message of the Mujahid 3 video posted on YouTube:

---

[63] *See* "Responding To U.S.-Led Campaign, IS Spokesman Calls To Kill Westerners, Including Civilians, By Any Means Possible," The Middle East Research Institute (MEMRI) (Sept. 22, 2014), http://www.memrijttm.org/content/view_print/blog/7825.

"We will give a message to France over the bombing in Iraq and Syria. We have warned, you are at war against the Islamic State. We are people to whom the victory will be assured with the help God. Now you have been warned.

…

You have so many murders and killings as did our dear brother Mohamed Merah. You were afraid of a brother, there will be thousands in the future.

…

This is a message to all Muslims of France. Enjoy and see what happens in the world. They gathered against us. Why, because we are defending Islam and because we want to apply the law of Allah. . . . You say that we're the criminals. But they're the cowards who drop bombs in their sky. We will take revenge for all the brothers and all the civilians who were killed.

…

You will not be safe anywhere in France or in other countries. We will make appeals to all brothers who live in France to kill any civilian. You will never be safe. All murders you committed, you will regret it."

439.     Prior to the Orlando Attack, ISIS carried out and attempted several other terror attacks in Paris, Nice, and Belgium.

440.     For example, on January 15, 2015, Belgian commandos thwarted an ISIS terrorist plot (the "Verviers Plot") when they raided a safe house in Verviers, Belgium, killing ISIS terrorists Sofiane Amghar ("Amghar") and Khalid Ben Larbi ("Larbi"), and arresting a third conspirator.

441.     In the safe house, police found AK-47 assault rifles, components of the explosive TATP, GoPro cameras, and police uniforms.

442.     Officials reported that the Verviers Plot had included a planned beheading of a police officer that was to be filmed.

443.     ISIS's *Dar al-Islam* online French-language magazine is dedicated to recruiting French-speaking members for ISIS and promoting attacks against France and other western countries.

444.     *Dar al-Islam* Issue 2 was released shortly after a series of Islamist terrorist attacks in Paris had taken place from January 7-9, 2015: in one attack, two "*al-Qaeda* in the

Arabian Peninsula" ("AQAP") terrorists shot and killed 11 civilians and a police officer and wounded 11 others in a shooting attack at the office of the *Charlie Hebdo* satire magazine; immediately afterward, ISIS terrorist Amedy Coulibaly ("Coulibaly") shot and killed a police officer and a jogger, and then killed four Jewish shoppers and took others hostage at a Hypercacher kosher supermarket.

445.    *Dar al-Islam* Issue 2 praised and justified these attacks, and featured pictures of Coulibaly and an interview with his wife, Hayat Boumeddiene.

446.    The issue also called for more terrorist attacks against France and other western countries; for example, one article in this issue included the following statement:

> The disbeliever states have understood the consequences of the return of the Caliphate: the end of the domination by the Jews, the Crusaders and their allies. Every sincere Muslim must migrate to one of the regions of the Islamic State, the land of Islam, and leave the land of disbelief led by the worst *tawaghit* [tyrants] of this world, who constantly war against our community. The time has come for the believers to go forth, to recover the land, and not to let these tyrants rest for one second. . . . France needs to mourn its dead as we mourn our own; may they see the blood of their own people flow like we see that of our own.

447.    In June 2015, French police took an ISIS recruit named Nicholas Moreau ("Moreau") into custody after he was deported from Turkey.

448.    After arresting Moreau, French police arrested another ISIS recruit in 2015 named Reda Hame ("Hame") before he was able to carry out a planned terrorist attack.

449.    During his interrogation on August 13, 2015, Hame told the police that in June 2015 ISIS had given Hame hands-on training in a park in Raqqa on the use of Kalashnikov assault rifles and grenades.

450.    Asked by police whether he was aware of any pending attacks, Hame replied: "All I can tell you is that it's going to happen soon. It's a veritable factory over there – they are really looking to hit France or Europe."[64]

## D.    The Orlando Attack

451.    On June 12, 2016, at around 12:00AM, Omar Mateen arrived at the Pulse nightclub in Orlando, Florida, with the intention of committing an act of international terrorism. Mateen was armed with the assault-style rifle Sig Sauer MCX[65] and a Glock 9mm semi-automatic pistol.[66]

452.    Mateen enters the Pulse nightclub, pays the entrance fee, gets a wristband, enters the club and later leaves. Investigators say he may have been scoping out the club's security.[67]

453.    Pulse nightclub has been labeled as "No. 1 destination for LGBT people to attend in the summertime." On June 12, 2016, patrons were celebrating "Latin Night," a "high capacity night" where as many as "800 people might be packed inside the club."[68]

454.    The first reports of gunfire came at 2:02AM, when Mateen reentered the Pulse nightclub and began firing his rifle into the crowd.[69]

---

[64] *Id.*

[65]    https://www.washingtonpost.com/news/checkpoint/wp/2016/06/14/the-gun-the-orlando-shooter-used-was-not-an-ar-15-that-doesnt-change-much/?utm_term=.9ce6cee1657f

[66] http://www.cnn.com/2016/06/13/us/orlando-nightclub-shooting/

[67] http://www.cnn.com/2016/06/22/us/omar-mateen-timeline/index.html

[68]    https://www.washingtonpost.com/news/post-nation/wp/2016/06/12/it-was-just-complete-chaos-survivors-of-orlando-massacre-recall-desperate-struggle-to-stay-alive/?utm_term=.8d77926e2ab0

455.        At 2:08AM, officers from multiple agencies entered the club, engaging in a gunfight with Mateen. "That engagement and that initial entry caused him to stop shooting, retreat, and barricade himself into a bathroom," Orlando Police Chief John Mina said.[70]

456.        Survivors who were in that bathroom have said Mateen had sprayed it with gunfire, killing and injuring several people. Mateen then took hostages in the bathroom, which initiated a three-hour hostage situation.[71]

457.        At 2:35AM, Mateen called 911, telling the operator that he was responsible for the shootings "in the name of God the merciful," declaring allegiance to ISIS and its leader, Abu Bakr al-Baghdadi. He further demanded that the United States halt its bombing in Syria and Iraq.[72]

458.        In his conversations with negotiators, Mateen referred to himself as an "Islamic Soldier," commanding that negotiators call him "Mujahideen," "Soldier of the God."[73]

459.        Mateen also posted to Facebook both just before and during the massacre, venting about the recent Islamic State bombings, warning, "in the next few days you will see attacks from the Islamic State in the USA."[74]

---

[69]        https://www.nytimes.com/2016/06/21/us/fbi-transcripts-orlando-shooting-omar-mateen.html?rref=collection%2Fnewseventcollection%2F2016-orlando-shooting

[70] *Id.*

[71] *Id.*

[72]https://www.nytimes.com/2016/06/21/us/fbi-transcripts-orlando-shooting-omar-mateen.html?rref=collection%2Fnewseventcollection%2F2016-orlando-shooting

[73] http://www.cnn.com/2016/09/23/us/orlando-shooter-hostage-negotiator-call/index.html

[74] http://www.cnn.com/2016/06/16/us/orlando-shooter-omar-mateen/

460.     Mateen, while holding hostages at gunpoint, made three more calls to police

negotiators, speaking at 2:48AM for nine minutes, at 3:03AM for 16 minutes, and at

3:24AM for three minutes. In Mateen's last call, he claimed — falsely— to have

explosives: "There is some vehicle outside that has some bombs, just to let you know,"

he said. "You people are gonna get it, and I'm gonna ignite it if they try to do anything

stupid."[75]

461.     Mateen further referenced an explosive vest similar to those "used in France," an

apparent reference to explosive vests used by ISIS in Paris terror attacks in November.[76]

462.     At 4:21AM, officers pulled an air-conditioner out of a wall, creating an escape

route for people hiding in one room of the club. Eight minutes later, some people who

been inside had told the police that the gunman had said he was going to put explosive

vests on four hostages within 15 minutes. Officials later revealed that Mateen's mention

of explosive vests prompted the decision to storm the club.[77]

463.     At 5:02AM, a team from the Orange County Sheriff's Office placed and

detonated explosives on Pulse's outer wall to make entry. The explosion, however, did

not break all the way through, so officers used an armored vehicle to punch through the

wall.[78]

---

[75] http://www.cnn.com/2016/09/23/us/orlando-shooter-hostage-negotiator-call/index.html
[76] *Id.*
[77] *Id.*
[78] *Id.*

464.     At 5:14AM, officers entered the club and traded fire with Mateen. At 5:15AM, it was radioed that Mateen was "down," killed by police.[79]

465.     By 5:15AM, police cleared the Pulse nightclub as hostages fled to safety.[80]

466.     During his three-hour terror attack, Mateen murdered 49 innocent people, injuring 53 others. At the time, this was the deadliest mass shooting by one person in American history.[81]

## E.     The Aftermath of the Orlando Attack

467.     Shortly after the Orlando terror attack, ISIS issued a statement claiming direct responsibility, describing Mateen as an "Islamic State fighter." Amaq, the official news agency of ISIS, issued a flash bulletin:

> "Breaking News – Source to Amaq. The attack that targeted a nightclub for homosexuals in Orlando, Florida, and left more than one hundred dead and wounded was carried out by an Islamic State fighter."[82]

468.     The group's official radio station, al-Bayan, also asserted that the attack came from ISIS:

> "Over 100 Crusaders killed and injured after an attack on their gathering at a night club in America."

> "We begin from America, where Allah has enabled brother Omar

---

[79] *Id.*

[80] https://www.nytimes.com/2016/06/21/us/fbi-transcripts-orlando-shooting-omar-mateen.html?rref=collection%2Fnewseventcollection%2F2016-orlando-shooting

[81] https://www.nytimes.com/2016/06/19/us/omar-mateen-gunman-orlando-shooting.html?rref=collection%2Fnewseventcollection%2F2016-orlando-shooting&action=click&contentCollection=us&region=rank&module=package&version=highlights&contentPlacement=1&pgtype=collection

[82]        http://www.cbsnews.com/news/mass-shooting-at-orlando-nightclub-pulse-isis-takes-responsibility/

Mateen, one of the soldiers of the Caliphate in America, to carry out a raid where he was able to infiltrate a Crusaders' gathering at a gay night club in Orlando, Florida. Allah enabled him to inflict heavy casualties amongst the filthy Crusaders. He killed and injured over a hundred of them. This is the biggest raid to be carried in America after the raid of Manhattan 16 years ago. All praise to Allah."[83]

469.　　　Following the attack, former FBI Director James Comey related that he was "highly confident" the gunman was self-radicalized through the Internet.[84]

470.　　　DOJ staff also uncovered during the arrest of Mateen's spouse, Noor Salmon, that Mateen specifically utilized ISIS YouTube videos to be recruited and radicalized.

471.　　　According to officials, analysis of Mateen's electronic devices showed searches for jihadist propaganda, including videos of ISIS beheading videos and of Anwar al-Awlaki -- an influential American-born imam who worked as a spokesman for al Qaeda in the Arabian Peninsula and was killed in 2011.[85]

472.　　　Comey also said that one of the FBI's first investigative steps is to check a suspect's social media, "especially in light of the Islamic State's aggressive recruitment efforts on Facebook, Twitter and other digital networks and apps."[86]

473.　　　ISIS's official news agency issued a bulletin quoting "a source" confirming that Mr. Mateen was acting on the Islamic State's behalf.[87]

---

[83] http://time.com/4365507/orlando-shooting-isis-claims-responsibility-terror/

[84] http://www.cnn.com/2016/06/13/us/orlando-nightclub-shooting/

[85] *Id.*

[86] http://www.latimes.com/nation/la-na-fbi-investigation-mateen-20160712-snap-story.html

[87] https://www.nytimes.com/2016/06/13/us/orlando-omar-mateen-isis.html

474.     During hearings, the Government confirmed that Mateen also used Facebook during his terrorist attack to pledge allegiance to the Islamic State and to Abu Bakral-Baghadi:

> "I pledge my allegiance to (ISIS leader) abu bakr al Baghdadi.. may Allah accept me" … "The real muslims will never accept the filthy ways of the west" … "You kill innocent women and children by doing us airstrikes..now taste the Islamic State."[88]

475.     Investigations also revealed that during the attack, Mateen utilized ISIS talking points made available from Twitter to urge the United States to stop "the air strikes and stop killing innocent women and children."[89]

476.     Supporters of ISIS, through Defendants' websites, praised Mateen, sharing screenshots of Mr. Adnani's speech calling for lone wolf attacks during Ramadan. And in an act of tribute, several changed their profile pictures on Defendants' platforms to photographs of the Orlando attacker.[90]

477.     Screenshots of the scene of the Orlando Attack and praise for ISIS were also shared by supporters.

478.     Even if Mateen had never been directly in contact with ISIS, ISIS' use of social media directly influenced his actions on the night of the Orlando massacre:

> researchers, who identified and analyzed second-by-second online records of 196 pro-ISIS groups operating during the first eight months of 2015, found that even though most of the 108,000-plus individual members of these self-organized groups probably never met, they had a striking ability to adapt and extend their online longevity, increase their size and number, reincarnate when shut down — and inspire "lone wolves" with no history of extremism to

---

[88] Seamus Hughes, *Program on Extremism*, Georgetown University

[89] Rukmini Callimachi, Orlando Sentinel, September 26, 2016

[90] https://www.nytimes.com/2016/06/13/us/orlando-omar-mateen-isis.html

carry out horrific attacks like the nation's deadliest mass shooting at
a gay nightclub in Orlando this week.[91]

479.     ISIS continues to promote Mateen's actions through Defendants' platforms today.

ISIS uses Defendants' platforms to disseminate their propaganda, including their praise

of Mateen, through online propaganda magazines like *Rumiyah* and propaganda videos.

## V.      PLAINTIFFS

480.     Angel Colon is a youthful, ambitious 26-year-old who has always shared a

message of love, hope, and positivity. On June 12, 2016, Angel C. Colon went to the

Pulse nightclub with friends to celebrate Latin Night.



*Figure 37 Photo of Angel Colon*

481.     Shortly after Angel's arrival, Omar Mateen entered the nightclub and began

shooting. Omar Mateen shot Angel Colon six times. Angel Colon has suffered severely,

and will continue to suffer, numerous physical and mental injuries, including severe

psychological and emotional harm, as a result of the Orlando Attack.

---

[91]     http://www.homelandsecuritynewswire.com/dr20160620-tracking-analyzing-how-isis-recruits-through-social-media

482.     Norman E. Casiano-Mojica is a brilliant and passionate chef and make-up artist. On June 12, 2016, Norman, a regular at the Pulse nightclub, went to Pulse to spend time with his friends and family.



*Figure 38 Photo of Norman E. Casiano-Mojica*

483.     Shortly after Norman's arrival, Omar Mateen entered the nightclub and began shooting. Omar Mateen shot Norman E. Casiano-Mojica twice. Norman E. Casiano-Mojica has suffered severely, and will continue to suffer, numerous physical and mental injuries, including severe psychological and emotional harm, as a result of this attack.

484.     Jeanette McCoy is a 37-year-old personal trainer, bodybuilder, and model. On June 12, 2016, McCoy went to Pulse nightclub to enjoy a fun night of drinks and dancing with friends.



*Figure 39 Photo of Jeanette McCoy and Angel Colon*

485.     After her arrival, Omar Mateen entered the nightclub and began shooting. Jeanette

only escaped the murderous rampage of Omar Mateen because her body was shielded by

Plaintiff Angel Colon, who took bullets to the back and leg that were meant for Jeanette.

Jeanette McCoy has suffered severely, and will continue to suffer, numerous mental

injuries, including severe psychological and emotional harm, as a result of this attack.

486.     Rodney Sumter is a 27-year-old churchgoing father of two beautiful children.

Sumter was working as a bartender at the Pulse nightclub on the evening of June 12,

2016.



*Figure 40 Photo of Rodney Sumter*

487.    Omar Mateen entered the nightclub and began shooting. Omar Mateen shot Rodney Sumter three times, once in each of his arms and in his back, barely missing his spine. Bleeding and running on adrenaline, Rodney ran outside into an adjacent parking lot, where he was assisted by a nursing student who family says saved his life. The nursing student tied his shirt over his wounds to stop the bleeding. Rodney has suffered severely, and will continue to suffer, numerous physical and mental injuries, including severe psychological and emotional harm, as a result of this attack.

488.    Leonel Melendez is an outgoing, hardworking family man from Orlando, working every day to support his 7-year-old child. On June 12, 2016, Leonel went to the Pulse nightclub to celebrate a friend's birthday at the club's "Latin Night."



*Figure 41 Leonel Melendez and his mother*

489.     That evening, Omar Mateen severely injured Leonel when he shot him multiple times, including shots to the leg, elbow, and head.  After spending two weeks in a coma as a result of the Orlando Attack, Leonel has endured multiple surgeries to correct the injuries he sustained. Leonel has suffered lifetime lasting effects from the attack, including complete loss of hearing in his left ear, only 50% hearing in his right ear, and an inability to see clearly, as the bullet that hit him in the head caused substantial damage to his eyesight. In addition to his physical injuries, Leonel has suffered, and will continue to suffer, from severe psychological and emotional harm, including PTSD from the attack and paranoia, including fear of crowds and loud noises.

490.     Joaquin Rojas is a 28-year-old hardworking student pursuing his master's degree in nursing from Walden University. Having just turned 27 a few days before, Joaquin was celebrating his birthday with friends at the Pulse nightclub on the evening of June 12, 2016.



*Figure 42 Joaquin Rojas and friends*

491.     Shortly after Joaquin and friends arrived, Omar Mateen entered the nightclub and began shooting. Omar Mateen shot Joaquin in his arm. Joaquin attempted to stem the bleeding and then pretended to be dead. Joaquin has endured two surgeries to repair a shattered radius bone in his right arm and nerves shredded by a high-velocity round. Joaquin Rojas has suffered severely, and will continue to suffer, numerous physical and mental injuries, including severe psychological and emotional harm, as a result of this attack.

492.     Cesar Rodriguez is a peaceful 47-year-old who went to the Pulse nightclub on June 12, 2016, and survived the Orlando Attack. As a result of Omar Mateen's act of terrorism at the Pulse nightclub, Rodriguez has sustained several physical and mental injuries, including post traumatic stress disorder, psychological trauma, back pain, cervical injuries, and neck injuries.

493.     Kaliesha Andino is a goal-driven 20-year-old who was living in Orlando on June 12, 2016. On the evening of the attack, Kaliesha went to the Pulse nightclub for the first time to enjoy a night out with her friends and family.



*Figure 43 Kaliesha Andino visiting the grave of her friend Luis Omar Ocasio-Capo who was killed in the Orlando Attack*

494.  Shortly after Kaliesha arrived, Omar Mateen entered the Pulse nightclub and began shooting. Omar Mateen shot Kaliesha several times. As a result of the attack, Kaliesha endured several injuries, including a gunshot wound to her right forearm, which required several surgeries, a gunshot wound to the back which required one surgery, and a grazed gunshot wound on the chest. As a result of the attack, Kaleisha has suffered, and will continue to suffer, from severe physical and psychological trauma.

495.  Rosamaria Febo is an outgoing, social 23-year-old who just finished school to become an EMT. A regular at Pulse nightclub, she and her friends looked forward to spending June 12, 2016 dancing and celebrating "Latin Night."

496.  On June 12, 2106, Rosamaria sustained severe psychological trauma as a result of Omar Mateen's terror attack inside the Pulse nightclub. Each and every day, she experiences loss of sleep, stress, depression, and other effects of post traumatic stress disorder.

497.      Corey Rivera is a quick witted, hardworking business owner from Orlando. He
went to the Pulse nightclub on June 12, 2016 to enjoy a relaxing night with friends.

498.      On June 12, 2016, Omar Mateen's attack on the Pulse nightclub changed Corey's
life forever.  Corey has sustained lifelong psychological injuries as a result of the attack,
including ongoing post traumatic stress disorder which has completely altered the way he
lives his life.

499.      Carlos Muniz is an outgoing, positive person who went to the Pulse nightclub on
June 12, 2016 to hang out with friends. During Omar Mateen's terrorist action, Torres
lost several close friends, one of whom was like a brother. As a result of the attack,
Torres has suffered, and will continue to suffer from, severe psychological and emotional
harm.

500.      David Jourdenais is a hardworking veterinarian who graduated as valedictorian
from the University of Florida College of Veterinary Medicine.



*Figure 44 David and his bulldog Matilda*

501.    David went out with friends on June 12, 2016 to visit the Pulse nightclub for the first time. David was lucky to escape without any physical injuries, however, as a result of witnessing Omar Mateen's terrorist attack, David has suffered, and will continue to suffer, from severe emotional and psychological injuries.

502.    Javier Nava is a noble, trustworthy person who has always worked hard to achieve his goals upon coming to the United States of America.



*Figure 45 Javier Nava*

503.    On June 12, 2016, Javier went to the Pulse nightclub to share some time with his friends. During Omar Mateen's terrorist attack, Javier was shot in the lower right abdomen. Javier has suffered, and will continue to suffer, from his physical injuries, as well as severe psychological and emotional harm.

504.    Adrian Lopez is an outgoing, positive individual who went to the Pulse nightclub on June 12, 2016 to celebrate the return of two friends who were on vacation.



*Figure 46 Javier Nava (right) and Adrian Lopez (left) after the Orlando Attack*

505.    While Adrian was lucky to avoid sustaining any physical injuries, as a result of Omar Mateen's terrorist attack, Adrian has suffered, and will continue to suffer, from emotional and psychological harm.

506.    Emily Ann Portalatin is an outgoing, hardworking 23-year-old college student. On June 12, 2016, Emily went to the Pulse nightclub with three friends for an evening of dancing at the club's "Latin Night."



*Figure 47 Emily Ann Portalatin*

507.    During the Orlando Attack, Emily was severely injured when her right hand was crushed. She suffered a broken hand, a crushed pinky finger, and a torn ligament. Her physical injuries required surgery. Additionally, Emily has suffered and continues to suffer from severe emotional distress and Post Traumatic Stress Disorder as a result of the Orlando Attack. These psychological injuries required her to leave her job.

508.    Franchesska Mercado is a hardworking, adventurous 20-year-old who enjoys living every day to its fullest. On June 12, 2016, Francesca went with friends to the Pulse nightclub for the first time. While she was lucky to not suffer any physical injuries as a result of the Orlando Attack, she has suffered, and continues to suffer, from severe emotional and psychological distress. As a result of her injuries, she has had to undergo therapy, has lost sleep, wasn't able to leave the house, and was fired from one of her jobs.

509.    Luis Omar Ocasio-Capo was an outgoing, happy, 20-year-old who loved music and dancing. Friends described him as bright, kindhearted and always laughing.



*Figure 48 Photo of Luis Omar Ocasio-Capo*

510.     On Friday, June 12, 2016, Luis was enjoying a night in Orlando and attended Latin Night at the Pulse nightclub. After arriving, Omar Mateen entered the nightclub and began shooting. Luis was struck and killed.

511.     Anthony Luis Laureano Disla was a kind, vibrant 25-year-old who moved to Orlando to pursue a career as a dancer and a choreographer. Friends described him as immensely talented, ambitious, and a staple of the community.



*Figure 49 Photo of Anthony Luis Laureano Disla*

512.     On Friday, June 12, 2016, Anthony was enjoying a night in Orlando and attended Latin Night at the Pulse nightclub. After arriving, Omar Mateen entered the nightclub and began shooting. Anthony was struck and killed.

513.     Angel Candelario Padro was an extremely bright, lively, driven 28-year-old. Angel was a member of the National Guard, a Zumba enthusiast, and was studying for a license in nursing while working.



*Figure 50 Photos of Angel Candelario Padro*

514.     On Friday, June 12, 2016, Angel was enjoying a night in Orlando and attended Latin Night at the Pulse nightclub. After arriving, Omar Mateen entered the nightclub and began shooting. Angel was struck and killed.

515.     Eric Ivan Ortiz-Rivera was an artistic, fun loving, generous soul. Friends described him as goofy and exuberant, with a passion for hairstyling and interior design.



*Figure 51 Photo of Eric Ivan Ortiz-Rivera*

516.     On Friday, June 12, 2016, Eric was enjoying a night in Orlando and attended Latin Night at the Pulse nightclub. After arriving, Omar Mateen entered the nightclub and began shooting. Eric was struck and killed.

517.     Leroy Valentin Fernandez was a positive, motivational 25-year-old leasing agent with a love for performing. He was an exuberant singer and dancer, and always full of energy and life.



*Figure 52 Photo of Leroy Valentin Fernandez*

518.     On Friday, June 12, 2016, Leroy was enjoying a night in Orlando and attended Latin Night at the Pulse nightclub. After arriving, Omar Mateen entered the nightclub and began shooting. Leroy was struck and killed.

519.     Franky Jimmy DeJesus Valazques was selfless, helpful, energetic young soul. Jimmy was an uncle, a brother, and a best friend.



*Figure 53 Photo of Franky Jimmy DeJesus Valazques*

520.     On Friday, June 12, 2016, Jimmy was enjoying a night in Orlando and attended Latin Night at the Pulse nightclub. After arriving, Omar Mateen entered the nightclub and began shooting. Jimmy was struck and killed.

521.     Keinon Carter is a hardworking, ambitious and dedicated young man with goals rooted in the music and entertainment industry. On June 12, 2016, Keinon went to the Pulse nightclub to hang out and enjoy an evening with friends.

522.     That evening, Keinon Carter sustained life-threatening injuries when Omar Mateen entered the Pulse nightclub and shot Keinon multiple times in the leg and abdomen. Keinon has endured multiple surgeries to correct the injuries he sustained. Keinon has suffered lifetime lasting affects from the attack, including his pelvis being split in half and a bullet tearing through his intestines and through to the bottom of his spine, greatly impairing his ability to walk. In addition to his physical injuries, Keinon has suffered, and will continue to suffer, from severe psychological and emotional harm, including PTSD from the attack.

523.     Edwin Rivera Alvarez is a hardworking man who has endured tremendous pain and hardship since the Orlando Attack. On June 12, 2016, Edwin went to the Pulse nightclub on a date.

524.     Shortly after Edwin's arrival, Omar Mateen entered the Pulse nightclub and began shooting, Edwin was brutally trampled as individuals escaping the shooting ran over top of him. Edwin has suffered lifetime lasting affects from the attack, including sciatica and other physical injuries that limit his ability to stand and work. In addition to his physical injuries, Edwin has suffered, and will continue to suffer, from severe psychological and emotional harm, including PTSD and depression as a result of the attack.

525.     Geoffrey Rodriguez is a creative, outgoing graphic designer. On June 12, 2016, Geoffrey went to the Pulse nightclub to enjoy an evening with his friends.

526.     Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Geoffrey was shot four times, sustaining gunshot wounds to his neck, stomach, and legs. Over the last two years, Geoffrey was forced to endure 12 surgeries in the hopes of recovering from the Orlando Attack. He continues to suffer from excruciating and unbearable pain, as two of the four bullets will forever remain in his body, unable to be removed. Additionally, Geoffrey no longer has feeling in his right foot, as following extensive corrective surgeries, the insertion of metal rods into his feet, and vein transfers from his left leg to his right, his right foot is now permanently numb. As a result of the gunshot wound to the stomach, Geoffrey also had to undergo a colostomy in order to fix damage to his intestines. This is just a brief summary of the extensive physical injuries Geoffrey has suffered and will continue to suffer from as a result of the attack.

527.     In addition to his physical injuries, Geoffrey has suffered, and will continue to suffer, from severe psychological and emotional harm, including PTSD and depression as a result of the attack.

528.     Sandy Roberts is a hardworking, dedicated mother. On June 12, 2016, Sandy went to the Pulse nightclub to celebrate her wife's return to Orlando.

529.     Shortly after their arrival, Omar Mateen entered the Pulse nightclub and began shooting. While Sandy did not sustain any physical injuries, she has suffered, and will continue to suffer, from severe mental and emotional trauma as a result of the attack. Following the Orlando Attack, Sandy has PTSD, has trouble sleeping, and is often afraid and paranoid as a result of the attack.

530.     Kadim Ramos is a loving, dedicated parent and wife of Plaintiff Sandy Roberts. On June 12, 2016, Kadim had recently returned from Panama and went to the Pulse nightclub with her wife to celebrate. Shortly after their arrival, Omar Mateen entered the Pulse nightclub and began shooting. While Kadim did not sustain any physical injuries, she has suffered, and will continue to suffer, from severe mental and emotional trauma as a result of the attack, including PTSD and paranoia.

531.     Plaintiff Sonia N. Cedeno is a dedicated mother and grandmother who prides herself on her committed, enthusiastic relationship with her local community. On June 12, 2016, Sonia went to the Pulse nightclub with her son to enjoy an evening out.

532.     Shortly after their arrival, Omar Mateen entered the Pulse nightclub and began shooting. During the shooting, Sonia was violently knocked to ground after a person who was struck by a bullet fell on top of her. Sonia sustained lasting physical injuries to her wrist. Sonia's physical injuries pale in comparison to the lifelong mental and emotional

injuries she sustained, which include post traumatic stress disorder, frequent anxiety, and trouble sleeping as a result of the attack. As result of these injuries, Sonia had to leave her job.

533.      Plaintiff Javier Antonetti is a musician who went to the Pulse nightclub on June 12, 2016 to celebrate friend's birthday. Shortly after his arrival, Omar Mateen entered the nightclub and began shooting. While Javier did not sustain any physical injuries, he has suffered, and will continue to suffer, from numerous mental and emotional injuries. In addition to trouble sleeping, fear of crowds and restaurants, and other stresses, Javier suffers from severe depression and post traumatic stress disorder as a result of the Orlando Attack.

534.      Plaintiff Juan Antonetti is a positive, motivated individual who since the Orlando Attack, has tried to use his experiences to educate others on finding peace while enduring negative or difficult situations. On June 12, 2016, Juan went to the Pulse nightclub to enjoy an evening out with friends.

535.      Shortly after his arrival, Omar Mateen entered the nightclub and began shooting. While Juan did not sustain any physical injuries, he has suffered, and will continue to suffer, from numerous mental and emotional injuries. Juan experiences tremendous anxiety, stress, and nervousness both around large crowds, and in normal everyday situations, like while driving. In addition to frequently having trouble sleeping due to the anxiety he continues to feel as a result of the attack, Juan suffers from post traumatic stress disorder.

536.    Plaintiff Francisco G. Pabon Garcia is an ambitious, adventurous student with a passion for traveling in his free time. On June 12, 2016, Francisco went the Pulse nightclub to attend "Latin Night" with his friends.

537.    Shortly after his arrival, Omar Mateen entered the nightclub and began shooting. Francisco did not sustain any physical injuries, but he has suffered, and will continue to suffer, from numerous mental and emotional injuries. Francisco frequently experiences the effects of post traumatic stress disorder, as large crowds and everyday situations cause him to feel nervous, scared, and intense flashbacks to the Orlando Attack. To this day, Francisco continues to experience trouble sleeping, anxiety, and other stresses caused by the Orlando Attack.

538.    Plaintiff Michael Gonzalez is a kindhearted, ambitious, family-oriented athlete who is always exploring and on the go. On June 12, 2016, Michael went the Pulse nightclub to celebrate an evening with friends who were visiting from out of town.

539.    Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. During the Orlando Attack, Michael sustained a gunshot wound to his hand, after which he was hospitalized due to losing a large amount of blood. To this day, Michael continues to experience pain, spasms, and grip issues in his hand as a result of that injury. Additionally, Michael frequently experiencing back pain as a result of the Orlando Attack, as during the attack he was trampled by numerous people.

540.    In addition to his physical injuries, Michael has suffered, and will continue to suffer, from often overwhelming mental and emotional trauma as a result of the Orlando Attack. To this day, Michael continues to feel the effects of post traumatic stress disorder. Michal had a very hard time finding employment, as large crowds of individuals were a

frequent source of stress, anxiety, and flashbacks. Additionally, Michael continues to feel the residual effects of the trauma he experienced during the Orlando Attack on a daily basis, as everyday tasks cause him to feel nervous and anxious.

541.     Plaintiff Marissa Delgado is an outgoing, sassy woman, full of personality who enjoys goofing around and playing pranks on her friends. On June 12, 2016, Marissa went to the Pulse nightclub to enjoy "Latin Night" with her best friend.

542.     Shortly after her arrival, Omar Mateen entered the pulse nightclub and began shooting. Marissa was struck several times. Marissa had to endure a surgery in which she lost half of her liver, and for the rest of her life she will live with a bullet lodged in her liver.  Marissa has suffered, and will continue to suffer, from the painful effects of these gunshot wounds for the rest of her life.

543.     In addition to her physical injuries, Marissa has experienced, and will continue to experience, severe mental and emotional injuries as a result of the Orlando attack. In addition to post traumatic stress disorder, Marissa experiences anxiety, lack of sleep, mood swings, emotional outbursts, and additionally, trouble working or being near large crowds of people.

544.     Plaintiff Christopher Hansen is an encouraging, friendly young man who is passionate about movies, photography, and dedicating his time to teaching others to know their self worth. On June 12, 2016, Christopher went to the Pulse nightclub to meet new people and make friends.

545.     Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Christopher did not sustain any physical injuries during the Orlando Attack, but he has suffered, and will continue to suffer, from numerous mental and emotional

injuries. Christopher frequently experiences the effects of post traumatic stress disorder and depression. Following the Orlando Attack, he has since found it challenging to step back into the real world, as the stress, anxiety, and trauma he experiences on a daily basis as a result of the Orlando Attack keep from living a normal life.

546.     On June 12, 2016, Plaintiff Yvens Carrenard went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting.  Yvens was injured as a result.

547.     On June 12, 2016, Plaintiff Mohammed S. Islam went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting.  Mohammed was injured as a result.

548.     On June 12, 2016, Plaintiff Mercedes A. McQuery went the Pulse nightclub and attended "Latin Night." Shortly after her arrival, Omar Mateen entered the Pulse nightclub and began shooting.  Mercedes was injured as a result.

549.     On June 12, 2016, Plaintiff Jonathan L. Garcia went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting.  Jonathan was injured as a result.

550.     On June 12, 2016, Plaintiff Miguel Vega went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting.  Miguel was injured as a result.

551.     On June 12, 2016, Plaintiff Christian Ortiz-Cardona went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Christian was injured as a result.

552.     On June 12, 2016, Plaintiff Carlos J. Perez Anglero went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Carlos was injured as a result.

553.     On June 12, 2016, Plaintiff Jose M. Diaz went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Jose was injured as a result.

554.     On June 12, 2016, Plaintiff Juan J. Cufino Rodriguez went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Juan was injured as a result.

555.     On June 12, 2016, Plaintiff Chriss Michael West went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Chriss was injured as a result.

556.     On June 12, 2016, Plaintiff Nathan Orozco went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting.  Nathan was injured as a result.

557.     On June 12, 2016, Plaintiff Cassandra Marquez went the Pulse nightclub and attended "Latin Night." Shortly after her arrival, Omar Mateen entered the Pulse nightclub and began shooting. Cassandra was injured as a result.

558.     On June 12, 2016, Plaintiff Demetrius Polanco went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Demetrius was injured as a result.

559.　　　On June 12, 2016, Plaintiff Rolando J. Rodriguez went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Rolando was injured as a result.

560.　　　On June 12, 2016, Plaintiff Jose Pacheco went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Jose was injured as a result.

561.　　　On June 12, 2016, Plaintiff Lizmaryee Finol Viloria went the Pulse nightclub and attended "Latin Night." Shortly after her arrival, Omar Mateen entered the Pulse nightclub and began shooting. Lizmaryee was injured as a result.

562.　　　On June 12, 2016, Plaintiff Maritza Gomez went the Pulse nightclub and attended "Latin Night." Shortly after her arrival, Omar Mateen entered the Pulse nightclub and began shooting. Maritza was injured as a result.

563.　　　On June 12, 2016, Plaintiff Mercedes Garcia went the Pulse nightclub and attended "Latin Night." Shortly after her arrival, Omar Mateen entered the Pulse nightclub and began shooting. Mercedes was injured as a result.

564.　　　On June 12, 2016, Plaintiff Roberto Texidor-Carrasquillo went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Roberto was injured as a result.

565.　　　On June 12, 2016, Plaintiff Yorvis Jose Camargo-Romero went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Yorvis was injured as a result.

566.      On June 12, 2016, Plaintiff Jacobi Ceballo went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Jacobi was injured as a result.

567.      On June 12, 2016, Plaintiff Bettie Lindsey went the Pulse nightclub and attended "Latin Night." Shortly after her arrival, Omar Mateen entered the Pulse nightclub and began shooting. Bettie was injured as a result.

568.      On June 12, 2016, Plaintiff Joseph Negron went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Joseph was injured as a result.

569.      On June 12, 2016, Plaintiff Cory Richards went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting.  Cory was injured as a result.

570.      On June 12, 2016, Plaintiff Nelson Rodriguez went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting.  Nelson was injured as a result.

571.      On June 12, 2016, Plaintiff Mavelyn Merced went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Mavelyn was injured as a result.

572.      On June 12, 2016, Plaintiff Nereida Ribot went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting.  Nereida was injured as a result.

573.     On June 12, 2016, Decedent Antonio Brown went the Pulse nightclub and attended "Latin Night." Shortly after his arrival, Omar Mateen entered the Pulse nightclub and began shooting. Antonio was killed as a result.

## VI.   DEFENDANTS' CONDUCT

### A.   Twitter, Facebook, and Google Profit From Allowing ISIS to Use Their Services

574.     Astonishingly, Defendants routinely profit from ISIS.  Each Defendant places ads on ISIS postings and derives revenue for the ad placement.

575.     These ads are not placed randomly by Defendants.  Instead, they are targeted to the viewer using knowledge about the viewer as well as information about the content being viewed.  The following sites for each Defendant show how targeting works: https://business.Twitter.com/en/targeting.html, https://www.facebook.com/business/a/online-sales/ad-targeting-details, https://static.googleusercontent.com/media/www.youtube.com/en//yt/advertise/medias/pdfs/targeting-onesheeter-en.pdf.

576.      By specifically targeting advertisements based on viewers and content, Defendants are no longer simply passing through the content of third parties. Defendants are themselves creating content because Defendants exercise control over what advertisement to match with an ISIS posting.  Furthermore, Defendants' profits are enhanced by charging advertisers extra for targeting advertisements at viewers based upon knowledge of the viewer and the content being viewed.

### B.   Defendants Knowingly Provided Material Support and Resources to Terrorists, Including ISIS and its Supporters

577.     ISIS's reputation as an organization that has engaged in and continues to engage in terrorist acts is widespread and has been reported in the world news media.

578.     ISIS's designation as a Foreign Terrorist Organization is public knowledge that has likewise been widely reported in the world news media.

579.     At all times relevant to this Complaint, Defendants have known that ISIS is an organization that has engaged in and continues to engage in terrorist activity.

580.     At all times relevant to this Complaint, Defendants have known that ISIS is designated as a Foreign Terrorist Organization.

581.     Despite this knowledge, Defendants have for years knowingly provided its Services to ISIS, its members, organizations owned or controlled by ISIS, and organizations and individuals that provide financing and material support to ISIS, including individuals and organizations that are designated as and SDGTs.

582.     ISIS, its members, and its related entities and affiliates have operated numerous accounts on Defendants' platforms, often using their own names and displaying emblems and symbols associated with ISIS and its related terrorist entities.

583.     ISIS's news and media organizations have operated accounts across each of Defendants' platforms, often including separate accounts for Arabic, French, English and other languages.

584.     Through Defendants' services, Defendants make potential ISIS recruits, ISIS members, and ISIS leaders, available to other ISIS operatives, thus providing personnel to ISIS itself.

585.     Prior to the Orlando Attack, Defendants refused to actively monitor its online social media networks, including Facebook, Twitter, and YouTube, to block ISIS's use of

Defendants' Services. Instead, Defendants knowingly permitted ISIS and ISIS's members and affiliates to use Defendants' platforms and other services, and generally only reviewed ISIS's use of its Services in response to third party complaints.

586.    Even when Defendants have received complaints about ISIS's use of their platforms and other services, despite knowing that ISIS is a designated FTO and that ISIS has engaged in terrorist activity, Defendants have at various times determined that ISIS's use of its Services did not violate Defendants' policies and permitted ISIS-affiliated accounts to remain active, or removed only a portion of the content posted on an ISIS-related account and permitted the account to remain active.

587.    While Defendants suspended or blocked selected ISIS-related accounts at various times, prior to the Orlando Attack, Defendants did not make substantial or sustained efforts to ensure that ISIS would not reestablish the accounts using new identifiers.

588.    Terrorists have used YouTube to promote and support their activities for years.

589.    In 2008, a member of a prominent *jihadi* website forum began to call on Islamist terrorists to begin using Facebook as a tool for terrorism; in making the case for Facebook, the member argued: "We have already had great success in raiding YouTube."[92]

590.    In December 2011, the Middle East Media Research Institute ("MEMRI") issued a report stating that it had determined that: "YouTube has emerged as one of the leading websites for online jihad. It has replaced – and surpassed – web sites administered by the jihadis themselves, which were previously the leaders in online jihadi efforts."

---

[92] Will McCants, "Invading Facebook: Theory and Practice," Jihadica.com (Dec. 17, 2008), http://www.jihadica.com/invading-facebook-theory-and-practice/.

591.     On February 26, 2013, members of the Home Affairs Committee of the U.K. House of Commons questioned Google/YouTube executive Sarah Hunter about *jihadi* terrorists' use of YouTube to promote terrorism, and particularly focused on *al-Qaeda* leader Anwar Al-Awlaki, whose video speeches (known to have inspired multiple terrorist attacks in the West) proliferate on YouTube.

592.     The Google representative admitted that she had seen some of al-Awlaki's videos on YouTube, but acknowledged that Google did not actively guard against terrorists' use of the YouTube platform and services.

593.     Rather, the Google representative testified that Google only reviews a video posted on YouTube if it receives a complaint from a YouTube user, and then Google will decide whether to block or remove the video if a Google reviewer determines that it violates Google's own content policies.

594.     The media has widely reported on terrorists' use of YouTube and Google's refusal to take any meaningful action to stop it.

595.     For example, on July 7, 2014, CBS Local reported that "militants post beheading videos on sites like Google's YouTube, giving an image the chance to go viral before being shut down."[93]

596.     In February 2015, Google announced that it had begun hiring Arabic speakers to serve as "moderators" to review videos posted to YouTube in the event complaints are received about particular posts.

---

[93] "Should Twitter, Facebook Be Held Liable For A Terrorist Attack? (Jul. 24, 2015), http://sanfrancisco.cbslocal.com/2015/07/24/should-twitter-facebook-be-held-liable-for-a-terrorist-attack/.

597.     However, Google reiterated that it would only review a video after a complaint is received, and it would then make a determination to block or delete the video based upon its own content policies.

598.     In some cases, rather than block or remove terrorist videos, Google will place an age restriction on a YouTube video, requiring a viewer to log-in to YouTube and claim to be at least 18 years-of-age before viewing it.

599.     On March 3, 2015, CNN Money reported that Google was placing advertisements in front of ISIS videos posted on YouTube.[94]

600.     On March 10th 2015, DeathandTaxes.com released an article titled, "Beer ads keep showing up on ISIS YouTube videos."[95]

601.     On March 10th 2015, NBC News released an article titled, "Ads Shown Before YouTube ISIS Videos Catch Companies Off-Guard."[96]

602.     On March 11, 2015, NewsMediaRockstars reported that: "Major corporations like Procter and Gamble, Anheuser-Busch, and Toyota have all been forced to make apologies after ads for their products started rolling in front of ISIS recruiting videos which have been cropping up ever more frequently on the [YouTube] site."[97]

---

[94] Laurie Segall, "These ads ran before ISIS videos," CNN Money (Mar. 3, 2015), http://money.cnn.com/2015/03/03/technology/isis-ads-youtube/.

[95] Joe Veix, "Beer ads keep showing up on ISIS YouTube videos," Deathandtaxes.com (Mar. 10, 2015), http://www.deathandtaxesmag.com/239510/beer-ads-keep-showing-up-on-isis-youtube-videos/.

[96] *See* http://www.nbcnews.com/storyline/isis-terror/ads-shown-isis-videos-youtube-catch-companies-guard-n320946.

[97] Evan DiSimone, "Advertisers Apologize For Ads Shown On ISIS YouTube Videos," NewMediaRockstars (Mar. 11, 2015), http://newmediarockstars.com/2015/03/advertisers-apologize-for-ads-shown-on-isis-youtube-videos/.

603.    On April 28, 2015, MusicTechPolicy.com reported that the Islamic State has released a new YouTube video "showcasing recent battles in the Al Sufiyah area of eastern Ramadi. Approximately 30 Iraqi police have been killed and around 100 more have been injured in recent days in the western provincial capital."[98]

604.    On August 6, 2015, Vladimir Platov of New Eastern Outlook reported: "The well-known online video platform YouTube serves as the main media platform of these radical fighters."[99]

605.    In March 2016 the Digital Citizens' Alliance issued a report documenting a number of examples of presidential election campaign ads placed on ISIS videos, including a Ted Cruz ad appearing before a video produced by ISIS's *al-Hayat* Media.[100]

606.    Google derives revenue from ads placed on YouTube, including the ads placed before ISIS videos posted on YouTube.

607.    Google does not place ads on YouTube randomly; rather, they are targeted to the viewer using based upon algorithms that analyze and use data about the ads, the user, and the video posted.[101]

---

[98] Chris Castle, "Live From YouTubeistan: Google Still Providing Material Support for ISIS," MusicTechnologyPolicy.com (Apr. 28, 2015), https://musictechpolicy.com/2015/04/28/live-from-youtubeistan-google-still-providing-material-support-for-isis/.

[99] Vladimir Platov, "Hi-Tech Tools of ISIL Propaganda," New Eastern Outlook (Aug. 6, 2015), http://journal-neo.org/2015/06/08/hi-tech-tools-of-isil-propaganda/.

[100] "Fear, Loathing, and Jihad: How YouTube is pairing the 2016 candidates with the creepy, the corrupt, and the criminal," Digital Citizens' Alliance (Mar. 2016), https://media.gractions.com/314A5A5A9ABBBBC5E3BD824CF47C46EF4B9D3A76/cbb90db1-b1aa-4b29-a4d5-5d6453acc2cd.pdf.

[101] *See* Google's description of targeted ads on YouTube at: https://static.googleusercontent.com/media/www.youtube.com/en//yt/advertise/medias/pdfs/targeting-onesheeter-en.pdf.

608.     By specifically targeting advertisements based on viewers and content, Google is no longer simply passing through the content of third parties; rather, Google is itself creating content because it exercises control over what advertisement to match with an ISIS video posting on YouTube.

609.     Moreover, Google's revenue is enhanced by charging advertisers extra for placing targeted advertisements.

610.     In addition, Google agrees to shares a percentage of the revenue it generates from ads placed before YouTube videos with the user who posts the video.

611.     In order for ads to appear associated with a YouTube video, the poster must create a Google "AdSense" account and register the account for "monetization."

612.     According to Google, each video must be reviewed and approved by Google before Google will permit ads to be placed with that video.

613.     Google represents that videos must meet Google's policies and terms before they will be approved for ads.

614.     Upon information and belief, Google has reviewed and approved ISIS videos, including videos posted by ISIS-affiliated users, for "monetization" through Google's placement of ads in connection with those videos.

615.     Upon information and belief, by thus approving ISIS videos, including videos by posted by ISIS-affiliated users, Google has agreed to share with ISIS and ISIS-affiliated users a percentage of revenues generated by these ads.

616.     Google uses the AdSense monetization program to earn revenue, and as an incentive to encourage users to post videos on YouTube.

617.     By approving ISIS videos for monetization via AdSense, Google has provided a financial incentive and encouraged ISIS to post videos on You Tube.

618.     The following is a screen shot example of Google placing targeted ads in conjunction with an ISIS video on YouTube. The video was created by ISIS and was posted by ISIS using a known ISIS account. On information and belief, the poster complied with YouTube's terms and conditions, as did YouTube. Thus, YouTube shared revenue with ISIS, the creator and poster of the video in violation of 18 U.S.C. §§ 2339A-B. By providing financial support to ISIS, Google contributed to the Orlando attack.



*Figure 54 Screenshot Example of Ads on YouTube*

619.     Given that ad placement on videos requires Google's specific approval of the video according to Google's terms and conditions, any video which is associated with

advertising has been approved by Google.

620.　　　Because ads appear on the above video posted by ISIS, this means that Google specifically approved the video for monetization, Google earned revenue from each view of this video, and Google shared the revenue with ISIS.  As a result, Google provides material support to ISIS.

621.　　　Twitter also profits from material posted by ISIS by routinely placing ads.  For example, a view of the account of "DJ Nasheed" on May 17, 2016, shows that Twitter placed an ad for OneNorth for their "M.E.A.N. Stack" offering.  As such, Twitter provides material support to ISIS and is compensated for the effort.



*Figure 55 ISIS post on Twitter with ad placed by Twitter*

622.　　　Facebook also profits from ISIS postings.   On May 31, 2016, the following screenshot was collected:



*Figure 56 ISIS post on Facebook with add placed by Facebook*

623.     As such, Facebook provides material support to ISIS and is compensated for the effort.

624.     Thus, not only does each Defendant provide material support to ISIS by allowing ISIS to make use of their social media sites, each Defendant derives revenue from ISIS postings irrespective of the content of ISIS's postings.

## C.     Defendants Are Information Content Providers

625.     When individuals look at a page on one of Defendants' sites that contains postings and advertisements, that configuration has been created by Defendants. In other words, a viewer does not simply see a posting; nor does the viewer see just an advertisement. Defendants create a composite page of content from multiple sources.

626.     Defendants create this page by selecting which advertisement to match with the content on the page. This selection is done by Defendants' proprietary algorithms that select the advertisement based on information about the viewer and the content being. Thus there is a content triangle matching the postings, advertisements, and viewers.

627.     Although Defendants have not created the posting, nor have they created the advertisement, Defendants have created new unique content by choosing which advertisement to combine with the posting with knowledge about the viewer.

628.     For example, Google also recommends content to users based upon the content and what is known about the viewer.[102] Google has recommended ISIS videos to users. Targeting content to users is not a traditional publishing function. By recommended ISIS videos to users, Google assists ISIS in spreading its message and thus provides material support to ISIS. The image below shows a video that was recommended to a user based upon other videos he had viewed in the past.[103] On information and belief, this is a common occurrence.

---

[102] *See* "How YouTube's Suggested Videos Work," *YouTube Creator Academy* (Aug. 30, 2017), https://www.youtube.com/watch?v=E6pC6iql5xM.

[103] Personal email from Eric Feinberg to Keith Altman dated October 29, 2016.



*Figure 57 Screen clip from Google*

629.    In addition, by specifically targeting advertisements based on viewers and content, Defendants are no longer simply passing through the content of third parties; rather, Defendants are themselves creating and developing content because they exercise control over what advertisement to match with an ISIS posting.

630.    When individuals look at a page that contains postings and advertisements, that configuration has been created and developed by Defendants. In other words, a viewer does not simply see the posted content; nor does the viewer see just an advertisement. Rather, Defendants create and develop a composite page of content from multiple sources.

631.    Defendants create and develop this page by selecting which advertisement to match with the posting on the page through its proprietary algorithms that select the advertisement based on information about the viewer and the posting. Thus there is a content triangle matching the videos, advertisements, and viewers.

632.     As discussed above, Defendants tout the ability to target advertisements as a benefit to advertising with the respective networks. Furthermore, Defendants extract a premium from advertisers for the use of targeted advertising. The ability to target advertising based upon what is known about the viewer and what the viewer is looking at is not a traditional publishing function and did not exist until long after 1996.

633.     Although Defendants have not created the posted content, nor has it created the advertisement, Defendants have created new unique content and developed the content by choosing which advertisement to combine with the posted video with knowledge about the viewer.

634.     Thus, Defendants' active involvement in combining certain advertisements with certain postings for specific viewers means that Defendants are not simply passing along content created by third parties; rather, Defendants have incorporated ISIS postings along with advertisements matched to the viewer to create new content for which Defendants earn revenue, and thus providing material support to ISIS.

## D.     Defendants' Platforms and Other Services are Unique

635.     Defendants' platforms and other services are provided to users via Defendants' unique computer architecture.

636.     Whenever a Twitter, Facebook, or YouTube user posts content on Twitter, Facebook, or YouTube, Defendants' computer servers receive the information and distribute it to the Twitter, Facebook, or YouTube user's network of Twitter "followers," Facebook "friends," or YouTube channel "subscribers."

637.     The posted content also appears on Twitter's "Timeline," Facebook's "Newsfeed," or the YouTube user's YouTube channel page, and is available via Twitter,

Facebook, or YouTube's platforms and search engines on the Internet, depending upon the user's privacy settings.

638.     The video and other information that is input by a Twitter, Facebook, or YouTube user into Twitter, Facebook, or YouTube is also stored on Defendants' computer equipment as well as on Defendants' backup storage equipment.

639.     Twitter, Facebook, and YouTube users' content, videos, and other information are hosted on Defendants' computer equipment.

640.     Defendants enable users to connect and communicate with "followers," "friends," "subscribers," or with others via posts that can be in the form of a short message, a photo with a caption, sharing a web link or a news article from another website, or linking to other social media platforms.

641.     Defendants' platforms' users also "like" and "share" others' videos, thereby exposing these videos to new networks of viewers.

642.     Defendants use computer algorithms to match content, videos, and accounts with similarities, so that similar Twitter, Facebook, or YouTube content, videos and accounts are suggested to a user or viewer when viewing a Twitter, Facebook, or YouTube account; in this way, users are able to locate other videos and accounts related to ISIS even if they do not know the correct identifier or if the original Twitter, Facebook, or YouTube account has been replaced by a new identifier.

643.     Effectively, Defendants serve as a broker or matchmaker between like-minded people, introducing users to other users and videos that they will be interested in based on the video and account information and characteristics; these types of suggestions appear

on the side margin of the user's Twitter, Facebook, or YouTube page, and in the case of YouTube, even automatically load and play when a selected video ends.

644.     By providing Twitter, Facebook, and Google's YouTube platforms and other services to ISIS, Defendants are providing to ISIS use of unique computer architecture, computer servers, storage and communication equipment, highly-developed and sophisticated algorithms, and services that facilitate ISIS's ability to reach and engage audiences it could not otherwise reach as effectively.

645.     As discussed above, Twitter, Facebook, and YouTube's usefulness to ISIS is not merely about content; ISIS uses Twitter, Facebook, and YouTube as tools to connect with others and promote its terrorist activity.

**E.     Defendants Can Deny Services to ISIS But Refused to Do So**

646.     Defendants have tools by which it can identify, flag, review, and remove ISIS accounts.

647.     In a January 2011 blog post entitled "The tweets Must Flow," Twitter co-founder Biz Stone and Twitter General Counsel Alex Macgillivray wrote: "We don't always agree with the things people choose to tweet, but we keep the information flowing irrespective of any view we may have about the content."

648.     On June 20, 2014, Twitter founder Biz Stone, responding to media questions about ISIS's use of Twitter to publicize its acts of terrorism, said, "[i]f you want to create a platform that allows for the freedom of expression for hundreds of millions of people around the world, you really have to take the good with the bad."

649.     In September 2014, Twitter spokesperson Nu Wexler reiterated Twitter's hands-off approach, telling the press, "Twitter users around the world send approximately 500

million tweets each day, and we do not monitor them proactively." "The Twitter Rules" reiterated that Twitter "do[es] not actively monitor and will not censor user content, except in exceptional circumstances." In February 2015, Twitter confirmed that it does not proactively monitor content and that it reviews only that content which is reported by other users as violating its rules.

650.     Most technology experts agree that Defendants could and should be doing more to stop ISIS from using its social network. "When Twitter says, 'We can't do this,' I don't believe that," said Hany Farid, chairman of the computer science department at Dartmouth College. Mr. Farid, who co-developed a child pornography tracking system with Microsoft, says that the same technology could be applied to terror content, so long as companies were motivated to do so. "There's no fundamental technology or engineering limitation," he said. "This is a business or policy decision. Unless the companies have decided that they just can't be bothered."

651.     According to Rita Katz, the director of SITE Intelligence Group, "Twitter is not doing enough. With the technology Twitter has, they can immediately stop these accounts, but they have done nothing to stop the dissemination and recruitment of lone wolf terrorists."

652.     Even when Defendants shut down an ISIS-linked account, they do nothing to stop it from springing right back up. According to the New York Times, the Twitter account of the pro- ISIS group Asawitiri Media has had 335 accounts. When its account @TurMedia333 was shut down, it started @TurMedia334. When that was shut down, it started @TurMedia335. This "naming convention — adding one digit to a new account after the last one is suspended — does not seem as if it would require artificial

intelligence to spot." Each of these accounts also used the same user photograph of a bearded man's face over and over again. In the hours after the shooting attack in San Bernardino, California on December 2, 2015, @TurMedia335 tweeted: "California, we have already arrived with our soldiers. Decide how to be your end, with knife or bomb."

653.     Using this simplistic naming scheme is critical to ISIS's use of social media. Without a common prefix, it would be difficult for followers of ISIS accounts to know the new name of the account.

654.     Because of the simplistic renaming scheme, Defendants could easily detect names that are likely to be replacement accounts and delete them almost as soon as they are created.   Yet Defendants have failed to implement such a basic account detection methodology.

655.     Furthermore, ISIS keeps track of the followers of each account.  Once an account is deleted by one of the Defendants and then regenerated, ISIS uses a bot to contact each of its followers asking them to connect.  This allows ISIS to reconstitute the connections for each account very quickly.  Defendants could easily detect such activity but chose not to.

656.     Although Defendants proclaim that they do take accounts down including those of ISIS, Defendants do nothing to keep those accounts down.  ISIS and other nefarious groups are dependent upon having a social media network from which to collect money and conduct terrorist operations including recruitment and radicalization.

657.     The following example illustrates how Defendants allow ISIS to quickly construct networks of followers.  Below is a posting from Twitter captured on June 20, 2016.  The individual is named "DriftOne00146" and he proudly proclaims that this is

the 146th version of his account.  With only 11 tweets, this individual is followed by 349 followers.  This is very suspicious activity.



*Figure 58 DriftOne00146 posting 06/20/2016*

658.        The very next day, this individual now has 547 followers with only 3 additional tweets.



*Figure 59 DriftOne00146 posting June 21, 2016*

659.     The next morning, this individual's account was taken down by Twitter.  That

afternoon, he was back up as DriftOne0147 with 80 followers.



*Figure 60 DriftOne0147 posting June 22, 2016*

660.     The very next week on June 28, 2016, the same individual was back up as DriftOne150.  Most disturbing is that his posting of #Bangladesh and #Dhaka just three days before the unfortunate ISIS attack in Dhaka, Bangladesh.



*Figure 61 DriftOne150 posting June 28, 2016*

661.    The day after the attacks, he is now DriftOne0151 and he posts pictures of those

individuals who conducted the attacks.



*Figure 62 DriftOne0151 posting July 2, 2016*

662.     What the above example clearly demonstrates is that there is a pattern that is easily detectable without reference to the content.  As such, a content-neutral algorithm could be easily developed that would prohibit the above behavior.  First, there is a text prefix to the username that contains a numerical suffix.  When an account is taken down by a Defendant, assuredly all such names are tracked by Defendants.  It would be trivial to detect names that appear to have the same name root with a numerical suffix which is incremented.  By limiting the ability to simply create a new account by incrementing a numerical suffix to one which has been deleted, this will disrupt the ability of individuals and organizations from using Defendants networks as an instrument for conducting terrorist operations.

663.     Prohibiting this conduct would be simple for Defendants to implement and not impinge upon the utility of Defendants sites.   There is no legitimate purpose for

allowing the use of fixed prefix/incremental numerical suffix names.  Preventing the use of these names once a similarly named account would not place a significant burden on Defendants to implement nor would it place any "chilling" effect on the use of Defendants' sites.

664.     Sending out large numbers of requests to connect with friends/followers from a newly created account is also suspicious activity.  As shown in the "DriftOne" example above, it is clear that this individual must be keeping track of those previously connected.  When an account is taken down and then re-established, the individual then uses an automated method to send out requests to all those members previously connected.  Thus, accounts for ISIS and others can quickly reconstitute after being deleted.  Such activity is suspicious on its face.

665.     Clearly, it is not normal activity for a newly created account to send out large numbers of requests for friends and followers immediately after creation.  It is further unusual for those connections requests to be accepted in a very short period of time.  As such, this activity would be easy to detect and could be prohibited by Defendants in a content-neutral manner as the content is never considered; only the conduct.

666.     Furthermore, limiting the rapidity with which a newly created account can send requests to friends/followers would not place a significant burden on Defendants to implement.  Once again, such activity is suspicious and suggestive of reconstitution of an account which was deleted by Defendants.  In addition, Defendants could easily track that a newly created account similarly named to one previously taken down is sending out large numbers of requests in a very short period of time.

667.     Because the suspicious activity used by ISIS and other nefarious organizations

engaged in illegal activities is easily detectable and preventable and that Defendants are fully aware that these organizations are using their networks to engage in illegal activity demonstrates that Defendants are acting knowingly and recklessly allowing such illegal conduct.  ISIS is dependent on using social media to conduct its terrorist operations. Limiting ISIS's ability to rapidly connect and reconnect to supports Thus, Defendants knowing and reckless conduct provides materials support to ISIS and other nefarious organizations.

668.     Notably, while Twitter has now put in place a rule that supposedly prohibits "threats of violence . . . including threatening or promoting terrorism," many ISIS-themed accounts are still easily found on Twitter.com.  To this day, Twitter also permits groups designated by the U.S. government as Foreign Terrorist Organizations to maintain official accounts, including Hamas (@hamasinfo and @HamasInfoEn) and Hizbollah (@almanarnews).

669.     On November 17, 2015, the hacking group Anonymous took down several thousand ISIS Twitter accounts.  That an external third party could identify and disrupt ISIS Twitter accounts confirms that Twitter itself could have prevented or substantially limited ISIS's use of Twitter.

670.     Although YouTube proclaims that it deletes accounts of those who run afoul of its policies, YouTube allows these accounts to be quickly regenerated.  This account regeneration leaves signatures which could be easily detected by YouTube in a content independent manner.  That YouTube allows ISIS to quickly regenerate deleted accounts when this practice could be eliminated or severely limited provides further evidence that YouTube provides material support to ISIS.

671.    In August 2016, after a 12-month inquiry on countering extremism that included testimony from Google and other social media company executives, the U.K. House of Commons' Home Affairs Committee issued a report titled "Radicalisation: the counter-narrative and identifying the tipping point." ("U.K. Report").[104]

672.    In the 2016 U.K. Report, the Home Affairs Committee found that:

> "The use of the internet to promote radicalisation and terrorism is one of the greatest threats that countries . . . face.
> …
> Social media companies are consciously failing to combat the use of their sites to promote terrorism and killings. Networks like Facebook, Twitter and YouTube are the vehicle of choice in spreading propaganda and they have become the recruiting platforms for terrorism. They must accept that the hundreds of millions in revenues generated from billions of people using their products needs to be accompanied by a greater sense of responsibility and ownership for the impact that extremist material on their sites is having. There must be a zero tolerance approach to online extremism, including enticement to join extremist groups or commit attacks of terror and any glorification of such activities… These companies are hiding behind their supranational legal status to pass the parcel of responsibility and refusing to act responsibly in case they damage their brands."[105]

## VII.    The Orlando Attack Was An Act of International Terrorism

673.    One of the stated goals of ISIS is to use social media, including Defendants platforms, to radicalize individuals to conduct attacks throughout the world, including the United States.

674.    By radicalizing individuals through social media, this allowed ISIS to exert its influence without the necessity of direct physical contact with these individuals.

---

[104] Home Affairs Committee, "Radicalisation: the counter-narrative and identifying the tipping point," House of Commons (Aug. 25, 2016), http://www.publications.parliament.uk/pa/cm201617/cmselect/cmhaff/135/135.pdf.

[105] *Id.* at 11, 13-14 (original in bold).

Furthermore, this allows ISIS to incite or participate in attacks without the necessity of sending its own operatives.

675.     Thus, an attack in the United States to which ISIS's use of social media caused or contributed is an action by ISIS.  Given that ISIS has been declared an international terrorist organization, such an action is an act of international terrorism.

676.     Omar Mateen was radicalized by ISIS's use of social media.  This was the stated goal of ISIS.  Omar Mateen then carried out the deadly attack in Orlando.  Conducting terrorist acts via radicalized individuals is a stated goal of ISIS.

677.     Mateen's attack on the Pulse nightclub was a violent act causing death and injury and constitutes numerous criminal acts under the laws of the United States.

678.     ISIS intended to intimidate and coerce United States' populations and governments through a pattern of intimidation and coercion as discussed throughout Plaintiffs' Complaint.

679.     ISIS acts from outside the United States using Defendants' platforms in a manner that transcends national boundaries because of the international usage of Defendants' platforms.

680.     But for ISIS's postings using Defendants' social media platforms, Mateen would not have engaged in his Orlando Attack.

681.     Mateen's terrorist actions were a direct result of ISIS's actions and given that ISIS is an international terrorist organization, Mateen's actions were also an act of international terrorism.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## LIABILITY FOR AIDING AND ABETTING
## ACTS OF INTERNATIONAL TERRORISM
## PURSUANT TO 18 U.S.C. § 2333(a) and (d)

682.    Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

683.    Since 2004, ISIS has been and continues to be, a designated foreign terrorist organization under section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

684.    ISIS has committed, planned, or authorized activities that involved violence or acts dangerous to human life that are a violation of the criminal laws of the United States, or that would be a criminal violation if committed within the jurisdiction of the United States, including *inter alia* the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

685.    These activities committed, planned, or authorized by ISIS appear to have been, and were intended to: (a) intimidate or coerce the civilian populations of the United States and other countries; (b) influence the policy of the Governments of the United States and other countries by intimidation or coercion; or (c) affect the conduct of the Governments of the United States and other countries by mass destruction, assassination, or kidnapping.

686.    These activities committed, planned, or authorized by ISIS occurred entirely or primarily outside of the territorial jurisdiction of the United States and constituted acts of international terrorism as defined in 18 U.S.C. § 2331(1).

687.    Plaintiffs have been injured in their person by reason of the acts of international terrorism committed, planned, or authorized by ISIS.

688.     At all times relevant to this action, Defendants knew that ISIS was a Foreign Terrorist Organization, that it had engaged in and continued to engage in illegal acts of terrorism, including international terrorism.

689.     Defendants knowingly provided substantial assistance and encouragement to ISIS, and thus aided and abetted ISIS in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured Plaintiffs.

690.     By aiding and abetting ISIS in committing, planning, or authorizing acts of international terrorism, including acts that caused each of the Plaintiffs to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

## SECOND CLAIM FOR RELIEF

### LIABILITY FOR CONSPIRING IN FURTHERANCE OF ACTS OF INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a) and (d)

691.     Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

692.     Defendants knowingly agreed, licensed, and permitted ISIS and its affiliates to register and use Defendants' sites and other services to promote and carry out ISIS's activities, including ISIS's illegal acts of international terrorism that injured Plaintiffs.

693.     Defendants were aware that U.S. federal law prohibited providing material support and resources to, or engaging in transactions with, designated foreign terrorist organizations and other specially designated terrorists.

694. Defendants thus conspired with ISIS in its illegal provision of Defendants' sites and equipment to promote and carry out ISIS's illegal acts of international terrorism, including the acts that injured Plaintiffs.

695. By conspiring with ISIS in furtherance of ISIS's committing, planning, or authorizing acts of international terrorism, including acts that caused each of the Plaintiffs to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

## THIRD CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333

696. Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

697. The online social media platform and communication services which Defendants knowingly provided to ISIS, including the use of Defendants' services, computers, and communications equipment, substantially assisted ISIS in carrying out its terrorist activities, including recruiting, radicalizing, and instructing terrorists, raising funds, creating fear and carrying out attacks, among other things.

698. Through their actions, Defendants have also provided personnel to ISIS by making ISIS leaders, members, and potential new recruits available to each other and to ISIS.

699. These services, equipment, and personnel constituted material support and resources pursuant to 18 U.S.C. § 2339A, and they facilitated acts of terrorism in violation of 18 U.S.C. § 2332 that caused the injuries to Plaintiffs.

700.     Defendants provided these services, equipment, and personnel to ISIS, knowing that they were to be used in preparation for, or in carrying out, criminal acts including the acts that injured the Plaintiffs.

701.     As set forth more fully above, but for the material support and resources provided by Defendants, the attack that injured the Plaintiffs would have been substantially more difficult to implement.

702.     By committing violations of 18 U.S.C. § 2339A that have caused the Plaintiffs to be injured in his or her person, business or property, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

### FOURTH CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT AND RESOURCES TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

703.     Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

704.     By knowingly (or with willful blindness) providing their social media platforms and communication services, including use of computer and communications equipment, and personnel, for the benefit of ISIS, Defendants have provided material support and resources to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

705.     Defendants knew of (or were willfully blind to) ISIS's terrorist activities.

706.     Defendants knew (or were willfully blind to the fact) that ISIS had been designated a Foreign Terrorist Organization by the United States Government.

707.    The Services and support that Defendants purposefully, knowingly or with willful blindness provided to ISIS constitute material support to the preparation and carrying out of acts of international terrorism, including the attack in which the Plaintiffs were injured.

708.    Defendants' violation of 18 U.S.C. § 2339B proximately caused the damages to Plaintiffs described herein.

709.    By knowingly (or with willful blindness) providing material support to a designated Foreign Terrorist Organization, Defendants are therefore civilly liable for damages to Plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

710.    Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

711.    Defendants engaged in negligent behavior by providing services to ISIS.

712.    Defendants' acts of providing services to ISIS constituted a willful violation of federal statutes, and thus amounted to a willful violation of a statutory standard.

713.    As a direct, foreseeable and proximate result of the conduct of Defendants as alleged hereinabove, Plaintiffs has suffered severe emotional distress, and therefore Defendants are liable to the Plaintiffs for Plaintiffs' severe emotional distress and related damages.

## SIXTH CLAIM FOR RELIEF

## CONCEALMENT OF MATERIAL SUPPORT AND RESOURCES TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2339C(c) AND 18 U.S.C. § 2333(a)

714.    Plaintiffs repeat and re-allege each and every allegation of the foregoing

paragraphs as if fully set forth herein.

715.    By knowingly concealing or disguising the nature, location, source, ownership, or control of material support or resources, knowing that the material support or resources were provided to ISIS in violation of 18 U.S.C. § 2339B, Defendants violated 18 U.S.C. § 2339C(c).

716.    By concealing such material support and resources, Defendants enabled and prolonged ISIS's use of such material support and resources to carry out terrorist activities, including the acts of international terrorism that injured Plaintiffs.

717.    Defendants' violation of 18 U.S.C. § 2339C(c) proximately caused the injuries to Plaintiffs described herein.

718.    By knowingly concealing material support or resources as described herein, Defendants are therefore civilly liable for damages to Plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

### SEVENTH CLAIM FOR RELIEF

### PROVISION OF FUNDS, GOODS, OR SERVICES TO OR FOR THE BENEFIT OF SPECIALLY DESIGNATED GLOBAL TERRORISTS IN VIOLATION OF EXECUTIVE ORDER NO. 13224, 31 C.F.R. Part 594, 50 U.S.C. § 1705, AND 18 U.S.C. § 2333(a)

719.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

720.    Defendants knowingly and willfully engaged in transactions with, and provided funds, goods, or services to or for the benefit of, Specially Designated Global Terrorists ("SDGTs"), including ISIS, its leaders, and members, in violation of EO 13224, 31 C.F.R. Part 594, and 50 U.S.C. § 1705.

721.    The actions of Defendants constituted acts of international terrorism as defined

in 18 U.S.C. § 2331, and proximately caused Plaintiffs' injuries.

722.     Defendants are liable pursuant to 18 U.S.C. § 2333(a) for any and all damages

that Plaintiffs have sustained as a result of such injuries.

## EIGHTH CLAIM FOR RELIEF

## WRONGFUL DEATH

723.     Plaintiffs repeat and re-allege each and every allegation of the foregoing

paragraphs as if fully set forth herein.

724.     Each of the Defendants provides services to ISIS that, among other things,

substantially assist and contribute to ISIS's ability to carry out its terrorist activities.

725.     As set for more fully above, but for the assistance provided by the Defendants,

the terrorist attack that killed each of the Plaintiffs' Decedents herein, would have been

substantially more difficult to implement.

726.     The conduct of each Defendant party was unreasonable and outrageous and

exceeds the bounds usually tolerated by decent society, and was done willfully,

maliciously and deliberately, or with reckless indifference to the life of the victims of

ISIS's terrorist activity, Plaintiffs herein.

727.     The conduct of each Defendant was a direct, foreseeable and proximate cause of

the wrongful deaths of each of the Plaintiffs' Decedents and therefore the Defendants

are liable to Plaintiffs for their wrongful deaths.

728.     Each of the Defendants' actions were undertaken willfully, wantonly,

maliciously and in reckless disregard for Plaintiffs' rights, and as a direct, foreseeable

and proximate result thereof, Plaintiffs suffered economic and emotional damage in a

total amount to be proven at trial. Therefore, Plaintiffs seek punitive damages in an

amount sufficient to deter Defendants from similar future wrongful conduct.

729.     At all times material, Defendants' wrongful conduct, acts, and omissions, as described herein, increased the risk of harm and caused Plaintiff decedent's wrongful death.

730.     As a direct and proximate result of the misconduct of Defendants, decedents died, and Defendants are responsible for their death and damages as set forth below:

  A.  The survivors of LUIS OMAR OCASIO-CAPO, ANTHONY LUIS LAUREANO DISLA, ANGEL CANDELARIO PADRO, ERIC IVAN ORTIZ RIVERA, LEROY VALENTIN FERNANDEZ, and FRANKY JIMMY DEJESUS VALASQUEZ have incurred past and future loss of support and services.

  B.  The Estates of LUIS OMAR OCASIO-CAPO, ANTHONY LUIS LAUREANO DISLA, ANGEL CANDELARIO PADRO, ERIC IVAN ORTIZ RIVERA, LEROY VALENTIN FERNANDEZ, and FRANKY JIMMY DEJESUS VALASQUEZ have lost prospective net accumulations and have incurred medical and funeral expenses due to their injuries and death.

WHEREFORE, Plaintiffs, personal representatives of the Estates of Decedents, for the benefit of her Estates and her statutory survivors, demand judgment against Defendants for all damages allowed by law including compensatory and punitive damages and costs, and for such other relief this Court deems appropriate and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     Enter judgment against Defendants and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial;

(b)     Enter judgment against Defendants and in favor of each Plaintiff for treble damages pursuant to 18 U.S.C. § 2333;

(c)     Enter judgment against Defendants and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

(d)     Enter an Order declaring that Defendants have violated, and are continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

(e)     Grant such other and further relief as justice requires.

## JURY DEMAND

### PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: July 10, 2018.


**Excolo Law, PLLC**


by:____/s/ Michael T. Gibson_____
        Michael Gibson

2420 Lakemont Ave, #150
Orlando, FL 32814
407-422-4529
Email: michael@gibsonjustice.com


Excolo Law, PLLC
Keith Altman (*pro hac vice*)
Solomon Radner (*pro hac vice to be applied for*)
26700 Lahser Road, Suite 401
Southfield, MI 48033
516-456-5885
Email: kaltman@excololaw.com
        sradner@excololaw.com.com

**1-800-LAWFIRM**
Ari Kresch (*pro hac vice to be applied for*)
26700 Lahser Road, Suite 401
Southfield, MI 48033
516-456-5885
800-LawFirm
Email: akresch@1800lawfirm.com